# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI

FANNIE MAE, )
       )
     Plaintiff, )
       )
     v. )     Case No. 5:24-cv-06053-JAM
       )
ORON ZARUM )
       )
     Defendant. )
       )

## AFFIDAVIT OF JAMES NOAKES IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT <u>JUDGMENT AGAINST ORON ZARUM</u>

STATE OF TEXAS     )
                  ) ss.
COUNTY OF COLLIN  )

JAMES NOAKES, being duly sworn, of lawful age and sound mind, states as follows:

1. I am competent to testify in this matter and have personal knowledge of the facts set forth herein.

2. I am a Senior Asset Manager with Fannie Mae. Part of my job duties at Fannie Mae include coordinating Fannie Mae's efforts in enforcing promissory notes held by Fannie Mae. One such promissory note for which I have been responsible includes the promissory note executed by APEX Brittany MO LP and the guaranty executed by Defendant Oron Zarum ("Defendant") described in more detail herein.

3. I have personally reviewed the documents evidencing these debt obligations and am generally familiar with their contents. I am also the records custodian for these documents.

4. I have reviewed the documents submitted with Fannie Mae's complaint and can attest that they are true and accurate copies of the documents in Fannie Mae's possession, custody and control.

CORE/0772514.0056/190472260.1

Fannie Mae Confidential

5. The documents described in the complaint are kept and maintained by me in the ordinary course and scope of my employment with Fannie Mae.

6. My knowledge of the background facts in this matter comes from my review of these documents.

7. On or about August 16, 2019, the Borrower APEX Brittany MO LP (the "Borrower") executed a Multifamily Note in favor of Lument Real Estate Capital, LLC a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC) ("Original Lender"), evidencing a loan made by the Original Lender to the Borrower in the original principal amount of $7,704,000.00 (the "Note"). A true and correct copy of the Note is attached hereto and marked as **Exhibit A**.

8. In conjunction with the execution of the Note, the Borrower executed a Multifamily Loan and Security Agreement in favor of Original Lender (the "Loan Agreement"). A true and correct copy of the Loan Agreement is attached hereto and marked as **Exhibit B**.

9. To secure repayment of the amounts owing under the Note, the Borrower executed a Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 16, 2019 ("Deed of Trust"), granting the Original Lender a first priority lien on, *inter alia*, the real property located at 1601 N 36th St., Saint Joseph, MO 64506 (the "Real Estate") and certain personal property of the Borrower (the "Personal Property") more fully described in the Deed of Trust (the Personal Property together with the Real Estate, collectively the "Collateral"). A true and correct copy of the Deed of Trust is attached hereto and marked as **Exhibit C**.

10. On August 16, 2019, Defendant executed a Guaranty of Non-Recourse Obligations (the "Guaranty") guaranteeing all obligations owed by Borrower to Original Lender. A true and

2

Fannie Mae Confidential

correct copy of the Guaranty is attached hereto and marked as **Exhibit D**.

11. On August 16, 2019, Original Lender executed an endorsement to the Note (the "Endorsement") which assigned the rights and payments due under the Note to Fannie Mae without recourse. A true and correct copy of the Endorsement is attached to **Exhibit A**.

12. The Deed of Trust was assigned by Original Lender to Fannie Mae on August 16, 2019 by virtue of an Assignment of Security Instrument (the "Assignment"). A true and correct copy of the Assignment is attached hereto and marked as **Exhibit E**.

13. On April 20, 2023, Fannie Mae executed an Appointment of Successor Trustee (the "Appointment") to appoint SMF Registered Services (the "Successor Trustee") as successor trustee under the Deed of Trust. A true and correct copy of the Appointment is attached hereto and marked as **Exhibit F**.

14. The Note, the Loan Agreement, the Deed of Trust, and Guaranty are hereinafter referred to as the "Loan Documents."

15. The loan evidenced by the Note is a commercial loan.

16. Fannie Mae is the lawful holder of the Loan Documents and is legally owed all obligations thereunder.

17. Pursuant to the Loan Agreement, the Borrower shall not "have personal liability under this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of any other Loan Document." Loan Agreement, Ex. B, Section 3.01. However, the Borrower "shall be personally liable" for the full indebtedness under the Loan Agreement if a Bankruptcy Event occurs. *Id*. at Section 3.02(b)(3).

18. Bankruptcy Event is defined as, in relevant part,

      a.     the commencement, filing or continuation of a voluntary case or proceeding

CORE/0772514.0056/190472260.1

Fannie Mae Confidential

under one or more of the Insolvency Laws[1] by Borrower.

       Loan Agreement, Ex. B, Schedule 1.

19. Under Section 14.02(a) of the Loan Agreement, "the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender."

20. Pursuant to the Loan Documents, Oron Zarum agreed to pay attorneys' fees and collection costs incurred by Fannie Mae in collecting the Indebtedness and in enforcing Fannie Mae's rights and remedies under the Loan Documents.

21. On January 12, 2023, Original Lender, as servicer, sent Borrower a Notice of Demand (the "First Demand Notice"), notifying Borrower of its failure to maintain the Real Estate pursuant to Section 6 of the Loan Agreement and demanding that Borrower perform, within the dates listed in the Demand Notice, the Additional Fannie Mae Repairs and Additional Fannie Mae Replacements (collectively, the "Required Repairs") listed in the Demand Notice and Property Condition Assessment ("PCA") performed on December 31, 2022 by Armada Analytics, Inc. and provide evidence of completion to servicer, and that Borrower, within thirty days, deposit with Original Lender, on behalf of Fannie Mae, the amount of $1,313,330.00 to cover the costs of the Additional Fannie Mae Repairs and Additional Fannie Mae Replacements. A true and correct copy of the First Demand Notice is attached hereto and marked as **Exhibit G**.

22. On February 13, 2023, counsel for Fannie Mae sent the Borrower a Notice of Acceleration of Indebtedness and Demand for Payment, notifying the Borrower of its failure to comply with the First Demand Notice, that it was in default under the Loan Documents and that the indebtedness under the Note was accelerated and all amounts were immediately due and owing,

---

[1] Insolvency Laws include the United States Bankruptcy Code. Loan Agreement, Ex. B, Schedule 1.

CORE/0772514.0056/190472260.1

Fannie Mae Confidential

and demanded payment (the "Second Demand Notice"). A true and correct copy of the Second Demand Notice is attached hereto and marked as **Exhibit H**.

23. On March 24, 2023, Fannie Mae filed its Verified Petition and Emergency Motion for Appointment of Receiver in the Circuit Court for Buchanan County, Missouri. [Case No. 23BU-CC00481]. This action was removed to the U.S. District Court for the Western District of Missouri on April 11, 2023, and an order was entered on April 26, 2023, granting the appointment of a receiver over Borrower (the "Receivership Order"). [Dkt. No. 15, Case No. 5:23-cv-06050-SRB]. A true and correct copy of the Receivership Order is attached hereto and marked as **Exhibit I**.

24. Pursuant to the Receivership Order, the receiver had the "sole authority and power to file a voluntary petition under Title 11 of the United States Code." Receivership Order, Ex. 1, Section (B)(5)(e). Additionally, the Borrower was enjoined from filing a voluntary petition under Title 11 of the United States Code. *Id.* at Section (C)(9).

25. On September 15, 2023, Borrower filed a Chapter 11 Voluntary Petition (the "Bankruptcy Case") in the U.S. Bankruptcy Court for the District of Delaware. [Dkt. No. 1, Case No. 23-11463-CTG]. Defendant signed both the Chapter 11 Voluntary Petition and the Corporate Authority Statement as the authorized representative of the Borrower. A true and correct copy of the Chapter 11 Voluntary Petition and Corporate Authority Statement are attached hereto and marked as **Exhibit J**.

26. The Bankruptcy Case was dismissed on December 6, 2023. *See* Order Granting Fannie Mae's Motion to Dismiss Chapter 11 Case [Dkt. No. 40, Case No. 23-11463-CTG].

27. On January 12, 2024, the Successor Trustee performed a foreclosure sale on the property described in the Deed of Trust pursuant to Missouri law and under the Deed of Trust and sold the property to Fannie Mae for a credit bid of $7,188,000.00 (the "Trustee's Deed"). A true

CORE/0772514.0056/190472260.1

Fannie Mae Confidential

and correct copy of the Trustee's Deed is attached hereto and marked as **Exhibit K**.

28. As of January 12, 2024, the Borrower was indebted to Fannie Mae in the following amounts, plus all accruing interest, late charges, fees, costs, and attorneys' fees: $7,388,131.50 in principal, $591,965.83 in accrued interest, $1,568,080.85 in fees and expenses, $52,570.09 in attorneys' fees, less $365,402.85, less the foreclosure sale amount of $7,188,000.00, for a total of $2,047,345.42 plus interest thereafter at the per diem default rate of $453.82 (collectively, the "Indebtedness").

29. As of January 12, 2024, the Defendant is indebted under the Guaranty in the amount of the Indebtedness.

30. Attached to the Motion for Default Judgment Against Oron Zarum is the Affidavit of Nicholas J. Zluticky, setting for the attorneys' fees and costs of collection Fannie Mae has incurred in its enforcement of its rights and remedies under the Loan Documents. The costs and attorneys' fees Fannie Mae has incurred are reasonable and were incurred as a necessary part of its attempt to enforce its rights under the Loan Documents.

FURTHER AFFIANT SAYETH NAUGHT.

JAMES NOAKES
SENIOR ASSET MANAGER
Fannie Mae

Subscribed and sworn before me this 16th day of July, 2024.

Name: _Linda Henderson_
Notary Public

My commission expires:

4-19-28

CORE/0772514.0056/190472260.1

Fannie Mae Confidential

# EXHIBIT A

# MULTIFAMILY NOTE

**US $7,704,000.00**                                     As of August 16, 2019

**FOR VALUE RECEIVED**, the undersigned ("**Borrower**") promises to pay to the order of **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company ("**Lender**"), the principal amount of **SEVEN MILLION SEVEN HUNDRED FOUR THOUSAND AND 00/100 DOLLARS ($7,704,000.00)** (the "**Mortgage Loan**"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Mortgage Loan proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Multifamily Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

**1.      Defined Terms.**

Capitalized terms used and not specifically defined in this Multifamily Note (this "**Note**") have the meanings given to such terms in the Loan Agreement.

**2.      Repayment.**

Borrower agrees to pay the principal amount of the Mortgage Loan and interest on the principal amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The outstanding balance of the Mortgage Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date, together with all other amounts due to Lender under the Loan Documents.

**3.      Security.**

The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

**4.      Acceleration.**

In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to

Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

**5. Personal Liability.**

The provisions of Article 3 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

**6. Governing Law.**

This Note shall be governed in accordance with the terms and provisions of Section 15.01 (Governing Law; Consent to Jurisdiction and Venue) of the Loan Agreement.

**7. Waivers.**

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, and grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

**8. Commercial Purpose.**

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

**9. Construction; Joint and Several (or Solidary, as applicable) Liability.**

(a)     Section 15.08 (Construction) of the Loan Agreement is hereby incorporated herein as if fully set forth in the body of this Note.

(b)     If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

**10. Notices.**

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 15.02 (Notice) of the Loan Agreement.

**11. Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

## 12.    Loan Charges Savings Clause.

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents.  Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation.  Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

## 13.    WAIVER OF TRIAL BY JURY.

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

14.     **Receipt of Loan Documents**.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

15.     **Incorporation of Schedules**.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

**ATTACHED SCHEDULE.**  The following Schedule is attached to this Note:

☐            Schedule 1            Modifications to Note

**[Remainder of Page Intentionally Blank]**

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative. Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

**APEX BRITTANY MO LP**, a
Delaware limited partnership

By:    **APEX OPPORTUNITY LIMITED LLC**, a
          New Jersey limited liability company,
          its General Partner

By: _____(SEAL)
Name:          Oren Zarum
Title:            Managing Member

PAY TO THE ORDER OF _____

WITHOUT RECOURSE.

**HUNT MORTGAGE CAPITAL, LLC**, a
Delaware limited liability company

By:_____ (SEAL)

Name:

Title:

Vanessa Howes
Vice President

# EXHIBIT B

**MULTIFAMILY LOAN AND SECURITY AGREEMENT**
**(NON-RECOURSE)**

**BY AND BETWEEN**

**APEX BRITTANY MO LP, a**
**Delaware limited partnership**

**AND**

**HUNT MORTGAGE CAPITAL, LLC, a**
**Delaware limited liability company**

**DATED AS OF**

**August 16, 2019**



# TABLE OF CONTENTS

**ARTICLE 1 - DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS** .................................1

SECTION 1.01   DEFINED TERMS ...................................................................................1
SECTION 1.02   SCHEDULES, EXHIBITS, AND ATTACHMENTS INCORPORATED ...................1

**ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS** ...........................................................2

SECTION 2.01   MORTGAGE LOAN ORIGINATION AND SECURITY..................................2
  (a)   Making of Mortgage Loan.............................................................................2
  (b)   Security for Mortgage Loan..........................................................................2
  (c)   Protective Advances ......................................................................................2
SECTION 2.02   PAYMENTS ON MORTGAGE LOAN .......................................................2
  (a)   Debt Service Payments .................................................................................2
  (b)   Capitalization of Accrued But Unpaid Interest.............................................3
  (c)   Late Charges .................................................................................................3
  (d)   Default Rate ..................................................................................................4
  (e)   Address for Payments ...................................................................................5
  (f)   Application of Payments................................................................................5
SECTION 2.03   LOCKOUT/PREPAYMENT..................................................................6
  (a)   Prepayment; Prepayment Lockout; Prepayment Premium ...........................6
  (b)   Voluntary Prepayment in Full ......................................................................6
  (c)   Acceleration of Mortgage Loan ...................................................................7
  (d)   Application of Collateral ...............................................................................7
  (e)   Casualty and Condemnation .........................................................................7
  (f)   No Effect on Payment Obligations ...............................................................7
  (g)   Loss Resulting from Prepayment ..................................................................8

**ARTICLE 3 - PERSONAL LIABILITY** ................................................................................8

SECTION 3.01   NON-RECOURSE MORTGAGE LOAN; EXCEPTIONS .............................8
SECTION 3.02   PERSONAL LIABILITY OF BORROWER (EXCEPTIONS TO NON-RECOURSE PROVISION).9
  (a)   Personal Liability Based on Lender's Loss ...................................................9
  (b)   Full Personal Liability for Mortgage Loan .................................................10
SECTION 3.03   PERSONAL LIABILITY FOR INDEMNITY OBLIGATIONS .....................10
SECTION 3.04   LENDER'S RIGHT TO FOREGO RIGHTS AGAINST MORTGAGED PROPERTY ................11

**ARTICLE 4 - BORROWER STATUS** ................................................................................11

SECTION 4.01   REPRESENTATIONS AND WARRANTIES ...........................................11
  (a)   Due Organization and Qualification; Organizational Agreements ..............11
  (b)   Location .......................................................................................................12
  (c)   Power and Authority....................................................................................12
  (d)   Due Authorization .......................................................................................12
  (e)   Valid and Binding Obligations ...................................................................13
  (f)   Effect of Mortgage Loan on Borrower's Financial Condition....................13
  (g)   Economic Sanctions, Anti-Money Laundering, and Anti-Corruption .........13
  (h)   Borrower Single Asset Status .....................................................................14
  (i)   No Bankruptcies or Judgments ...................................................................15
  (j)   No Actions or Litigation .............................................................................15
  (k)   Payment of Taxes, Assessments, and Other Charges ..................................16

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Fannie Mae**

Form 6001.NR
06-19

Page i
© 2019 Fannie Mae

| (l) | Not a Foreign Person | 16 |
| (m) | ERISA | 16 |
| (n) | Default Under Other Obligations | 17 |
| (o) | Prohibited Person | 17 |
| (p) | No Contravention | 17 |
| (q) | Lockbox Arrangement | 17 |

SECTION 4.02   COVENANTS ........... 18
| (a) | Maintenance of Existence; Organizational Documents | 18 |
| (b) | Economic Sanctions, Anti-Money Laundering, and Anti-Corruption | 18 |
| (c) | Payment of Taxes, Assessments, and Other Charges | 19 |
| (d) | Borrower Single Asset Status | 19 |
| (e) | ERISA | 20 |
| (f) | Notice of Litigation or Insolvency | 21 |
| (g) | Payment of Costs, Fees, and Expenses | 21 |
| (h) | Restrictions on Distributions | 22 |
| (i) | Lockbox Arrangement | 22 |

**ARTICLE 5 - THE MORTGAGE LOAN** .......... **22**

SECTION 5.01   REPRESENTATIONS AND WARRANTIES ........... 22
| (a) | Receipt and Review of Loan Documents | 22 |
| (b) | No Default | 22 |
| (c) | No Defenses | 22 |
| (d) | Loan Document Taxes | 22 |

SECTION 5.02   COVENANTS .......... 23
| (a) | Ratification of Covenants; Estoppels; Certifications | 23 |
| (b) | Further Assurances | 23 |
| (c) | Sale of Mortgage Loan | 24 |
| (d) | Limitations on Further Acts of Borrower | 24 |
| (e) | Financing Statements; Record Searches | 25 |
| (f) | Loan Document Taxes | 25 |

**ARTICLE 6 - PROPERTY USE, PRESERVATION, AND MAINTENANCE** .......... **25**

SECTION 6.01   REPRESENTATIONS AND WARRANTIES .......... 25
| (a) | Compliance with Law; Permits and Licenses | 26 |
| (b) | Property Characteristics | 26 |
| (c) | Property Ownership | 26 |
| (d) | Condition of the Mortgaged Property | 27 |
| (e) | Personal Property | 27 |

SECTION 6.02   COVENANTS .......... 27
| (a) | Use of Property | 27 |
| (b) | Property Maintenance | 28 |
| (c) | Property Preservation | 29 |
| (d) | Property Inspections | 30 |
| (e) | Compliance with Laws | 30 |

SECTION 6.03   MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING THE PROPERTY .......... 31
| (a) | Property Management | 31 |
| (b) | Subordination of Fees to Affiliated Property Managers | 31 |
| (c) | Property Condition Assessment | 31 |

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Fannie Mae**

**Form 6001.NR**
06-19

**Page ii**
**© 2019 Fannie Mae**

**ARTICLE 7 - LEASES AND RENTS** ..............................................................................**32**

SECTION 7.01    REPRESENTATIONS AND WARRANTIES ...................................32
  (a)    Prior Assignment of Rents ...................................................................32
  (b)    Prepaid Rents ......................................................................................32
SECTION 7.02    COVENANTS ..........................................................................32
  (a)    Leases ..................................................................................................32
  (b)    Commercial Leases .............................................................................33
  (c)    Payment of Rents ................................................................................34
  (d)    Assignment of Rents ...........................................................................34
  (e)    Further Assignments of Leases and Rents ..........................................34
  (f)    Options to Purchase by Tenants ..........................................................34
SECTION 7.03    MORTGAGE LOAN ADMINISTRATION REGARDING LEASES AND RENTS ...................35
  (a)    Material Commercial Lease Requirements ..........................................35
  (b)    Residential Lease Form .......................................................................35

**ARTICLE 8 - BOOKS AND RECORDS; FINANCIAL REPORTING** ...............**35**

SECTION 8.01    REPRESENTATIONS AND WARRANTIES ...................................35
  (a)    Financial Information ..........................................................................35
  (b)    No Change in Facts or Circumstances .................................................36
SECTION 8.02    COVENANTS ..........................................................................36
  (a)    Obligation to Maintain Accurate Books and Records .........................36
  (b)    Items to Furnish to Lender ..................................................................36
  (c)    Audited Financials ..............................................................................39
  (d)    Delivery of Books and Records ...........................................................39
SECTION 8.03    MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING BOOKS AND RECORDS
              AND FINANCIAL REPORTING ....................................................39
  (a)    Lender's Right to Obtain Audited Books and Records ........................39
  (b)    Credit Reports; Credit Score ...............................................................40

**ARTICLE 9 - INSURANCE** ........................................................................................**40**

SECTION 9.01    REPRESENTATIONS AND WARRANTIES ...................................40
  (a)    Compliance with Insurance Requirements ..........................................40
  (b)    Property Condition ..............................................................................41
SECTION 9.02    COVENANTS ..........................................................................41
  (a)    Insurance Requirements ......................................................................41
  (b)    Delivery of Policies, Renewals, Notices, and Proceeds ......................41
SECTION 9.03    MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING INSURANCE ...............42
  (a)    Lender's Ongoing Insurance Requirements .........................................42
  (b)    Application of Proceeds on Event of Loss ...........................................43
  (c)    Payment Obligations Unaffected .........................................................45
  (d)    Foreclosure Sale ..................................................................................45
  (e)    Appointment of Lender as Attorney-In-Fact ......................................45

**ARTICLE 10 - CONDEMNATION** .............................................................................**45**

SECTION 10.01    REPRESENTATIONS AND WARRANTIES .................................45
  (a)    Prior Condemnation Action .................................................................45
  (b)    Pending Condemnation Actions ..........................................................46
SECTION 10.02    COVENANTS ........................................................................46
  (a)    Notice of Condemnation ......................................................................46

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Fannie Mae**

Form 6001.NR
06-19

Page iii
© 2019 Fannie Mae

    (b)    Condemnation Proceeds ................................................................................46
Section 10.03   Mortgage Loan Administration Matters Regarding Condemnation.........46
    (a)    Application of Condemnation Awards ........................................................46
    (b)    Payment Obligations Unaffected ...............................................................46
    (c)    Appointment of Lender as Attorney-In-Fact ............................................47
    (d)    Preservation of Mortgaged Property .........................................................47

**ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS** .......................................................**47**

Section 11.01   Representations and Warranties ...............................................................47
    (a)    No Labor or Materialmen's Claims ...........................................................47
    (b)    No Other Interests.......................................................................................47
Section 11.02   Covenants....................................................................................................48
    (a)    Liens; Encumbrances..................................................................................48
    (b)    Transfers ....................................................................................................48
    (c)    No Other Indebtedness ...............................................................................52
    (d)    No Mezzanine Financing or Preferred Equity ...........................................52
Section 11.03   Mortgage Loan Administration Matters Regarding Liens, Transfers, and
              Assumptions ...............................................................................................53
    (a)    Assumption of Mortgage Loan...................................................................53
    (b)    Transfers to Key Principal-Owned Affiliates or Guarantor-Owned Affiliates.......................54
    (c)    Estate Planning ..........................................................................................55
    (d)    Termination or Revocation of Trust ..........................................................55
    (e)    Death of Key Principal or Guarantor; Transfer Due to Death ..................56
    (f)    Bankruptcy of Guarantor ...........................................................................57
    (g)    Further Conditions to Transfers and Assumption .....................................58

**ARTICLE 12 - IMPOSITIONS** .............................................................................................**59**

Section 12.01   Representations and Warranties ...............................................................59
    (a)    Payment of Taxes, Assessments, and Other Charges ...............................59
Section 12.02   Covenants....................................................................................................59
    (a)    Imposition Deposits, Taxes, and Other Charges.......................................59
Section 12.03   Mortgage Loan Administration Matters Regarding Impositions ..............60
    (a)    Maintenance of Records by Lender ............................................................60
    (b)    Imposition Accounts...................................................................................60
    (c)    Payment of Impositions; Sufficiency of Imposition Deposits ...................61
    (d)    Imposition Deposits Upon Event of Default...............................................61
    (e)    Contesting Impositions ...............................................................................61
    (f)    Release to Borrower ...................................................................................62

**ARTICLE 13 – REPLACEMENTS, REPAIRS, AND RESTORATION** ..........................................**62**

Section 13.01   Covenants....................................................................................................62
    (a)    Initial Deposits to Replacement Reserve Account, Repairs Escrow Account, and
Reserve Account .........................................................................................................................62
    (b)    Monthly Replacement Reserve Deposits ...................................................62
    (c)    Payment and Deliverables for Replacements, Repairs, and Restoration ...62
    (d)    Assignment of Contracts for Replacements, Repairs, and Restoration .....63
    (e)    Indemnification ..........................................................................................63
    (f)    Amendments to Loan Documents...............................................................63
    (g)    Administrative Fees and Expenses .............................................................64

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Fannie Mae**

SECTION 13.02   MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING RESERVES ...................64
   (a)   Accounts, Deposits, and Disbursements ........................................................................64
   (b)   Approvals of Contracts; Assignment of Claims ...........................................................71
   (c)   Delays and Workmanship .............................................................................................72
   (d)   Appointment of Lender as Attorney-In-Fact ...............................................................72
   (e)   No Lender Obligation ...................................................................................................72
   (f)   No Lender Warranty .....................................................................................................73

**ARTICLE 14 - DEFAULTS/REMEDIES** ...........................................................................................73

SECTION 14.01   EVENTS OF DEFAULT ...............................................................................................73
   (a)   Automatic Events of Default ........................................................................................73
   (b)   Events of Default Subject to a Specified Cure Period ..................................................74
   (c)   Events of Default Subject to Extended Cure Period .....................................................75
SECTION 14.02   REMEDIES .................................................................................................................75
   (a)   Acceleration; Foreclosure ............................................................................................75
   (b)   Loss of Right to Disbursements from Collateral Accounts ..........................................75
   (c)   Remedies Cumulative ...................................................................................................76
SECTION 14.03   ADDITIONAL LENDER RIGHTS; FORBEARANCE ....................................................76
   (a)   No Effect Upon Obligations .........................................................................................76
   (b)   No Waiver of Rights or Remedies ................................................................................77
   (c)   Appointment of Lender as Attorney-In-Fact ...............................................................77
   (d)   Borrower Waivers .........................................................................................................79
SECTION 14.04   WAIVER OF MARSHALING ......................................................................................79

**ARTICLE 15 - MISCELLANEOUS** ...................................................................................................80

SECTION 15.01   GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE ................................80
   (a)   Governing Law .............................................................................................................80
   (b)   Venue ............................................................................................................................80
SECTION 15.02   NOTICE .....................................................................................................................80
   (a)   Process of Serving Notice .............................................................................................80
   (b)   Change of Address ........................................................................................................81
   (c)   Default Method of Notice .............................................................................................81
   (d)   Receipt of Notices .........................................................................................................81
SECTION 15.03   SUCCESSORS AND ASSIGNS BOUND; SALE OF MORTGAGE LOAN ..........................81
   (a)   Binding Agreement .......................................................................................................81
   (b)   Sale of Mortgage Loan; Change of Servicer ...............................................................82
SECTION 15.04   COUNTERPARTS ........................................................................................................82
SECTION 15.05   JOINT AND SEVERAL (OR SOLIDARY) LIABILITY ................................................82
SECTION 15.06   RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY ............................82
   (a)   Solely Creditor and Debtor ..........................................................................................82
   (b)   No Third Party Beneficiaries .......................................................................................82

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)
Fannie Mae**

Form 6001.NR
06-19

Page v
© 2019 Fannie Mae

SECTION 15.07   SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS ................................................83
SECTION 15.08   CONSTRUCTION ....................................................................................................83
SECTION 15.09   MORTGAGE LOAN SERVICING ............................................................................84
SECTION 15.10   DISCLOSURE OF INFORMATION ...........................................................................84
SECTION 15.11   WAIVER; CONFLICT ...........................................................................................84
SECTION 15.12   NO RELIANCE ....................................................................................................84
SECTION 15.13   SUBROGATION ...................................................................................................85
SECTION 15.14   COUNTING OF DAYS ..........................................................................................85
SECTION 15.15   REVIVAL AND REINSTATEMENT OF INDEBTEDNESS...............................................85
SECTION 15.16   TIME IS OF THE ESSENCE ....................................................................................85
SECTION 15.17   FINAL AGREEMENT ............................................................................................86
SECTION 15.18   WAIVER OF TRIAL BY JURY ...............................................................................86

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)
Fannie Mae**

**Form 6001.NR
06-19**

**Page vi
© 2019 Fannie Mae**

# MULTIFAMILY LOAN AND SECURITY AGREEMENT
## (Non-Recourse)

This MULTIFAMILY LOAN AND SECURITY AGREEMENT (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**") is made as of the Effective Date (as hereinafter defined) by and between **APEX BRITTANY MO LP**, a Delaware limited partnership ("**Borrower**"), and **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company ("**Lender**").

# RECITALS:

WHEREAS, Borrower desires to obtain the Mortgage Loan (as hereinafter defined) from Lender to be secured by the Mortgaged Property (as hereinafter defined); and

WHEREAS, Lender is willing to make the Mortgage Loan on the terms and conditions contained in this Loan Agreement and in the other Loan Documents (as hereinafter defined);

NOW, THEREFORE, in consideration of the making of the Mortgage Loan by Lender and other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereby covenant, agree, represent, and warrant as follows:

# AGREEMENTS:

# ARTICLE 1 - DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS

## Section 1.01        Defined Terms.

Capitalized terms not otherwise defined in the body of this Loan Agreement shall have the meanings set forth in the Definitions Schedule attached as <u>Schedule 1</u> to this Loan Agreement.

## Section 1.02        Schedules, Exhibits, and Attachments Incorporated.

The schedules, exhibits, and any other addenda or attachments are incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 1

Form 6001.NR
06-19

Page 1
© 2019 Fannie Mae

# ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS

**Section 2.01**     **Mortgage Loan Origination and Security.**

**(a)**     **Making of Mortgage Loan.**

Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender hereby makes the Mortgage Loan to Borrower, and Borrower hereby accepts the Mortgage Loan from Lender. Borrower covenants and agrees that it shall:

(1)     pay the Indebtedness, including the Prepayment Premium, if any (whether in connection with any voluntary prepayment or in connection with an acceleration by Lender of the Indebtedness), in accordance with the terms of this Loan Agreement and the other Loan Documents; and

(2)     perform, observe, and comply with this Loan Agreement and all other provisions of the other Loan Documents.

**(b)**     **Security for Mortgage Loan.**

The Mortgage Loan is made pursuant to this Loan Agreement, is evidenced by the Note, and is secured by the Security Instrument, this Loan Agreement, and the other Loan Documents that are expressly stated to be security for the Mortgage Loan.

**(c)**     **Protective Advances.**

As provided in the Security Instrument, Lender may take such actions or disburse such funds as Lender reasonably deems necessary to perform the obligations of Borrower under this Loan Agreement and the other Loan Documents and to protect Lender's interest in the Mortgaged Property.

**Section 2.02**     **Payments on Mortgage Loan.**

**(a)**     **Debt Service Payments.**

**(1)**     **Short Month Interest.**

If the date the Mortgage Loan proceeds are disbursed is any day other than the first day of the month, interest for the period beginning on the disbursement date and ending on and including the last day of the month in which the disbursement occurs shall be payable by Borrower on the date the Mortgage Loan proceeds are disbursed. In the event that the disbursement date is not the same as the Effective Date, then:

(A)     the disbursement date and the Effective Date must be in the same month, and

(B)     the Effective Date shall not be the first day of the month.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 2

**Form 6001.NR**
**06-19**

**Page 2**
**© 2019 Fannie Mae**

**(2)      Interest Accrual and Computation.**

Except as provided in Section 2.02(a)(1), interest shall be paid in arrears.  Interest shall accrue as provided in the Schedule of Interest Rate Type Provisions and shall be computed in accordance with the Interest Accrual Method.  If the Interest Accrual Method is "Actual/360," Borrower acknowledges and agrees that the amount allocated to interest for each month will vary depending on the actual number of calendar days during such month.

**(3)      Monthly Debt Service Payments.**

Consecutive monthly debt service installments (comprised of either interest only or principal and interest, depending on the Amortization Type), each in the amount of the applicable Monthly Debt Service Payment, shall be due and payable on the First Payment Date, and on each Payment Date thereafter until the Maturity Date, at which time all Indebtedness shall be due.  Any regularly scheduled Monthly Debt Service Payment that is received by Lender before the applicable Payment Date shall be deemed to have been received on such Payment Date solely for the purpose of calculating interest due.  All payments made by Borrower under this Loan Agreement shall be made without set-off, counterclaim, or other defense.

**(4)      Payment at Maturity.**

The unpaid principal balance of the Mortgage Loan, any Accrued Interest thereon and all other Indebtedness shall be due and payable on the Maturity Date.

**(5)      Interest Rate Type.**

See the Schedule of Interest Rate Type Provisions for additional provisions, if any, specific to the Interest Rate Type.

**(b)      Capitalization of Accrued But Unpaid Interest.**

Any accrued and unpaid interest on the Mortgage Loan remaining past due for thirty (30) days or more may, at Lender's election, be added to and become part of the unpaid principal balance of the Mortgage Loan.

**(c)      Late Charges.**

(1)      If any Monthly Debt Service Payment due hereunder is not received by Lender within ten (10) days (or fifteen (15) days for any Mortgaged Property located in Mississippi or North Carolina to comply with applicable law) after the applicable Payment Date, or any amount payable under this Loan Agreement (other than the payment due on the Maturity Date for repayment of the Mortgage Loan in full) or any other Loan Document is not received by Lender within ten (10) days (or fifteen (15) days for any Mortgaged Property located in Mississippi or North Carolina to comply with applicable law) after the

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 2

Form 6001.NR
06-19

Page 3
© 2019 Fannie Mae

date such amount is due, inclusive of the date on which such amount is due, Borrower shall pay to Lender, immediately without demand by Lender, the Late Charge.

The Late Charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 2.02(d).

(2)     Borrower acknowledges and agrees that:

(A)     its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan;

(B)     it is extremely difficult and impractical to determine those additional expenses;

(C)     Lender is entitled to be compensated for such additional expenses; and

(D)     the Late Charge represents a fair and reasonable estimate, taking into account all circumstances existing on the date hereof, of the additional expenses Lender will incur by reason of any such late payment.

**(d)     Default Rate.**

(1)     Default interest shall be paid as follows:

(A)     If any amount due in respect of the Mortgage Loan (other than amounts due on the Maturity Date) remains past due for thirty (30) days or more, interest on such unpaid amount(s) shall accrue from the date payment is due at the Default Rate and shall be payable upon demand by Lender.

(B)     If any Indebtedness due is not paid in full on the Maturity Date, then interest shall accrue at the Default Rate on all such unpaid amounts from the Maturity Date until fully paid and shall be payable upon demand by Lender.

Absent a demand by Lender, any such amounts shall be payable by Borrower in the same manner as provided for the payment of Monthly Debt Service Payments.  To the extent permitted by applicable law, interest shall also accrue at the Default Rate on any judgment obtained by Lender against Borrower in connection with the Mortgage Loan.  To the extent Borrower or any other Person is vested with a right of redemption, interest shall continue to accrue at the Default Rate during any redemption period until such time as the Mortgaged Property has been redeemed.

(2)     Borrower acknowledges and agrees that:

(A)     its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan; and

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 2

**Form 6001.NR**
**06-19**

**Page 4**
**© 2019 Fannie Mae**

(B)    in connection with any failure to timely pay all amounts due in respect of the Mortgage Loan on the Maturity Date, or during the time that any amount due in respect of the Mortgage Loan is delinquent for more than thirty (30) days:

(i)    Lender's risk of nonpayment of the Mortgage Loan will be materially increased;

(ii)    Lender's ability to meet its other obligations and to take advantage of other investment opportunities will be adversely impacted;

(iii)    Lender will incur additional costs and expenses arising from its loss of the use of the amounts due;

(iv)    it is extremely difficult and impractical to determine such additional costs and expenses;

(v)    Lender is entitled to be compensated for such additional risks, costs, and expenses; and

(vi)    the increase from the Interest Rate to the Default Rate represents a fair and reasonable estimate of the additional risks, costs, and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquency on the Mortgage Loan (taking into account all circumstances existing on the Effective Date).

**(e)    Address for Payments.**

All payments due pursuant to the Loan Documents shall be payable at Lender's Payment Address, or such other place and in such manner as may be designated from time to time by written notice to Borrower by Lender.

**(f)    Application of Payments.**

If at any time Lender receives, from Borrower or otherwise, any payment in respect of the Indebtedness that is less than all amounts due and payable at such time, then Lender may apply such payment to amounts then due and payable in any manner and in any order determined by Lender or hold in suspense and not apply such payment at Lender's election. Neither Lender's acceptance of a payment that is less than all amounts then due and payable, nor Lender's application of, or suspension of the application of, such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such payment to the Indebtedness, Borrower's obligations under this Loan Agreement and the other Loan Documents shall remain unchanged.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 2

Form 6001.NR
06-19

**Page 5**
**© 2019 Fannie Mae**

**Section 2.03    Lockout/Prepayment.**

    **(a)    Prepayment; Prepayment Lockout; Prepayment Premium.**

        (1)    Borrower shall not make a voluntary partial prepayment on the Mortgage Loan at any time during the Loan Term, or a voluntary full prepayment on the Mortgage Loan at any time during any Prepayment Lockout Period.  Except as expressly provided in this Loan Agreement (including as provided in the Prepayment Premium Schedule), a Prepayment Premium calculated in accordance with the Prepayment Premium Schedule shall be payable in connection with any prepayment of the Mortgage Loan.

        (2)    If a Prepayment Lockout Period applies to the Mortgage Loan, and during such Prepayment Lockout Period Lender accelerates the unpaid principal balance of the Mortgage Loan or otherwise applies collateral held by Lender to the repayment of any portion of the unpaid principal balance of the Mortgage Loan, the Prepayment Premium shall be due and payable and equal to the amount obtained by multiplying the percentage indicated (if at all) in the Prepayment Premium Schedule by the amount of principal being prepaid at the time of such acceleration or application.

    **(b)    Voluntary Prepayment in Full.**

    At any time after the expiration of any Prepayment Lockout Period, Borrower may voluntarily prepay the Mortgage Loan in full on a Permitted Prepayment Date so long as:

        (1)    Borrower delivers to Lender a Prepayment Notice specifying the Intended Prepayment Date not more than sixty (60) days, but not less than thirty (30) days (if given via U.S. Postal Service) or twenty (20) days (if given via facsimile, e-mail, or overnight courier) prior to such Intended Prepayment Date; and

        (2)    Borrower pays to Lender an amount equal to the sum of:

            (A)    the entire unpaid principal balance of the Mortgage Loan; plus

            (B)    all Accrued Interest (calculated through the last day of the month in which the prepayment occurs); plus

            (C)    the Prepayment Premium; plus

            (D)    all other Indebtedness.

In connection with any such voluntary prepayment, Borrower acknowledges and agrees that interest shall always be calculated and paid through the last day of the month in which the prepayment occurs (even if the Permitted Prepayment Date for such month is not the last day of such month, or if Lender approves prepayment on an Intended Prepayment Date that is not a Permitted Prepayment Date).  Borrower further acknowledges that Lender is not required to accept a voluntary prepayment of the Mortgage Loan on any day other than a Permitted Prepayment Date.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 2

Form 6001.NR
06-19

Page 6
© 2019 Fannie Mae

However, if Lender does approve an Intended Prepayment Date that is not a Permitted Prepayment Date and accepts a prepayment on such Intended Prepayment Date, such prepayment shall be deemed to be received on the immediately following Permitted Prepayment Date. If Borrower fails to prepay the Mortgage Loan on the Intended Prepayment Date for any reason (including on any Intended Prepayment Date that is approved by Lender) and such failure either continues for five (5) Business Days, or into the following month, Lender shall have the right to recalculate the payoff amount. If Borrower prepays the Mortgage Loan either in the following month or more than five (5) Business Days after the Intended Prepayment Date that was approved by Lender, Lender shall also have the right to recalculate the payoff amount based upon the amount of such payment and the date such payment was received by Lender. Borrower shall immediately pay to Lender any additional amounts required by any such recalculation.

(c)     **Acceleration of Mortgage Loan.**

Upon acceleration of the Mortgage Loan, Borrower shall pay to Lender:

(1)     the entire unpaid principal balance of the Mortgage Loan;

(2)     all Accrued Interest (calculated through the last day of the month in which the acceleration occurs);

(3)     the Prepayment Premium; and

(4)     all other Indebtedness.

(d)     **Application of Collateral.**

Any application by Lender of any collateral or other security to the repayment of all or any portion of the unpaid principal balance of the Mortgage Loan prior to the Maturity Date in accordance with the Loan Documents shall be deemed to be a prepayment by Borrower. Any such prepayment shall require the payment to Lender by Borrower of the Prepayment Premium calculated on the amount being prepaid in accordance with this Loan Agreement.

(e)     **Casualty and Condemnation.**

Notwithstanding any provision of this Loan Agreement to the contrary, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any insurance proceeds or amounts received in connection with a Condemnation Action in accordance with this Loan Agreement.

(f)     **No Effect on Payment Obligations.**

Unless otherwise expressly provided in this Loan Agreement, any prepayment required by any Loan Document of less than the entire unpaid principal balance of the Mortgage Loan shall not extend or postpone the due date of any subsequent Monthly Debt Service Payments, Monthly

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 2

Form 6001.NR
06-19

Page 7
© 2019 Fannie Mae

Replacement Reserve Deposit, or other payment, or change the amount of any such payments or deposits.

**(g)     Loss Resulting from Prepayment.**

In any circumstance in which a Prepayment Premium is due under this Loan Agreement, Borrower acknowledges that:

(1)     any prepayment of the unpaid principal balance of the Mortgage Loan, whether voluntary or involuntary, or following the occurrence of an Event of Default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional risk, expense, and frustration or impairment of Lender's ability to meet its commitments to third parties;

(2)     it is extremely difficult and impractical to ascertain the extent of such losses, risks, and damages;

(3)     the formula for calculating the Prepayment Premium represents a reasonable estimate of the losses, risks, and damages Lender will incur as a result of a prepayment; and

(4)     the provisions regarding the Prepayment Premium contained in this Loan Agreement are a material part of the consideration for the Mortgage Loan, and that the terms of the Mortgage Loan are in other respects more favorable to Borrower as a result of Borrower's voluntary agreement to such prepayment provisions.

# ARTICLE 3 - PERSONAL LIABILITY

**Section 3.01     Non-Recourse Mortgage Loan; Exceptions.**

Except as otherwise provided in this Article 3 or in any other Loan Document, none of Borrower, or any director, officer, manager, member, partner, shareholder, trustee, trust beneficiary, or employee of Borrower, shall have personal liability under this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of such Indebtedness and the performance of such obligations shall be Lender's exercise of its rights and remedies with respect to the Mortgaged Property and any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability shall not limit or impair Lender's enforcement of its rights against Guarantor under any Loan Document.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 2

Form 6001.NR
06-19

**Page 8**
**© 2019 Fannie Mae**

**Section 3.02**      **Personal Liability of Borrower (Exceptions to Non-Recourse Provision).**

     **(a)**      **Personal Liability Based on Lender's Loss.**

Borrower shall be personally liable to Lender for the repayment of the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, subject to any notice and cure period, if any:

     (1)      failure to pay as directed by Lender upon demand after an Event of Default (to the extent actually received by Borrower):

         (A)      all Rents to which Lender is entitled under the Loan Documents; and

         (B)      the amount of all security deposits then held or thereafter collected by Borrower from tenants and not properly applied pursuant to the applicable Leases;

     (2)      failure to maintain all insurance policies required by the Loan Documents, except to the extent Lender has the obligation to pay the premiums pursuant to Section 12.03(c);

     (3)      failure to apply all insurance proceeds received by Borrower or any amounts received by Borrower in connection with a Condemnation Action, as required by the Loan Documents;

     (4)      failure to comply with any provision of this Loan Agreement or any other Loan Document relating to the delivery of books and records, statements, schedules, and reports;

     (5)      except to the extent directed otherwise by Lender pursuant to Section 3.02(a)(1), failure to apply Rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, as and when each is due and payable, except that Borrower will not be personally liable with respect to Rents that are distributed by Borrower in any calendar year if Borrower has paid all ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts for such calendar year;

     (6)      waste or abandonment of the Mortgaged Property; or

     (7)      grossly negligent or reckless unintentional material misrepresentation or omission by Borrower, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Guarantor, or Key Principal in connection with ongoing financial or other reporting required by the Loan Documents, or any request for action or consent by Lender.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 3

Form 6001.NR
06-19

Page 9
© 2019 Fannie Mae

Notwithstanding the foregoing, Borrower shall not have personal liability under clauses (1), (3), or (5) above to the extent that Borrower lacks the legal right to direct the disbursement of the applicable funds due to an involuntary Bankruptcy Event that occurs without the consent, encouragement, or active participation of Borrower, Guarantor, Key Principal, or any Borrower Affiliate.

**(b)** **Full Personal Liability for Mortgage Loan.**

Borrower shall be personally liable to Lender for the repayment of all of the Indebtedness, and the Mortgage Loan shall be fully recourse to Borrower, upon the occurrence of any of the following:

(1)     failure by Borrower to comply with the single-asset entity requirements of Section 4.02(d) of this Loan Agreement;

(2)     a Transfer (other than a conveyance of the Mortgaged Property at a Foreclosure Event pursuant to the Security Instrument and this Loan Agreement) that is not permitted under this Loan Agreement or any other Loan Document;

(3)     the occurrence of any Bankruptcy Event (other than an acknowledgement in writing as described in clause (b) of the definition of "Bankruptcy Event"); provided, however, in the event of an involuntary Bankruptcy Event, Borrower shall only be personally liable if such involuntary Bankruptcy Event occurs with the consent, encouragement, or active participation of Borrower, Guarantor, Key Principal, or any Borrower Affiliate;

(4)     fraud, written material misrepresentation, or material omission by Borrower, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Guarantor, or Key Principal in connection with any application for or creation of the Indebtedness;

(5)     fraud, written intentional material misrepresentation, or intentional material omission by Borrower, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Guarantor, or Key Principal in connection with ongoing financial or other reporting required by the Loan Documents, or any request for action or consent by Lender; or

(6)     a Division that is not permitted under this Loan Agreement or any other Loan Document.

**Section 3.03**    **Personal Liability for Indemnity Obligations.**

Borrower shall be personally and fully liable to Lender for Borrower's indemnity obligations under Section 13.01(e) of this Loan Agreement, the Environmental Indemnity Agreement, and any other express indemnity obligations provided by Borrower under any Loan Document. Borrower's liability for such indemnity obligations shall not be limited by the amount

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 3

**Form 6001.NR**
06-19

**Page 10**
© 2019 Fannie Mae

of the Indebtedness, the repayment of the Indebtedness, or otherwise, provided that Borrower's liability for such indemnities shall not include any loss caused by the gross negligence or willful misconduct of Lender as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**Section 3.04    Lender's Right to Forego Rights Against Mortgaged Property.**

To the extent that Borrower has personal liability under this Loan Agreement or any other Loan Document, Lender may exercise its rights against Borrower personally to the fullest extent permitted by applicable law without regard to whether Lender has exercised any rights against the Mortgaged Property, the UCC Collateral, or any other security, or pursued any rights against Guarantor, or pursued any other rights available to Lender under this Loan Agreement, any other Loan Document, or applicable law.  For purposes of this Section 3.04 only, the term "Mortgaged Property" shall not include any funds that have been applied by Borrower as required or permitted by this Loan Agreement prior to the occurrence of an Event of Default, or that Borrower was unable to apply as required or permitted by this Loan Agreement because of a Bankruptcy Event. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article 3, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.

# ARTICLE 4 - BORROWER STATUS

**Section 4.01    Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 4.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)    Due Organization and Qualification; Organizational Agreements.**

(1)    Borrower is validly existing and qualified to transact business, and in good standing in:

(A)    the state in which it is formed or organized;

(B)    the Property Jurisdiction; and

(C)    each other jurisdiction that qualification or good standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to be so qualified or in good standing would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document.

(2)    Borrower's organizational documents prohibit a Division of Borrower.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 3

Form 6001.NR
06-19

Page 11
© 2019 Fannie Mae

(3)     True, correct and complete organizational documents of Borrower, Guarantor and Key Principal have been delivered to Lender prior to the Effective Date. The Ownership Interests Schedule attached hereto as <u>Schedule 8</u> to this Loan Agreement sets forth:

(A)     the direct owners of Borrower and their respective interests;

(B)     the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

(C)     the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests.

**(b)     Location.**

Borrower's General Business Address is Borrower's principal place of business and principal office.

**(c)     Power and Authority.**

Borrower has the requisite power and authority:

(1)     to own the Mortgaged Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under this Loan Agreement and under the other Loan Documents to which it is a party; and

(2)     to execute and deliver this Loan Agreement and the other Loan Documents to which it is a party, and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents to which it is a party.

**(d)     Due Authorization.**

The execution, delivery, and performance of this Loan Agreement and the other Loan Documents to which it is a party have been duly authorized by all necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by Borrower of this Loan Agreement or any of the other Loan Documents to which it is a party, except filings required to perfect and maintain the liens to be granted under the Loan Documents and routine filings to maintain good standing and its existence.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 12
© 2019 Fannie Mae

(e)     **Valid and Binding Obligations.**

This Loan Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by Borrower and constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(f)     **Effect of Mortgage Loan on Borrower's Financial Condition.**

The Mortgage Loan will not render Borrower Insolvent. Borrower has sufficient working capital, including proceeds from the Mortgage Loan, cash flow from the Mortgaged Property, or other sources, not only to adequately maintain the Mortgaged Property, but also to pay all of Borrower's outstanding debts as they come due, including all Debt Service Amounts, exclusive of Borrower's ability to refinance or pay in full the Mortgage Loan on the Maturity Date. In connection with the execution and delivery of this Loan Agreement and the other Loan Documents (and the delivery to, or for the benefit of, Lender of any collateral contemplated thereunder), and the incurrence by Borrower of the obligations under this Loan Agreement and the other Loan Documents, Borrower did not receive less than reasonably equivalent value in exchange for the incurrence of the obligations of Borrower under this Loan Agreement and the other Loan Documents.

(g)     **Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.**

(1)     None of Borrower, Guarantor, or Key Principal, or to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal, is in violation of any applicable civil or criminal laws or regulations, including those requiring internal controls, intended to prohibit, prevent, or regulate money laundering, drug trafficking, terrorism, or corruption, of the United States and the jurisdiction where the Mortgaged Property is located or where the Person resides, is domiciled, or has its principal place of business.

(2)     None of Borrower, Guarantor, or Key Principal, or to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal, is a Person:

(A)     against whom proceedings are pending for any alleged violation of any laws described in Section 4.01(g)(1);

(B)     that has been convicted of any violation of, has been subject to civil penalties or Economic Sanctions pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.01(g)(1);

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 13
© 2019 Fannie Mae

(C)     with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other Applicable Law; or

(D)     that is deemed a Sanctioned Person.

(3)     Borrower, Guarantor, and Key Principal are in compliance with all applicable Economic Sanctions laws and regulations.

**(h)     Borrower Single Asset Status.**

Borrower:

(1)     does not own or lease any real property, personal property, or assets other than the Mortgaged Property;

(2)     does not own, operate, or participate in any business other than the leasing, ownership, management, operation, and maintenance of the Mortgaged Property;

(3)     has no material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, or other agreement or instrument to which Borrower is a party, or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)     unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property (exclusive of amounts for rehabilitation, restoration, repairs, or replacements of the Mortgaged Property) that (i) are not evidenced by a promissory note, (ii) are payable within sixty (60) days of the date incurred, and (iii) as of the Effective Date, do not exceed, in the aggregate, four percent (4%) of the original principal balance of the Mortgage Loan;

(B)     if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

(C)     obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(4)     has maintained its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets have

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 14
© 2019 Fannie Mae

been included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)     has not commingled its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(6)     has been adequately capitalized in light of its contemplated business operations;

(7)     has not assumed, guaranteed, or pledged its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument), or held out its credit as being available to satisfy the obligations of any other Person;

(8)     has not made loans or advances to any other Person;

(9)     has not entered into, and is not a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's length transaction with an unrelated third party; and

(10)     has not sought and has no plans to Divide at any time during the Loan Term.

**(i)     No Bankruptcies or Judgments.**

None of Borrower, Guarantor, or Key Principal, or to Borrower's knowledge, any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal, is currently:

(1)     the subject of or a party to any completed or pending bankruptcy, reorganization, including any receivership or other insolvency proceeding;

(2)     preparing or intending to be the subject of a Bankruptcy Event; or

(3)     the subject of any judgment unsatisfied of record or docketed in any court; or

(4)     Insolvent.

**(j)     No Actions or Litigation.**

(1)     There are no claims, actions, suits, or proceedings at law or in equity by or before any Governmental Authority now pending against or, to Borrower's knowledge,

threatened against or affecting Borrower or the Mortgaged Property not otherwise covered by insurance (except claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be disclosed); and

(2) there are no claims, actions, suits, or proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Guarantor or Key Principal, which claims, actions, suits, or proceedings, if adversely determined (individually or in the aggregate) reasonably would be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal or the condition, operation, or ownership of the Mortgaged Property (except claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

**(k)    Payment of Taxes, Assessments, and Other Charges.**

Borrower confirms that:

(1) it has filed all federal, state, county, and municipal tax returns and reports required to have been filed by Borrower;

(2) it has paid, before any fine, penalty interest, lien, or costs may be added thereto, all taxes, governmental charges, and assessments due and payable with respect to such returns and reports;

(3) there is no controversy or objection pending, or to the knowledge of Borrower, threatened in respect of any tax returns of Borrower; and

(4) it has made adequate reserves on its books and records for all taxes that have accrued but which are not yet due and payable.

**(l)    Not a Foreign Person.**

Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

**(m)    ERISA.**

Borrower represents and warrants that:

(1) Borrower is not an Employee Benefit Plan;

(2) no asset of Borrower constitutes "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(3) no asset of Borrower is subject to any laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(4) neither Borrower nor any ERISA Affiliate is subject to any obligation or liability with respect to any ERISA Plan.

**(n) Default Under Other Obligations.**

(1) The execution, delivery, and performance of the obligations imposed on Borrower under this Loan Agreement and the Loan Documents to which it is a party will not cause Borrower to be in default under the provisions of any agreement, judgment, or order to which Borrower is a party or by which Borrower is bound.

(2) None of Borrower, Guarantor, or Key Principal is in default under any obligation to Lender.

**(o) Prohibited Person.**

None of Borrower, Guarantor, or Key Principal is a Prohibited Person. To Borrower's knowledge, none of the following is a Prohibited Person:

(1) Any Person Controlling Borrower, Guarantor, or Key Principal; or

(2) Any Person Controlled by and having a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal.

**(p) No Contravention.**

Neither the execution and delivery of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement and the other Loan Documents to which Borrower is a party, nor the performance of the obligations of Borrower under this Loan Agreement and the other Loan Documents does or will conflict with or result in any breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's organizational documents, or any indenture, existing agreement, or other instrument to which Borrower is a party or to which Borrower, the Mortgaged Property, or other assets of Borrower are subject.

**(q) Lockbox Arrangement.**

Borrower is not party to any type of lockbox agreement or similar cash management arrangement that has not been approved by Lender in writing, and no direct or indirect owner of Borrower is party to any type of lockbox agreement or similar cash management arrangement with respect to Rents or other income from the Mortgaged Property that has not been approved by Lender in writing.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 17
© 2019 Fannie Mae

**Section 4.02   Covenants.**

**(a)   Maintenance of Existence; Organizational Documents.**

Borrower shall maintain its existence, its entity status, franchises, rights, and privileges under the laws of the state of its formation or organization (as applicable). Borrower shall continue to be duly qualified and in good standing to transact business in each jurisdiction in which qualification or standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to do so would adversely affect Borrower's operation of the Mortgaged Property or the validity, enforceability, or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document. Neither Borrower nor any partner, member, manager, officer, or director of Borrower shall:

(1)   make or allow any material change to the organizational documents or organizational structure of Borrower, including changes relating to the Control of Borrower, or

(2)   file any action, complaint, petition, or other claim to:

(A)   divide, partition, or otherwise compel the sale of the Mortgaged Property, or

(B)   otherwise change the Control of Borrower.

**(b)   Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.**

(1)   Borrower, Guarantor, Key Principal, and any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal shall remain in compliance with any applicable civil or criminal laws or regulations (including those requiring internal controls) intended to prohibit, prevent, or regulate money laundering, drug trafficking, terrorism, or corruption, of the United States and the jurisdiction where the Mortgaged Property is located or where the Person resides, is domiciled, or has its principal place of business.

(2)   At no time shall Borrower, Guarantor, or Key Principal, or any Person Controlling Borrower, Guarantor, or Key Principal, or any Person Controlled by Borrower, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Guarantor, or Key Principal, be a Person:

(A)   against whom proceedings are pending for any alleged violation of any laws described in Section 4.02(b)(1);

(B)   that has been convicted of any violation of, has been subject to civil penalties or Economic Sanctions pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.02(b)(1);

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 4

**Form 6001.NR**
06-19

**Page 18**
**© 2019 Fannie Mae**

(C)     with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other Applicable Law; or

(D)     that is deemed a Sanctioned Person.

(3)     Borrower, Guarantor, and Key Principal shall at all times remain in compliance with any applicable Economic Sanctions laws and regulations.

**(c)     Payment of Taxes, Assessments, and Other Charges.**

Borrower shall file all federal, state, county, and municipal tax returns and reports required to be filed by Borrower and shall pay, before any fine, penalty interest, or cost may be added thereto, all taxes payable with respect to such returns and reports.

**(d)     Borrower Single Asset Status.**

Until the Indebtedness is fully paid, Borrower:

(1)     shall not acquire or lease any real property, personal property, or assets other than the Mortgaged Property;

(2)     shall not acquire, own, operate, or participate in any business other than the leasing, ownership, management, operation, and maintenance of the Mortgaged Property;

(3)     shall not commingle its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(4)     shall maintain its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's assets are included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)     shall have no material financial obligation under any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, other agreement or instrument to which Borrower is a party or by which Borrower is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)     unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property (exclusive of amounts (i) to be paid out of the Replacement Reserve Account or Repairs Escrow Account, or (ii) for

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 19
© 2019 Fannie Mae

rehabilitation, restoration, repairs, or replacements of the Mortgaged Property or otherwise approved by Lender) so long as such trade payables (1) are not evidenced by a promissory note, (2) are payable within sixty (60) days of the date incurred, and (3) as of any date, do not exceed, in the aggregate, two percent (2%) of the original principal balance of the Mortgage Loan; provided, however, that otherwise compliant outstanding trade payables may exceed two percent (2%) up to an aggregate amount of four percent (4%) of the original principal balance of the Mortgage Loan for a period (beginning on or after the Effective Date) not to exceed ninety (90) consecutive days;

(B)     if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

(C)     obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(6)     shall not assume, guaranty, or pledge its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument) or hold out its credit as being available to satisfy the obligations of any other Person;

(7)     shall not make loans or advances to any other Person;

(8)     shall not enter into, or become a party to, any transaction with any Borrower Affiliate, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party; or

(9)     shall not Divide.

**(e)     ERISA.**

Borrower covenants that:

(1)     no asset of Borrower shall constitute "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(2)     no asset of Borrower shall be subject to the laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(3)     neither Borrower nor any ERISA Affiliate shall incur any obligation or liability with respect to any ERISA Plan.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 20
© 2019 Fannie Mae

**(f)     Notice of Litigation or Insolvency.**

Borrower shall give immediate written notice to Lender of any claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceeding) by or before any Governmental Authority pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor, Key Principal, or the Mortgaged Property, which claims, actions, suits, or proceedings, if adversely determined reasonably would be expected to materially adversely affect the financial condition or business of Borrower, Guarantor, or Key Principal, or the condition, operation, or ownership of the Mortgaged Property (including any claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

**(g)     Payment of Costs, Fees, and Expenses.**

In addition to the payments specified in this Loan Agreement, Borrower shall pay, on demand, all of Lender's out-of-pocket fees, costs, charges, or expenses (including the reasonable fees and expenses of attorneys, accountants, and other experts) incurred by Lender in connection with:

(1)     any amendment to, or consent, or waiver required under, this Loan Agreement or any of the Loan Documents (whether or not any such amendments, consents, or waivers are entered into);

(2)     defending or participating in any litigation arising from actions by third parties and brought against or involving Lender with respect to:

(A)     the Mortgaged Property;

(B)     any event, act, condition, or circumstance in connection with the Mortgaged Property; or

(C)     the relationship between or among Lender, Borrower, Key Principal, and Guarantor in connection with this Loan Agreement or any of the transactions contemplated by this Loan Agreement;

(3)     the administration or enforcement of, or preservation of rights or remedies under, this Loan Agreement or any other Loan Documents including or in connection with any litigation or appeals, any Foreclosure Event or other disposition of any collateral granted pursuant to the Loan Documents; and

(4)     any Bankruptcy Event or Guarantor Bankruptcy Event.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 21
© 2019 Fannie Mae

**(h)    Restrictions on Distributions.**

No distributions or dividends of any nature with respect to Rents or other income from the Mortgaged Property shall be made to any Person having a direct ownership interest in Borrower if an Event of Default has occurred and is continuing.

**(i)    Lockbox Arrangement.**

Borrower shall not enter into any type of lockbox agreement or similar cash management arrangement that has not been approved by Lender in writing, and no direct or indirect owner of Borrower shall enter into any type of lockbox agreement or similar cash management arrangement with respect to Rents or other income from the Mortgaged Property that has not been approved by Lender in writing.   Lender's approval of any such cash management arrangement may be conditioned upon requiring Borrower to enter into a lockbox agreement or similar cash management arrangement with Lender in form and substance acceptable to Lender with regard to Rents and other income from the Mortgaged Property.

# ARTICLE 5 - THE MORTGAGE LOAN

**Section 5.01    Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 5.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)    Receipt and Review of Loan Documents.**

Borrower has received and reviewed this Loan Agreement and all of the other Loan Documents.

**(b)    No Default.**

No default exists under any of the Loan Documents.

**(c)    No Defenses.**

The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim, or defense by either Borrower or Guarantor, including the defense of usury, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

**(d)    Loan Document Taxes.**

All mortgage, mortgage recording, stamp, intangible, or any other similar taxes required to be paid by any Person under applicable law currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 4

Form 6001.NR
06-19

Page 22
© 2019 Fannie Mae

Documents, including the Security Instrument, have been paid or will be paid in the ordinary course of the closing of the Mortgage Loan.

**Section 5.02      Covenants.**

    **(a)      Ratification of Covenants; Estoppels; Certifications.**

Borrower shall:

        (1)      promptly notify Lender in writing upon any violation of any covenant set forth in any Loan Document of which Borrower has notice or knowledge; <u>provided, however</u>, any such written notice by Borrower to Lender shall not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement or any other Loan Document; and

        (2)      within ten (10) days after a request from Lender, provide a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement:

            (A)      that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications);

            (B)      the unpaid principal balance of the Mortgage Loan;

            (C)      the date to which interest on the Mortgage Loan has been paid;

            (D)      that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail);

            (E)      whether or not there are then-existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and

            (F)      any additional facts reasonably requested in writing by Lender.

    **(b)      Further Assurances.**

    **(1)      Other Documents As Lender May Require.**

Within ten (10) days after request by Lender, Borrower shall, subject to Section 5.02(d) below, execute, acknowledge, and deliver, at its cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 5

Form 6001.NR
06-19

Page 23
© 2019 Fannie Mae

in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents.

### (2) Corrective Actions.

Within ten (10) days after request by Lender, Borrower shall provide, or cause to be provided, to Lender, at Borrower's cost and expense, such further documentation or information reasonably deemed necessary or appropriate by Lender in the exercise of its rights under the related commitment letter between Borrower and Lender or to correct patent mistakes in the Loan Documents, the Title Policy, or the funding of the Mortgage Loan.

### (c) Sale of Mortgage Loan.

Borrower shall, subject to Section 5.02(d) below:

(1) comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days after the request, at Borrower's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A) Lender to sell the Mortgage Loan to such Investor;

(B) Lender to obtain a refund of any commitment fee from any such Investor; or

(C) any such Investor to further sell or securitize the Mortgage Loan;

(2) ratify and affirm in writing the representations and warranties set forth in any Loan Document as of such date specified by Lender modified as necessary to reflect changes that have occurred subsequent to the Effective Date;

(3) confirm that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); and

(4) execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions, or additions to this Loan Agreement or other Loan Document(s) as is reasonably required by Lender or such Investor.

### (d) Limitations on Further Acts of Borrower.

Nothing in Section 5.02(b) and Section 5.02(c) shall require Borrower to do any further act that has the effect of:

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 5

Form 6001.NR
06-19

Page 24
© 2019 Fannie Mae

(1)	changing the economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower and Lender;

(2)	imposing on Borrower or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

(3)	materially changing the rights and obligations of Borrower or Guarantor under the commitment letter.

(e)	**Financing Statements; Record Searches.**

(1)	Borrower shall pay all costs and expenses associated with:

(A)	any filing or recording of any financing statements, including all continuation statements, termination statements, and amendments or any other filings related to security interests in or liens on collateral; and

(B)	any record searches for financing statements that Lender may require.

(2)	Borrower hereby authorizes Lender to file any financing statements, continuation statements, termination statements, and amendments (including an "all assets" or "all personal property" collateral description or words of similar import) in form and substance as Lender may require in order to protect and preserve Lender's lien priority and security interest in the Mortgaged Property (and to the extent Lender has filed any such financing statements, continuation statements, or amendments prior to the Effective Date, such filings by Lender are hereby authorized and ratified by Borrower).

(f)	**Loan Document Taxes.**

Borrower shall pay, on demand, any transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents or the Mortgage Loan.

# ARTICLE 6 - PROPERTY USE, PRESERVATION, AND MAINTENANCE

## Section 6.01	Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 6.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 5

Form 6001.NR
06-19

Page 25
© 2019 Fannie Mae

(a)     **Compliance with Law; Permits and Licenses.**

(1)     To Borrower's knowledge, all improvements to the Land and the use of the Mortgaged Property comply with all applicable laws, ordinances, statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, and rent control, and Borrower has no knowledge of any action or proceeding (or threatened action or proceeding) regarding noncompliance or nonconformity with any of the foregoing.

(2)     To Borrower's knowledge, there is no evidence of any illegal activities on the Mortgaged Property.

(3)     To Borrower's knowledge, no permits or approvals from any Governmental Authority, other than those previously obtained and furnished to Lender, are necessary for the commencement and completion of the Repairs or Replacements, as applicable, other than those permits or approvals which will be timely obtained in the ordinary course of business.

(4)     All required permits, licenses, and certificates to comply with all zoning and land use statutes, laws, ordinances, rules, and regulations, and all applicable health, fire, safety, and building codes, and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent, have been obtained and are in full force and effect.

(5)     No portion of the Mortgaged Property has been purchased with the proceeds of any illegal activity.

(b)     **Property Characteristics.**

(1)     The Mortgaged Property contains at least:

(A)     the Property Square Footage;

(B)     the Total Parking Spaces; and

(C)     the Total Residential Units.

(2)     No part of the Land is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lot or parcels for the Land.

(c)     **Property Ownership.**

Borrower is sole owner or ground lessee of the Mortgaged Property.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 6

Form 6001.NR
06-19

Page 26
© 2019 Fannie Mae

**(d)    Condition of the Mortgaged Property.**

(1)    Borrower has not made any claims, and to Borrower's knowledge, no claims have been made, against any contractor, engineer, architect, or other party with respect to the construction or condition of the Mortgaged Property or the existence of any structural or other material defect therein; and

(2)    neither the Land nor the Improvements have sustained any damage other than damage which has been fully repaired, or is fully insured and is being repaired in the ordinary course of business.

**(e)    Personal Property.**

Borrower owns (or, to the extent disclosed on the Exceptions to Representations and Warranties Schedule, leases) all of the Personal Property that is material to and is used in connection with the management, ownership, and operation of the Mortgaged Property.

**Section 6.02    Covenants.**

**(a)    Use of Property.**

From and after the Effective Date, Borrower shall not, unless required by applicable law or Governmental Authority:

(1)    change the use of all or any part of the Mortgaged Property;

(2)    convert any individual dwelling units or common areas to commercial use, or convert any common area or commercial use to individual dwelling units;

(3)    initiate or acquiesce in a change in the zoning classification of the Land;

(4)    establish any condominium or cooperative regime with respect to the Mortgaged Property;

(5)    subdivide the Land; or

(6)    suffer, permit, or initiate the joint assessment of any Mortgaged Property with any other real property constituting a tax lot separate from such Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 6

**Form 6001.NR**
**06-19**

**Page 27**
**© 2019 Fannie Mae**

**(b)     Property Maintenance.**

Borrower shall:

(1)     pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, Repairs, and Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

(2)     keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and subject to Section 9.03(b)(3) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not any insurance proceeds received upon an event of loss or any amounts received in connection with a Condemnation Action are available to cover any costs of such restoration or repair;

(3)     commence all Required Repairs, Additional Lender Repairs, and Additional Lender Replacements as follows:

(A)     with respect to any Required Repairs, promptly following the Effective Date (subject to Force Majeure, if applicable), in accordance with the timelines set forth on the Required Repair Schedule, or if no timelines are provided, as soon as practical following the Effective Date;

(B)     with respect to Additional Lender Repairs, in the event that Lender determines that Additional Lender Repairs are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Repairs (subject to Force Majeure, if applicable), commence any such Additional Lender Repairs in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(C)     with respect to Additional Lender Replacements, in the event that Lender determines that Additional Lender Replacements are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Replacements (subject to Force Majeure, if applicable), commence any such Additional Lender Replacements in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(4)     make, construct, install, diligently perform, and complete all Replacements, Repairs, Restoration, and any other work permitted under the Loan Documents:

(A)     in a good and workmanlike manner as soon as practicable following the commencement thereof, free and clear of any Liens, including mechanics' or

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 6

Form 6001.NR
06-19

Page 28
© 2019 Fannie Mae

materialmen's liens and encumbrances (except Permitted Encumbrances and mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials);

(B)     in accordance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits, and environmental regulations;

(C)     in accordance with all applicable insurance and bonding requirements; and

(D)     within all timeframes required by Lender, and Borrower acknowledges that it shall be an Event of Default if Borrower abandons or ceases work on any Repair at any time prior to the completion of the Repairs for a period of longer than twenty (20) days (except when Force Majeure exists and Borrower is diligently pursuing the reinstitution of such work, provided, however, any such abandonment or cessation shall not in any event allow the Repair to be completed after the Completion Period, subject to Force Majeure); and

(5)     subject to the terms of Section 6.03(a), provide for professional management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing;

(6)     give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

(7)     upon Lender's written request, submit to Lender any contracts or work orders described in Section 13.02(b).

**(c)     Property Preservation.**

Borrower shall:

(1)     not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

(2)     not (or otherwise permit any other Person to) demolish, make any change in the unit mix, otherwise alter the Mortgaged Property or any part of the Mortgaged Property, or remove any Personalty or Fixtures from the Mortgaged Property, except for: (A) alterations required in connection with Repairs and Replacements; or (B) the replacement of tangible Personalty or Fixtures, provided (i) such Personalty or Fixtures are replaced with items of equal or better function and quality, and (ii) such replacement does

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 6

Form 6001.NR
06-19

Page 29
© 2019 Fannie Mae

not result in any disruption in occupancy (other than in connection with the routine re-leasing of units);

(3) not engage in or knowingly permit, and shall take appropriate measures to prevent and abate or cease and desist, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Land or otherwise materially impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property;

(4) not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage required by this Loan Agreement; or

(5) not subject the Mortgaged Property to any voluntary, elective, or non-compulsory tax lien or assessment (or opt in to any voluntary, elective, or non-compulsory special tax district or similar regime).

**(d)      Property Inspections.**

Borrower shall:

(1) permit Lender, its agents, representatives, and designees to enter upon and inspect the Mortgaged Property (including in connection with any Replacement, Repair, or Restoration, or to conduct any Environmental Inspection pursuant to the Environmental Indemnity Agreement), and shall cooperate and provide access to all areas of the Mortgaged Property (subject to the rights of tenants under the Leases):

(A) during normal business hours;

(B) at such other reasonable time upon reasonable notice of not less than one (1) Business Day;

(C) at any time when exigent circumstances exist; or

(D) at any time after an Event of Default has occurred and is continuing; and

(2) pay for reasonable costs or expenses incurred by Lender or its agents in connection with any such inspections.

**(e)      Compliance with Laws.**

Borrower shall:

(1) comply with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 6

Form 6001.NR
06-19

Page 30
© 2019 Fannie Mae

regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, and Leases;

(2)     procure and maintain all required permits, licenses, charters, registrations, and certificates necessary to comply with all zoning and land use statutes, laws, ordinances, rules and regulations, and all applicable health, fire, safety, and building codes and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent;

(3)     comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits;

(4)     at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.02(e); and

(5)     promptly after receipt or notification thereof, provide Lender copies of any building code or zoning violation from any Governmental Authority with respect to the Mortgaged Property.

## Section 6.03     Mortgage Loan Administration Matters Regarding the Property.

### (a)     Property Management.

From and after the Effective Date, each property manager and each property management agreement must be approved by Lender.  If, in connection with the making of the Mortgage Loan, or at any later date, Lender waives in writing the requirement that Borrower enter into a written contract for management of the Mortgaged Property, and Borrower later elects to enter into a written contract or change the management of the Mortgaged Property, such new property manager or the property management agreement must be approved by Lender.  As a condition to any approval by Lender, Lender may require that Borrower and such new property manager enter into a collateral assignment of the property management agreement on a form approved by Lender.

### (b)     Subordination of Fees to Affiliated Property Managers.

Any property manager that is a Borrower Affiliate to whom fees are payable for the management of the Mortgaged Property must enter into an assignment of management agreement or other agreement with Lender, in a form approved by Lender, providing for subordination of those fees and such other provisions as Lender may require.

### (c)     Property Condition Assessment.

If, in connection with any inspection of the Mortgaged Property, Lender determines that the condition of the Mortgaged Property has deteriorated (ordinary wear and tear excepted) since the Effective Date, Lender may obtain, at Borrower's expense, a property condition assessment of the Mortgaged Property.  Lender's right to obtain a property condition assessment pursuant to this Section 6.03(c) shall be in addition to any other rights available to Lender under this Loan

Agreement in connection with any such deterioration. Any such inspection or property condition assessment may result in Lender requiring Additional Lender Repairs or Additional Lender Replacements as further described in Section 13.02(a)(9)(B).

# ARTICLE 7 - LEASES AND RENTS

**Section 7.01       Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 7.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)       Prior Assignment of Rents.**

Borrower has not executed any:

(1)       prior assignment of Rents (other than an assignment of Rents securing prior indebtedness that has been paid off and discharged or will be paid off and discharged with the proceeds of the Mortgage Loan); or

(2)       instrument which would prevent Lender from exercising its rights under this Loan Agreement or the Security Instrument.

**(b)       Prepaid Rents.**

Borrower has not accepted, and does not expect to receive prepayment of, any Rents for more than two (2) months prior to the due dates of such Rents.

**Section 7.02       Covenants.**

**(a)       Leases.**

Borrower shall:

(1)       comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits;

(2)       surrender possession of the Mortgaged Property, including all Leases and all security deposits and prepaid Rents, immediately upon appointment of a receiver or Lender's entry upon and taking of possession and control of the Mortgaged Property, as applicable;

(3)       require that all Residential Leases have initial terms of not less than six (6) months and not more than twenty-four (24) months (however, if customary in the applicable market for properties comparable to the Mortgaged Property, Residential Leases with terms of less than six (6) months (but in no case less than one (1) month) may be

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 6

Form 6001.NR
06-19

Page 32
© 2019 Fannie Mae

permitted with Lender's prior written consent), provided however, Short-Term Rentals (regardless of the duration of the term) shall not be permitted unless otherwise expressly approved by Lender in writing; and

(4)     promptly provide Lender a copy of any non-Residential Lease at the time such Lease is executed (subject to Lender's consent rights for Material Commercial Leases in Section 7.02(b)) and, upon Lender's written request, promptly provide Lender a copy of any Residential Lease then in effect.

**(b)     Commercial Leases.**

(1)     With respect to Material Commercial Leases, Borrower shall not:

(A)     enter into any Material Commercial Lease except with the prior written consent of Lender; or

(B)     modify the terms of, extend, or terminate any Material Commercial Lease (including any Material Commercial Lease in existence on the Effective Date) without the prior written consent of Lender.

(2)     With respect to any non-Material Commercial Lease, Borrower shall not:

(A)     enter into any non-Material Commercial Lease that materially alters the use and type of operation of the premises subject to the Lease in effect as of the Effective Date or reduces the number or size of residential units at the Mortgaged Property; or

(B)     modify the terms of any non-Material Commercial Lease (including any non-Material Commercial Lease in existence on the Effective Date) in any way that materially alters the use and type of operation of the premises subject to such non-Material Commercial Lease in effect as of the Effective Date, reduces the number or size of residential units at the Mortgaged Property, or results in such non-Material Commercial Lease being deemed a Material Commercial Lease.

(3)     With respect to any Material Commercial Lease or non-Material Commercial Lease, Borrower shall cause the applicable tenant to provide within ten (10) days after a request by Borrower, a certificate of estoppel, or if not provided by tenant within such ten (10) day period, Borrower shall provide such certificate of estoppel, certifying:

(A)     that such Material Commercial Lease or non-Material Commercial Lease is unmodified and in full force and effect (or if there have been modifications, that such Material Commercial Lease or non-Material Commercial Lease is in full force and effect as modified and stating the modifications);

(B)     the term of the Lease including any extensions thereto;

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 7

Form 6001.NR
06-19

Page 33
© 2019 Fannie Mae

(C)     the dates to which the Rent and any other charges hereunder have been paid by tenant;

(D)     the amount of any security deposit delivered to Borrower as landlord;

(E)     whether or not Borrower is in default (or whether any event or condition exists which, with the passage of time, would constitute an event of default) under such Lease;

(F)     the address to which notices to tenant should be sent; and

(G)     any other information as may be reasonably required by Lender.

(c)     **Payment of Rents.**

Borrower shall:

(1)     pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing;

(2)     cooperate with Lender's efforts in connection with the assignment of Rents set forth in the Security Instrument; and

(3)     not accept Rent under any Lease (whether a Residential Lease or a non-Residential Lease) for more than two (2) months in advance.

(d)     **Assignment of Rents.**

Borrower shall not:

(1)     perform any acts or execute any instrument that would prevent Lender from exercising its rights under the assignment of Rents granted in the Security Instrument or in any other Loan Document; or

(2)     interfere with Lender's collection of such Rents.

(e)     **Further Assignments of Leases and Rents.**

Borrower shall execute and deliver any further assignments of Leases and Rents as Lender may reasonably require.

(f)     **Options to Purchase by Tenants.**

No Lease (whether a Residential Lease or a non-Residential Lease) shall contain an option to purchase, right of first refusal to purchase or right of first offer to purchase, except as required by applicable law.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 7

Form 6001.NR
06-19

Page 34
© 2019 Fannie Mae

**Section 7.03    Mortgage Loan Administration Regarding Leases and Rents.**

(a)    **Material Commercial Lease Requirements.**

Each Material Commercial Lease, including any renewal or extension of any Material Commercial Lease in existence as of the Effective Date, shall provide, directly or pursuant to a subordination, non-disturbance and attornment agreement approved by Lender, that:

(1)    the tenant shall, upon written notice from Lender after the occurrence of an Event of Default, pay all Rents payable under such Lease to Lender;

(2)    such Lease and all rights of the tenant thereunder are expressly subordinate to the lien of the Security Instrument;

(3)    the tenant shall attorn to Lender and any purchaser at a Foreclosure Event (such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a Foreclosure Event or by Lender in any manner);

(4)    the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a Foreclosure Event may from time to time request; and

(5)    such Lease shall not terminate as a result of a Foreclosure Event unless Lender or any other purchaser at such Foreclosure Event affirmatively elects to terminate such Lease pursuant to the terms of the subordination, non-disturbance and attornment agreement.

(b)    **Residential Lease Form.**

All Residential Leases entered into from and after the Effective Date shall be on forms approved by Lender.

# ARTICLE 8 - BOOKS AND RECORDS; FINANCIAL REPORTING

**Section 8.01    Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 8.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

(a)    **Financial Information.**

All financial statements and data, including statements of cash flow and income and operating expenses, that have been delivered to Lender in respect of the Mortgaged Property:

(1)    are true, complete, and correct in all material respects; and

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 7

Form 6001.NR
06-19

Page 35
© 2019 Fannie Mae

(2)     accurately represent the financial condition of the Mortgaged Property as of such date.

**(b)     No Change in Facts or Circumstances.**

All information in the Loan Application and in all financial statements, rent rolls, reports, certificates, and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

**Section 8.02     Covenants.**

**(a)     Obligation to Maintain Accurate Books and Records.**

Borrower shall keep and maintain at all times at the Mortgaged Property or the property management agent's offices or Borrower's General Business Address and, upon Lender's written request, shall make available at the Land:

(1)     complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property; and

(2)     copies of all written contracts, Leases, and other instruments that affect Borrower or the Mortgaged Property.

**(b)     Items to Furnish to Lender.**

Borrower shall furnish to Lender the following, certified as true, complete, and accurate, in all material respects, by an individual having authority to bind Borrower (or Guarantor, as applicable), in such form and with such detail as Lender reasonably requires:

(1)     within forty-five (45) days after the end of each first, second, and third calendar quarter, a statement of income and expenses for Borrower on a year-to-date basis as of the end of each calendar quarter;

(2)     within one hundred twenty (120) days after the end of each calendar year:

(A)     for any Borrower that is an entity, a statement of income and expenses and a statement of cash flows for such calendar year;

(B)     for any Borrower that is an individual, or a trust established for estate-planning purposes, a personal financial statement for such calendar year;

(C)     when requested in writing by Lender, balance sheet(s) showing all assets and liabilities of Borrower and a statement of all contingent liabilities as of the end of such calendar year;

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 8

Form 6001.NR
06-19

Page 36
© 2019 Fannie Mae

(D)     if an energy consumption metric for the Mortgaged Property is required to be reported to any Governmental Authority, the Fannie Mae Energy Performance Metrics report, as generated by ENERGY STAR® Portfolio Manager, for the Mortgaged Property for such calendar year, which report must include the ENERGY STAR score, the Source Energy Use Intensity (EUI), the month and year ending period for such ENERGY STAR score and such Source Energy Use Intensity, and the ENERGY STAR Portfolio Manager Property Identification Number; provided that, if the Governmental Authority does not require the use of ENERGY STAR Portfolio Manager for the reporting of the energy consumption metric and Borrower does not use ENERGY STAR Portfolio Manager, then Borrower shall furnish to Lender the Source Energy Use Intensity for the Mortgaged Property for such calendar year;

(E)     a written certification ratifying and affirming that:

(i)     Borrower has taken no action in violation of Section 4.02(d) regarding its single asset status;

(ii)    Borrower has received no notice of any building code violation, or if Borrower has received such notice, evidence of remediation;

(iii)   Borrower has made no application for rezoning or received any notice that the Mortgaged Property has been or is being rezoned; and

(iv)    Borrower has taken no action and has no knowledge of any action that would violate the provisions of Section 11.02(b)(1)(F) regarding liens encumbering the Mortgaged Property;

(F)     an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts; and

(G)     written confirmation of:

(i)     any changes occurring since the Effective Date (or that no such changes have occurred since the Effective Date) in (1) the direct owners of Borrower, (2) the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), or (3) the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), and their respective interests;

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 8

Form 6001.NR
06-19

Page 37
© 2019 Fannie Mae

(ii)     the names of all officers and directors of (1) any Borrower which is a corporation, (2) any corporation which is a general partner of any Borrower which is a partnership, or (3) any corporation which is the managing member or non-member manager of any Borrower which is a limited liability company; and

(iii)     the names of all managers who are not members of (1) any Borrower which is a limited liability company, (2) any limited liability company which is a general partner of any Borrower which is a partnership, or (3) any limited liability company which is the managing member or non-member manager of any Borrower which is a limited liability company; and

(H)     if not already provided pursuant to Section 8.02(b)(2)(A) above, a statement of income and expenses for Borrower's operation of the Mortgaged Property on a year-to-date basis as of the end of each calendar year;

(3)     within forty-five (45) days after the end of each first, second, and third calendar quarter and within one hundred twenty (120) days after the end of each calendar year, and at any other time upon Lender's written request, a rent schedule for the Mortgaged Property showing the name of each tenant and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender; and

(4)     upon Lender's written request (but, absent an Event of Default, no more frequently than once in any six (6) month period):

(A)     any item described in Section 8.02(b)(1) or Section 8.02(b)(2) for Borrower, certified as true, complete, and accurate by an individual having authority to bind Borrower;

(B)     a property management or leasing report for the Mortgaged Property, showing the number of rental applications received from tenants or prospective tenants and deposits received from tenants or prospective tenants, and any other information requested by Lender;

(C)     a statement of income and expenses for Borrower's operation of the Mortgaged Property on a year-to-date basis as of the end of each month for such period as requested by Lender, which statement shall be delivered within thirty (30) days after the end of such month requested by Lender;

(D)     a statement of real estate owned directly or indirectly by Borrower and Guarantor for such period as requested by Lender, which statement(s) shall be delivered within thirty (30) days after the end of such month requested by Lender;

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 8

Form 6001.NR
06-19

Page 38
© 2019 Fannie Mae

(E)     for any Guarantor, by the later of thirty (30) days after the date requested by Lender and the date one hundred twenty (120) days after the end of the most recent calendar year:

(i)      that is an entity, a statement of income and expenses and a statement of cash flows for such calendar year;

(ii)     that is an individual, or a trust established for estate-planning purposes, a personal financial statement for such calendar year; and

(iii)    balance sheet(s) showing all assets and liabilities of Guarantor and a statement of all contingent liabilities as of the end of such calendar year; and

(F)     a statement that identifies:

(i)      the direct owners of Borrower and their respective interests;

(ii)     the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

(iii)    the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests.

**(c)     Audited Financials.**

In the event Borrower or Guarantor receives or obtains any audited financial statements and such financial statements are required to be delivered to Lender under Section 8.02(b), Borrower shall deliver or cause to be delivered to Lender the audited versions of such financial statements.

**(d)     Delivery of Books and Records.**

If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender, upon written demand, all books and records relating to the Mortgaged Property or its operation.

**Section 8.03     Mortgage Loan Administration Matters Regarding Books and Records and Financial Reporting.**

**(a)     Lender's Right to Obtain Audited Books and Records.**

Lender may require that Borrower's or Guarantor's books and records be audited, at Borrower's expense, by an independent certified public accountant selected by Lender in order to

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 8

Form 6001.NR
06-19

Page 39
© 2019 Fannie Mae

produce or audit any statements, schedules, and reports of Borrower, Guarantor, or the Mortgaged Property required by Section 8.02, if:

(1)     Borrower or Guarantor fails to provide in a timely manner the statements, schedules, and reports required by Section 8.02 and, thereafter, Borrower or Guarantor fails to provide such statements, schedules, and reports within the cure period provided in Section 14.01(c);

(2)     the statements, schedules, and reports submitted to Lender pursuant to Section 8.02 are not full, complete, and accurate in all material respects as determined by Lender and, thereafter, Borrower or Guarantor fails to provide such statements, schedules, and reports within the cure period provided in Section 14.01(c); or

(3)     an Event of Default has occurred and is continuing.

Notwithstanding the foregoing, the ability of Lender to require the delivery of audited financial statements shall be limited to not more than once per Borrower's fiscal year so long as no Event of Default has occurred during such fiscal year (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing). Borrower shall cooperate with Lender in order to satisfy the provisions of this Section 8.03(a). All related costs and expenses of Lender shall become due and payable by Borrower within ten (10) Business Days after demand therefor.

**(b)     Credit Reports; Credit Score.**

No more often than once in any twelve (12) month period, Lender is authorized to obtain a credit report (if applicable) on Borrower or Guarantor, the cost of which report shall be paid by Borrower. Lender is authorized to obtain a Credit Score (if applicable) for Borrower or Guarantor at any time at Lender's expense.

# ARTICLE 9 - INSURANCE

## Section 9.01     Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 9.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)     Compliance with Insurance Requirements.**

Borrower is in compliance with Lender's insurance requirements (or has obtained a written waiver from Lender for any non-compliant coverage) and has timely paid all premiums on all required insurance policies.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 8

Form 6001.NR
06-19

Page 40
© 2019 Fannie Mae

**(b)      Property Condition.**

(1)      The Mortgaged Property has not been damaged by fire, water, wind, or other cause of loss; or

(2)      if previously damaged, any previous damage to the Mortgaged Property has been repaired and the Mortgaged Property has been fully restored.

## Section 9.02      Covenants.

**(a)      Insurance Requirements.**

(1)      As required by Lender and applicable law, and as may be modified from time to time, Borrower shall:

(A)      keep the Improvements insured at all times against any hazards, which insurance shall include coverage against loss by fire and all other perils insured by the "special causes of loss" coverage form, general boiler and machinery coverage, business income coverage, and flood (if any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor) as an area having special flood hazards and to the extent flood insurance is available in that area), and may include sinkhole insurance, mine subsidence insurance, earthquake insurance, terrorism insurance, windstorm insurance and, if the Mortgaged Property does not conform to applicable building, zoning, or land use laws, ordinance and law coverage;

(B)      maintain at all times commercial general liability insurance, workmen's compensation insurance, and such other liability, errors and omissions, and fidelity insurance coverage; and

(C)      maintain builder's risk and public liability insurance, and other insurance in connection with completing the Repairs or Replacements, as applicable.

**(b)      Delivery of Policies, Renewals, Notices, and Proceeds.**

Borrower shall:

(1)      cause all insurance policies (including any policies not otherwise required by Lender) which can be endorsed with standard non-contributing, non-reporting mortgagee clauses making loss payable to Lender (or Lender's assigns) to be so endorsed;

(2)      promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums;

(3)      deliver evidence, in form and content acceptable to Lender, that each required insurance policy under this Article 9 has been renewed not less than fifteen (15)

days prior to the applicable expiration date, and (if such evidence is other than an original or duplicate original of a renewal policy) deliver the original or duplicate original of each renewal policy (or such other evidence of insurance as may be required by or acceptable to Lender) in form and content acceptable to Lender within ninety (90) days after the applicable expiration date of the original insurance policy;

(4)     provide immediate written notice to the insurance company and to Lender of any event of loss;

(5)     execute such further evidence of assignment of any insurance proceeds as Lender may require; and

(6)     provide immediate written notice to Lender of Borrower's receipt of any insurance proceeds under any insurance policy required by Section 9.02(a)(1) above and, if requested by Lender, deliver to Lender all of such proceeds received by Borrower to be applied by Lender in accordance with this Article 9.

## Section 9.03     Mortgage Loan Administration Matters Regarding Insurance

**(a)     Lender's Ongoing Insurance Requirements.**

Borrower acknowledges that Lender's insurance requirements may change from time to time.  All insurance policies and renewals of insurance policies required by this Loan Agreement shall be:

(1)     in the form and with the terms required by Lender;

(2)     in such amounts, with such maximum deductibles and for such periods required by Lender; and

(3)     issued by insurance companies satisfactory to Lender.

BORROWER ACKNOWLEDGES THAT ANY FAILURE OF BORROWER TO COMPLY WITH THE REQUIREMENTS SET FORTH IN SECTION 9.02(a) OR SECTION 9.02(b)(3) ABOVE SHALL PERMIT LENDER TO PURCHASE THE APPLICABLE INSURANCE AT BORROWER'S COST.  SUCH INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS.  THE COVERAGE THAT LENDER PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAKES OR ANY CLAIM THAT IS MADE AGAINST BORROWER IN CONNECTION WITH THE MORTGAGED PROPERTY. IF LENDER PURCHASES INSURANCE FOR THE MORTGAGED PROPERTY AS PERMITTED HEREUNDER, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AT THE DEFAULT RATE AND ANY OTHER CHARGES LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR THE EXPIRATION OF THE INSURANCE.  THE COSTS OF THE INSURANCE SHALL BE ADDED TO BORROWER'S TOTAL OUTSTANDING BALANCE OR OBLIGATION AND

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 9

Form 6001.NR
06-19

Page 42
© 2019 Fannie Mae

SHALL CONSTITUTE ADDITIONAL INDEBTEDNESS. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN. BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS.

    **(b)**    **Application of Proceeds on Event of Loss.**

    (1)    Upon an event of loss, Lender may, at Lender's option:

    (A)    hold such proceeds in the Restoration Reserve Account to be applied to reimburse Borrower for the cost of Restoration (in accordance with Article 13 and Lender's then-current policies relating to the Restoration of similar multifamily residential properties); or

    (B)    apply such proceeds to the payment of the Indebtedness, whether or not then due; provided, however, Lender shall not apply insurance proceeds to the payment of the Indebtedness and shall permit Restoration pursuant to Section 9.03(b)(1)(A) if all of the following conditions are met:

    (i)    no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

    (ii)    Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

    (iii)    Lender determines that the Net Cash Flow generated by the Mortgaged Property after completion of the Restoration will be sufficient to support a debt service coverage ratio not less than the debt service coverage ratio immediately prior to the event of loss, but in no event less than 1.0x (the debt service coverage ratio shall be calculated on a thirty (30) year amortizing basis (if applicable, on a *proforma* basis approved by Lender) in all events and shall include all operating costs and other expenses, Imposition Deposits, deposits to Collateral Accounts, and Mortgage Loan repayment obligations);

    (iv)    Lender determines that the Restoration will be completed before the earlier of (1) one year before the stated Maturity Date, or (2) one year after the date of the loss or casualty; and

    (v)    Borrower provides Lender, upon written request, evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to this Loan Agreement.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 9

Form 6001.NR
06-19

Page 43
© 2019 Fannie Mae

(2)    Notwithstanding the foregoing, if any loss is estimated to be in an amount equal to or less than $75,000, Lender shall not exercise its rights and remedies as power-of-attorney herein and shall allow Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such policies of property damage insurance, and to collect and receive the proceeds of property damage insurance; provided that each of the following conditions shall be satisfied:

(A)    Borrower shall immediately notify Lender of the casualty giving rise to the claim;

(B)    no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

(C)    the Restoration will be completed before the earlier of (i) one year before the stated Maturity Date, or (ii) one year after the date of the loss or casualty;

(D)    Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

(E)    all proceeds of property damage insurance shall be issued in the form of joint checks to Borrower and Lender;

(F)    all proceeds of property damage insurance shall be applied to the Restoration;

(G)    Borrower shall deliver to Lender evidence satisfactory to Lender of completion of the Restoration and obtainment of all lien releases;

(H)    Borrower shall have complied to Lender's satisfaction with the foregoing requirements on any prior claims subject to this provision, if any; and

(I)    Lender shall have the right to inspect the Mortgaged Property (subject to the rights of tenants under the Leases).

(3)    If Lender elects to apply insurance proceeds to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property.  Rather, Borrower shall restrict access to the damaged portion of the Mortgaged Property and, at its expense and regardless of whether such costs are covered by insurance, clean up any debris resulting from the casualty event, and, if required or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition.  Nothing in this Section 9.03(b) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 9

Form 6001.NR
06-19

Page 44
© 2019 Fannie Mae

Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

**(c)  Payment Obligations Unaffected.**

The application of any insurance proceeds to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment, Monthly Replacement Reserve Deposit, or any other installments referred to in this Loan Agreement or in any other Loan Document. Notwithstanding the foregoing, if Lender applies insurance proceeds to the Indebtedness in connection with a casualty of less than the entire Mortgaged Property, and after such application of proceeds the debt service coverage ratio (as determined by Lender) is less than 1.25x based on the then-applicable Monthly Debt Service Payment and the anticipated ongoing Net Cash Flow of the Mortgaged Property after such casualty event, then Lender may, at its discretion, permit an adjustment to the Monthly Debt Service Payments that become due and owing thereafter, based on Lender's then-current underwriting requirements. In no event shall the preceding sentence obligate Lender to make any adjustment to the Monthly Debt Service Payments.

**(d)  Foreclosure Sale.**

If the Mortgaged Property is transferred pursuant to a Foreclosure Event or Lender otherwise acquires title to the Mortgaged Property, Borrower acknowledges that Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums applicable to the Mortgaged Property and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such Foreclosure Event or such acquisition.

**(e)  Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

# ARTICLE 10 - CONDEMNATION

**Section 10.01  Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 10.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)  Prior Condemnation Action.**

No part of the Mortgaged Property has been taken in connection with a Condemnation Action.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 9

Form 6001.NR
06-19

Page 45
© 2019 Fannie Mae

**(b)     Pending Condemnation Actions.**

No Condemnation Action is pending or, to Borrower's knowledge, is threatened for the partial or total condemnation or taking of the Mortgaged Property.

**Section 10.02     Covenants.**

**(a)     Notice of Condemnation.**

Borrower shall:

(1)     promptly notify Lender of any Condemnation Action of which Borrower has knowledge;

(2)     appear in and prosecute or defend, at its own cost and expense, any action or proceeding relating to any Condemnation Action, including any defense of Lender's interest in the Mortgaged Property tendered to Borrower by Lender, unless otherwise directed by Lender in writing; and

(3)     execute such further evidence of assignment of any condemnation award in connection with a Condemnation Action as Lender may require.

**(b)     Condemnation Proceeds.**

Borrower shall pay to Lender all awards or proceeds of a Condemnation Action promptly upon receipt.

**Section 10.03     Mortgage Loan Administration Matters Regarding Condemnation.**

**(a)     Application of Condemnation Awards.**

Lender may apply any awards or proceeds of a Condemnation Action, after the deduction of Lender's expenses incurred in the collection of such amounts, to:

(1)     the restoration or repair of the Mortgaged Property, if applicable;

(2)     the payment of the Indebtedness, with the balance, if any, paid to Borrower;
or

(3)     Borrower.

**(b)     Payment Obligations Unaffected.**

The application of any awards or proceeds of a Condemnation Action to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment, Monthly Replacement Reserve Deposit, or any other installments referred to in this Loan Agreement or in any other Loan Document.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 10

**Form 6001.NR**
06-19

**Page 46**
**© 2019 Fannie Mae**

**(c)** **Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

**(d)** **Preservation of Mortgaged Property.**

If a Condemnation Action results in or from damage to the Mortgaged Property and Lender elects to apply the proceeds or awards from such Condemnation Action to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to any portion of the Mortgaged Property which has been damaged or destroyed in connection with such Condemnation Action and, at Borrower's expense and regardless of whether such costs are covered by insurance, clean up any debris resulting in or from the Condemnation Action, and, if required by any Governmental Authority or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 10.03(d) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

# ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS

## Section 11.01    Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 11.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)** **No Labor or Materialmen's Claims.**

All parties furnishing labor and materials on behalf of Borrower have been paid in full. There are no mechanics' or materialmen's liens (whether filed or unfiled) outstanding for work, labor, or materials (and no claims or work outstanding that under applicable law could give rise to any such mechanics' or materialmen's liens) affecting the Mortgaged Property, whether prior to, equal with, or subordinate to the lien of the Security Instrument.

**(b)** **No Other Interests.**

No Person:

    (1)    other than Borrower has any possessory ownership or interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of existing Leases, the material terms of all such Leases having been previously disclosed in writing to Lender; or

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 10

Form 6001.NR
06-19

Page 47
© 2019 Fannie Mae

(2)     has an option, right of first refusal, or right of first offer (except as required by applicable law) to purchase the Mortgaged Property, or any interest in the Mortgaged Property.

## Section 11.02     Covenants.

### (a)     Liens; Encumbrances.

Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

(1)     Permitted Encumbrances;

(2)     the creation of:

(A)     any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within sixty (60) days after the earlier of the date Borrower has actual notice or constructive notice of the existence of such lien; or

(B)     any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(3)     the lien created by the Loan Documents.

### (b)     Transfers.

### (1)     Mortgaged Property.

Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

(A)     a Transfer to which Lender has consented in writing;

(B)     Leases permitted pursuant to the Loan Documents;

(C)     [reserved];

(D)     a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 48
© 2019 Fannie Mae

(E)    the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request (including reasonable attorneys' fees and a $5,000 review fee, which shall be in lieu of any other Review Fee or Transfer Fee);

(F)    a lien permitted pursuant to Section 11.02(a) of this Loan Agreement; or

(G)    the conveyance of the Mortgaged Property following a Foreclosure Event.

**(2)    Interests in Borrower, Key Principal, or Guarantor.**

Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

(A)    any direct or indirect ownership interest in Borrower, Key Principal, or Guarantor (if applicable) if such Transfer would cause a change in Control;

(B)    a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor (if applicable);

(C)    fifty percent (50%) or more of Key Principal's or Guarantor's direct or indirect ownership interests in Borrower that existed on the Effective Date (individually or on an aggregate basis);

(D)    the economic benefits or rights to cash flows attributable to any ownership interests in Borrower, Key Principal, or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement; or

(E)    a Transfer to a new key principal or new guarantor (if such new key principal or guarantor is an entity), which entity has an organizational existence termination date that ends before the Maturity Date.

Notwithstanding the foregoing, if a Publicly-Held Corporation or a Publicly-Held Trust Controls Borrower, Key Principal, or Guarantor, or owns a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor, a Transfer of any ownership interests in such Publicly-Held Corporation or Publicly-Held Trust shall not be prohibited under this Loan Agreement as long as (i) such Transfer does not result in a conversion of such Publicly-Held Corporation or Publicly-Held Trust to a privately held entity, and (ii) Borrower provides written notice to Lender not later than thirty (30) days thereafter of any such Transfer that results in any Person owning ten percent (10%) or more of the ownership interests in such Publicly-Held Corporation or Publicly-Held Trust.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 49
© 2019 Fannie Mae

(3)      **Transfers of Non-Controlling Interests.**

Transfers of direct or indirect limited partnership or non-managing member interests in Borrower that result in a Transfer of fifty percent (50%) or more of the limited partnership or non-managing membership interests shall be consented to by Lender if such Transfer satisfies the following conditions:

(A)      Key Principal or Guarantor (as applicable) Controls Borrower with the same rights and abilities as Key Principal or Guarantor (as applicable) Controls Borrower immediately prior to the date of such Transfer;

(B)      such Transfer satisfies the requirements of Section 11.02(b)(2)(C);

(C)      Borrower shall provide Lender not less than thirty (30) days prior written notice of the proposed Transfer and obtain Lender's approval;

(D)      Borrower shall provide with its notice to Lender an organizational chart reflecting, and all organizational documents relevant to, the proposed Transfer;

(E)      Borrower shall provide with its notice to Lender a certification that no change of Control of Borrower or Key Principal shall occur as a result of such Transfer;

(F)      the transferee shall not be, as of the date of the Transfer, a Prohibited Person if, as a result of the Transfer, the transferee will own twenty-five percent (25%) or more of the direct or indirect ownership interests in Borrower (or, if any other investor will own twenty-five percent (25%) or more of the direct or indirect ownership interests in Borrower that did not own twenty-five percent (25%) or more before the Transfer, such investor shall not, as of the date of the Transfer, be a Prohibited Person);

(G)      Borrower shall pay to Lender:

(i)      concurrently with its notice to Lender, the Review Fee plus a Transfer Fee of $25,000; and

(ii)      upon demand, any out-of-pocket costs and expenses, including reasonable attorneys' fees and expenses, incurred by Lender in connection with its review of the Transfer request; and

(H)      Borrower shall execute upon demand such documents or certifications as Lender reasonably requires in order to confirm the post-transfer ownership structure, compliance with the stated conditions, and any other relevant factual matter.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 50
© 2019 Fannie Mae

**(4)  Name Change or Entity Conversion.**

Lender shall consent to Borrower changing its name, changing its jurisdiction of organization, or converting from one type of legal entity into another type of legal entity for any lawful purpose, provided that:

(A)  Lender receives written notice at least thirty (30) days prior to such change or conversion, which notice shall include organizational charts that reflect the structure of Borrower both prior to and subsequent to such name change or entity conversion;

(B)  such Transfer is not otherwise prohibited under the provisions of Section 11.02(b)(2);

(C)  Borrower executes an amendment to this Loan Agreement and any other Loan Documents required by Lender documenting the name change or entity conversion;

(D)  Borrower agrees and acknowledges, at Borrower's expense, that (i) Borrower will execute and record in the land records any instrument required by the Property Jurisdiction to be recorded to evidence such name change or entity conversion (or provide Lender with written confirmation from the title company (via electronic mail or letter) that no such instrument is required), (ii) Borrower will execute any additional documents required by Lender, including the amendment to this Loan Agreement, and allow such documents to be recorded or filed in the land records of the Property Jurisdiction, (iii) Lender will obtain a "date down" endorsement to the Lender's Title Policy (or obtain a new Title Policy if a "date down" endorsement is not available in the Property Jurisdiction), evidencing title to the Mortgaged Property being in the name of the successor entity and the Lien of the Security Instrument against the Mortgaged Property, and (iv) Lender will file any required UCC-3 financing statement and make any other filing deemed necessary to maintain the priority of its Liens on the Mortgaged Property; and

(E)  no later than ten (10) days subsequent to such name change or entity conversion, Borrower shall provide Lender (i) the documentation filed with the appropriate office in Borrower's state of formation evidencing such name change or entity conversion, (ii) copies of the organizational documents of Borrower, including any amendments, filed with the appropriate office in Borrower's state of formation reflecting the post-conversion Borrower name, form of organization, and structure, and (iii) if available, new certificates of good standing or valid formation for Borrower.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 51
© 2019 Fannie Mae

(5)     **No Delaware Statutory Trust or Series LLC Conversion.**

Notwithstanding any provisions herein to the contrary, no Borrower, Guarantor, or Key Principal shall convert to a Delaware Statutory Trust or a series limited liability company.

(6)     **Plans of Division.**

Borrower shall not Divide.  Lender shall consent to a Division by Guarantor or Key Principal provided that:

(A)     Lender receives written notice at least thirty (30) days prior to the effective date of such Division, which notice shall include (i) a certification acceptable to Lender that such Division is not otherwise prohibited under the provisions of Article 11, (ii) a copy of the plan of division, and (iii) organizational charts that reflect the organizational structure of Borrower, Guarantor, and Key Principal both prior to and subsequent to such Division;

(B)     no later than ten (10) days subsequent to such Division, Borrower shall provide Lender (i) the certificate of division or such other documentation filed with the appropriate office evidencing such Division, (ii) copies of the organizational documents of Borrower (if amended), Guarantor, and Key Principal, including any amendments thereto, that reflect the post-Division organizational structure, and (iii) new certificates of good standing or valid formation for Borrower (if amended), Guarantor, and Key Principal; and

(C)     Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request (including reasonable attorneys' fees and a $25,000 review fee, which shall be in lieu of any other Review Fee or Transfer Fee).

(c)     **No Other Indebtedness.**

Other than the Mortgage Loan, Borrower shall not incur or be obligated at any time with respect to any loan or other indebtedness (except trade payables as otherwise permitted in this Loan Agreement), including any indebtedness secured by a Lien on, or the cash flows from, the Mortgaged Property.

(d)     **No Mezzanine Financing or Preferred Equity.**

Neither Borrower nor any direct or indirect owner of Borrower shall: (1) incur any Mezzanine Debt other than Permitted Mezzanine Debt; (2) issue any Preferred Equity other than Permitted Preferred Equity; or (3) incur any similar indebtedness or issue any similar equity.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 52
© 2019 Fannie Mae

**Section 11.03    Mortgage Loan Administration Matters Regarding Liens, Transfers, and Assumptions.**

    **(a)    Assumption of Mortgage Loan.**

    Lender shall consent to a Transfer of the Mortgaged Property to and an assumption of the Mortgage Loan by a new borrower if each of the following conditions is satisfied prior to the Transfer:

    (1)    Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(a);

    (2)    no Event of Default has occurred and is continuing, and no event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing;

    (3)    Lender determines that:

    (A)    the proposed new borrower, new key principal, and any other new guarantor fully satisfy all of Lender's then-applicable borrower, key principal, or guarantor eligibility, credit, management, and other loan underwriting standards, which shall include an analysis of (i) the previous relationships between Lender and the proposed new borrower, new key principal, new guarantor, and any Person in Control of them, and the organization of the new borrower, new key principal, and new guarantor (if applicable), and (ii) the operating and financial performance of the Mortgaged Property, including physical condition and occupancy;

    (B)    none of the proposed new borrower, new key principal, and any new guarantor, or any owners of the proposed new borrower, new key principal, and any new guarantor, are a Prohibited Person; and

    (C)    none of the proposed new borrower, new key principal, and any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date;

    (4)    [reserved];

    (5)    the proposed new borrower has:

    (A)    executed an assumption agreement acceptable to Lender that, among other things, requires the proposed new borrower to assume and perform all obligations of Borrower (or any other transferor), and that may require that the new borrower comply with any provisions of any Loan Document that previously may have been waived by Lender for Borrower, subject to the terms of Section 11.03(g);

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 53
© 2019 Fannie Mae

(B)     if required by Lender, delivered to the title company for filing and/or recording in all applicable jurisdictions, all applicable Loan Documents including the assumption agreement to correctly evidence the assumption and the confirmation, continuation, perfection, and priority of the Liens created hereunder and under the other Loan Documents; and

(C)     delivered to Lender a "date-down" endorsement to the Title Policy acceptable to Lender (or a new title insurance policy if a "date-down" endorsement is not available);

(6)     one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

(A)     an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

(B)     a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender;

(7)     Lender has reviewed and approved the Transfer documents; and

(8)     Lender has received the fees described in Section 11.03(g).

**(b)     Transfers to Key Principal-Owned Affiliates or Guarantor-Owned Affiliates.**

(1)     Except as otherwise covered in Section 11.03(b)(2) below, Transfers of direct or indirect ownership interests in Borrower to Key Principal or Guarantor, or to a transferee through which Key Principal or Guarantor (as applicable) Controls Borrower with the same rights and abilities as Key Principal or Guarantor (as applicable) Controls Borrower immediately prior to the date of such Transfer, shall be consented to by Lender if such Transfer satisfies the applicable requirements of Section 11.03(a) as they would relate to such transferee, other than Section 11.03(a)(5).

(2)     Transfers of direct or indirect interests in Borrower held by a Key Principal or Guarantor to other Key Principals or Guarantors, as applicable, shall be consented to by Lender if such Transfer satisfies the following conditions:

(A)     the Transfer does not cause a change in the Control of Borrower; and

(B)     the transferor Key Principal or Guarantor maintains the same right and ability to Control Borrower as existed prior to the Transfer.

If the conditions set forth in this Section 11.03(b) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 11

Form 6001.NR
06-19

**Page 54**
**© 2019 Fannie Mae**

(c)     **Estate Planning.**

Notwithstanding the provisions of Section 11.02(b)(2), so long as (1) the Transfer does not cause a change in the Control of Borrower, and (2) Key Principal and Guarantor, as applicable, maintain the same right and ability to Control Borrower as existed prior to the Transfer, Lender shall consent to Transfers of direct or indirect ownership interests in Borrower and Transfers of direct or indirect ownership interests in an entity Key Principal or entity Guarantor to:

(A)     Immediate Family Members of such transferor, each of whom must have obtained the legal age of majority;

(B)     United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor; or

(C)     partnerships or limited liability companies of which the partners or members, respectively, are comprised entirely of (i) such transferor and Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, (ii) Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, or (iii) United States domiciled trusts established for the benefit of the transferor or Immediate Family Members of the transferor.

If the conditions set forth in this Section 11.03(c) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

(d)     **Termination or Revocation of Trust.**

If any of Borrower, Guarantor, or Key Principal is a trust, or if Control of Borrower, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, the termination or revocation of such trust is an unpermitted Transfer; provided that the termination or revocation of the trust due to the death of an individual trustor shall not be considered an unpermitted Transfer so long as:

(1)     Lender is notified within thirty (30) days of the death; and

(2)     such Borrower, Guarantor, Key Principal, or other Person, as applicable, is replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 11.03(a) within ninety (90) days of the date of the death causing the termination or revocation.

If the conditions set forth in this Section 11.03(d) are satisfied, the Transfer Fee shall be waived; provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 55
© 2019 Fannie Mae

**(e)**     **Death of Key Principal or Guarantor; Transfer Due to Death.**

    (1)     If a Key Principal or Guarantor that is a natural person dies, or if Control of Borrower, Guarantor, or Key Principal is Transferred, or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred as a result of the death of a Person (except in the case of trusts which is addressed in Section 11.03(d)), Borrower must notify Lender in writing within ninety (90) days in the event of such death. Unless waived in writing by Lender, the deceased shall be replaced by an individual or entity within one hundred eighty (180) days, subject to Borrower's satisfaction of the following conditions:

    (A)     Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(e);

    (B)     Lender determines that, if applicable:

    (i)     any proposed new key principal and any other new guarantor (or Person Controlling such new key principal or new guarantor) fully satisfies all of Lender's then-applicable key principal or guarantor eligibility, credit, management, and other loan underwriting standards (including any standards with respect to previous relationships between Lender and the proposed new key principal and new guarantor (or Person Controlling such new key principal or new guarantor) and the organization of the new key principal and new guarantor);

    (ii)     none of any proposed new key principal or any new guarantor, or any owners of the proposed new key principal or any new guarantor, is a Prohibited Person; and

    (iii)     none of any proposed new key principal or any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date; and

    (C)     if applicable, one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

    (i)     an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

    (ii)     a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender.

    (2)     In the event a replacement Key Principal, Guarantor, or other Person is required by Lender due to the death described in this Section 11.03(e), and such replacement has not occurred within such period, the period for replacement may be

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 56
© 2019 Fannie Mae

extended by Lender to a date not more than one year from the date of such death; however, Lender may require as a condition to any such extension that:

> (A)    the then-current property manager be replaced with a property manager reasonably acceptable to Lender (or if a property manager has not been previously engaged, a property manager reasonably acceptable to Lender be engaged); or

> (B)    a lockbox agreement or similar cash management arrangement (with the property manager) reasonably acceptable to Lender during such extended replacement period be instituted.

If the conditions set forth in this Section 11.03(e) are satisfied, the Transfer Fee shall be waived, provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(f)    Bankruptcy of Guarantor.**

> (1)    Upon the occurrence of any Guarantor Bankruptcy Event, unless waived in writing by Lender, the applicable Guarantor shall be replaced by an individual or entity within ninety (90) days of such Guarantor Bankruptcy Event, subject to Borrower's satisfaction of the following conditions:

> > (A)    Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(f);

> > (B)    Lender determines that:

> > > (i)    the proposed new guarantor fully satisfies all of Lender's then-applicable guarantor eligibility, credit, management, and other loan underwriting standards (including any standards with respect to previous relationships between Lender and the proposed new guarantor and the organization of the new guarantor (if applicable));

> > > (ii)    no new guarantor is a Prohibited Person; and

> > > (iii)    no new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date; and

> > (C)    one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

> > > (i)    an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 57
© 2019 Fannie Mae

(ii)     a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender.

(2)     In the event a replacement Guarantor is required by Lender due to the Guarantor Bankruptcy Event described in this Section 11.03(f), and such replacement has not occurred within such period, the period for replacement may be extended by Lender in its discretion; however, Lender may require as a condition to any such extension that:

(A)     the then-current property manager be replaced with a property manager reasonably acceptable to Lender (or if a property manager has not been previously engaged, a property manager reasonably acceptable to Lender be engaged); or

(B)     a lockbox agreement or similar cash management arrangement (with the property manager) reasonably acceptable to Lender during such extended replacement period be instituted.

If the conditions set forth in this Section 11.03(f) are satisfied, the Transfer Fee shall be waived, provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(g)     Further Conditions to Transfers and Assumption.**

(1)     In connection with any Transfer of the Mortgaged Property, or an ownership interest in Borrower, Key Principal, or Guarantor for which Lender's approval is required under this Loan Agreement (including Section 11.03(a)), Lender may, as a condition to any such approval, require:

(A)     additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property;

(B)     amendment of the Loan Documents to delete or modify any specially negotiated terms or provisions previously granted for the exclusive benefit of original Borrower, Key Principal, or Guarantor and to restore the original provisions of the standard Fannie Mae form multifamily loan documents, to the extent such provisions were previously modified; or

(C)     a modification to the amounts required to be deposited into the Reserve/Escrow Account pursuant to the terms of Section 13.02(a)(3)(B).

(2)     In connection with any request by Borrower for consent to a Transfer, Borrower shall pay to Lender upon demand:

(A)     the Transfer Fee (to the extent charged by Lender);

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 58
© 2019 Fannie Mae

(B)　the Review Fee (regardless of whether Lender approves or denies such request); and

(C)　all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, regardless of whether Lender approves or denies such request.

# ARTICLE 12 - IMPOSITIONS

## Section 12.01　Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 12.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)　Payment of Taxes, Assessments, and Other Charges.**

Borrower has:

(1)　paid (or with the approval of Lender, established an escrow fund sufficient to pay when due and payable) all amounts and charges relating to the Mortgaged Property that have become due and payable before any fine, penalty interest, lien, or costs may be added thereto, including Impositions, leasehold payments, and ground rents;

(2)　paid all Taxes for the Mortgaged Property that have become due before any fine, penalty interest, lien, or costs may be added thereto pursuant to any notice of assessment received by Borrower and any and all taxes that have become due against Borrower before any fine, penalty interest, lien, or costs may be added thereto;

(3)　no knowledge of any basis for any additional assessments;

(4)　no knowledge of any presently pending special assessments against all or any part of the Mortgaged Property, or any presently pending special assessments against Borrower; and

(5)　not received any written notice of any contemplated special assessment against the Mortgaged Property, or any contemplated special assessment against Borrower.

## Section 12.02　Covenants.

**(a)　Imposition Deposits, Taxes, and Other Charges.**

Borrower shall:

(1)　deposit the Imposition Deposits with Lender on each Payment Date (or on another day designated in writing by Lender) in amount sufficient, in Lender's discretion,

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 11

Form 6001.NR
06-19

Page 59
© 2019 Fannie Mae

to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added, plus an amount equal to no more than one-sixth (1/6) (or the amount permitted by applicable law) of the Impositions for the trailing twelve (12) months (calculated based on the aggregate annual Imposition costs divided by twelve (12) and multiplied by two (2));

(2)     deposit with Lender, within ten (10) days after written notice from Lender (subject to applicable law), such additional amounts estimated by Lender to be reasonably necessary to cure any deficiency in the amount of the Imposition Deposits held for payment of a specific Imposition;

(3)     except as set forth in Section 12.03(c) below, pay all Impositions, leasehold payments, ground rents, and Taxes when due and before any fine, penalty interest, lien, or costs may be added thereto;

(4)     promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and, if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments; and

(5)     promptly deliver to Lender a copy of all notices of any special assessments and contemplated special assessments against the Mortgaged Property or Borrower.

## Section 12.03    Mortgage Loan Administration Matters Regarding Impositions.

### (a)    Maintenance of Records by Lender.

Lender shall maintain records of the monthly and aggregate Imposition Deposits held by Lender for the purpose of paying Taxes, insurance premiums, and each other obligation of Borrower for which Imposition Deposits are required.

### (b)    Imposition Accounts.

All Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and which accounts meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be obligated to open additional accounts, or deposit Imposition Deposits in additional institutions, when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. No interest, earnings, or profits on the Imposition Deposits shall be paid to Borrower unless applicable law so requires. Imposition Deposits shall not be trust funds or operate to reduce the Indebtedness, unless applied by Lender for that purpose in accordance with this Loan Agreement. For the purposes of 9-104(a)(3) of the UCC, Lender is the owner of the Imposition Deposits and shall be deemed a "customer" with sole control of the account holding the Imposition Deposits.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 12

Form 6001.NR
06-19

Page 60
© 2019 Fannie Mae

**(c)     Payment of Impositions; Sufficiency of Imposition Deposits.**

Lender may pay an Imposition according to any bill, statement, or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement, or estimate or into the validity of the Imposition.  Imposition Deposits shall be required to be used by Lender to pay Taxes, insurance premiums and any other individual Imposition only if:

(1)     no Event of Default exists;

(2)     Borrower has timely delivered to Lender all applicable bills or premium notices that it has received; and

(3)     sufficient Imposition Deposits are held by Lender for each Imposition at the time such Imposition becomes due and payable.

Lender shall have no liability to Borrower or any other Person for failing to pay any Imposition if any of the conditions are not satisfied.  If at any time the amount of the Imposition Deposits held for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender to be held in connection with such Imposition, the excess may be credited against future installments of Imposition Deposits for such Imposition.

**(d)     Imposition Deposits Upon Event of Default.**

If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in such amount and in such order as Lender determines, to pay any Impositions or as a credit against the Indebtedness.

**(e)     Contesting Impositions.**

Other than insurance premiums, Borrower may contest, at its expense, by appropriate legal proceedings, the amount or validity of any Imposition if:

(1)     Borrower notifies Lender of the commencement or expected commencement of such proceedings;

(2)     Lender determines that the Mortgaged Property is not in danger of being sold or forfeited;

(3)     Borrower deposits with Lender (or the applicable Governmental Authority if required by applicable law) reserves sufficient to pay the contested Imposition, if required by Lender (or the applicable Governmental Authority);

(4)     Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested in writing by Lender; and

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 12

Form 6001.NR
06-19

Page 61
© 2019 Fannie Mae

(5)     Borrower commences, and at all times thereafter diligently prosecutes, such contest in good faith until a final determination is made by the applicable Governmental Authority.

**(f)     Release to Borrower.**

Upon payment in full of all sums secured by the Security Instrument and this Loan Agreement and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower the balance of any Imposition Deposits then on deposit with Lender.

# ARTICLE 13 – REPLACEMENTS, REPAIRS, AND RESTORATION

**Section 13.01     Covenants.**

**(a)     Initial Deposits to Replacement Reserve Account, Repairs Escrow Account, and Restoration Reserve Account.**

(1)     On the Effective Date, Borrower shall pay to Lender:

(A)     the Initial Replacement Reserve Deposit for deposit into the Replacement Reserve Account; and

(B)     the Repairs Escrow Deposit for deposit into the Repairs Escrow Account.

(2)     After an event of loss, Borrower shall deliver or cause to be delivered to Lender any insurance proceeds received under any insurance policy required to be maintained in accordance with Article 9.

**(b)     Monthly Replacement Reserve Deposits.**

Borrower shall deposit the applicable Monthly Replacement Reserve Deposit into the Replacement Reserve Account on each Payment Date.

**(c)     Payment and Deliverables for Replacements, Repairs, and Restoration.**

Borrower shall:

(1)     pay all invoices for Replacements, Repairs, and Restoration, regardless of whether funds on deposit in the applicable Reserve/Escrow Account are sufficient to pay the full amount of such invoices, prior to any request for disbursement from such Reserve/Escrow Account (unless Lender has agreed to issue joint checks in connection with a particular Replacement, Repair, or Restoration);

(2)     pay all applicable fees and charges of any Governmental Authority on account of the Replacements, Repairs, and Restoration, as applicable;

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 12

Form 6001.NR
06-19

Page 62
© 2019 Fannie Mae

(3)     provide evidence satisfactory to Lender of completion of the Replacements, Restoration (within the period required under Section 9.03(b)(1)(B)(iv) or such other period required by Lender), and any Required Repairs (within the Completion Period or within such other period or by such other date set forth in the Required Repair Schedule and any Borrower Requested Repairs and Additional Lender Repairs (by the date specified by Lender for any such Borrower Requested Repairs or Additional Lender Repairs)); and

(4)     prior to commencement of any Restoration, Borrower shall deliver to Lender, for Lender's review and approval:

(A)     a copy of the plans and specifications for the Restoration; and

(B)     a copy of all building and other permits and authorizations required by any law, ordinance, statute, rule or regulation of the Governmental Authority to carry out the Restoration.

**(d)     Assignment of Contracts for Replacements, Repairs, and Restoration.**

Borrower shall collaterally assign to Lender as additional security any contract or subcontract for Replacements, Repairs, or Restoration, upon Lender's written request, on a form of assignment approved by Lender.

**(e)     Indemnification.**

If Lender elects to exercise its rights under Section 14.03 due to Borrower's failure to timely commence or complete any Replacements, Repairs, or Restoration, Borrower shall indemnify and hold Lender harmless for, from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arising from or in any way connected with the performance by Lender of the Replacements, Repairs, or Restoration or the investment of the Reserve/Escrow Account Funds; provided that Borrower shall have no indemnity obligation if such actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arise as a result of the willful misconduct or gross negligence of Lender, Lender's agents, employees, or representatives as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**(f)     Amendments to Loan Documents.**

Subject to Section 5.02, Borrower shall execute and deliver to Lender, upon written request, an amendment to this Loan Agreement, the Security Instrument, and any other Loan Document deemed necessary or desirable to perfect Lender's lien upon any portion of the Mortgaged Property for which Reserve/Escrow Account Funds were expended.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 63
© 2019 Fannie Mae

**(g)     Administrative Fees and Expenses.**

Borrower shall pay to Lender:

(1)     by the date specified in the applicable invoice, the Repairs Escrow Account Administrative Fee, the Replacement Reserve Account Administration Fee, and the Restoration Reserve Account Administration Fee for Lender's services in administering the Reserve/Escrow Accounts and investing the Reserve/Escrow Account Funds;

(2)     upon demand, a reasonable inspection fee, not exceeding the Maximum Inspection Fee, for each inspection of the Mortgaged Property by Lender in connection with a Repair, Replacement, or Restoration item, plus all other reasonable costs and out-of-pocket expenses relating to such inspections; and

(3)     upon demand, all reasonable fees charged by any engineer, architect, inspector or other person inspecting the Mortgaged Property on behalf of Lender for each inspection of the Mortgaged Property in connection with a Repair, Replacement, or Restoration item, plus all other reasonable costs and out-of-pocket expenses relating to such inspections.

**Section 13.02     Mortgage Loan Administration Matters Regarding Reserves.**

**(a)     Accounts, Deposits, and Disbursements.**

**(1)     Custodial Accounts.**

(A)     The Replacement Reserve Account shall be an interest-bearing account that meets the standards for custodial accounts as required by Lender from time to time.  Lender shall not be responsible for any losses resulting from the investment of the Replacement Reserve Deposits or for obtaining any specific level or percentage of earnings on such investment.  All interest, if any, earned on the Replacement Reserve Deposits shall be added to and become part of the Replacement Reserve Account; provided, however, if applicable law requires, and so long as no Event of Default has occurred and is continuing under any of the Loan Documents, Lender shall pay to Borrower the interest earned on the Replacement Reserve Account not less frequently than the Replacement Reserve Account Interest Disbursement Frequency.

(B)     Lender shall not be obligated to deposit the Repairs Escrow Deposits or any funds held in the Restoration Reserve Account into an interest-bearing account.

(C)     In no event shall Lender be obligated to disburse funds from any Reserve/Escrow Account if an Event of Default has occurred and is continuing.

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 13

**Form 6001.NR**
06-19

**Page 64
© 2019 Fannie Mae**

**(2) Disbursements by Lender Only.**

Only Lender or a designated representative of Lender may make disbursements from the Reserve/Escrow Accounts and the Repairs Escrow Account. Except as provided in Section 13.02(a)(8), disbursements shall only be made upon Borrower request and after satisfaction of all conditions for disbursement.

**(3) Adjustment to Deposits.**

**(A) Mortgage Loan Terms Exceeding Ten (10) Years.**

If the Loan Term exceeds ten (10) years (or five (5) years in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms), a property condition assessment shall be ordered by Lender for the Mortgaged Property at the expense of Borrower (which expense may be paid out of the Replacement Reserve Account if excess funds are available). The property condition assessment shall be performed no earlier than the sixth (6th) month and no later than the ninth (9th) month of the tenth (10th) Loan Year and every tenth (10th) Loan Year thereafter if the Loan Term exceeds twenty (20) years (or the fifth (5th) Loan Year in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms and every fifth (5th) Loan Year thereafter if the Loan Term exceeds ten (10) years). After review of the property condition assessment, the amount of the Monthly Replacement Reserve Deposit may be adjusted by Lender for the remaining Loan Term by written notice to Borrower so that the Monthly Replacement Reserve Deposits are sufficient to fund the Replacements as and when required and/or the amount to be held in the Repairs Escrow Account may be adjusted by Lender so that the Repairs Escrow Deposit is sufficient to fund the Repairs as and when required.

**(B) Transfers.**

In connection with any Transfer of the Mortgaged Property, or any Transfer of an ownership interest in Borrower, Guarantor, or Key Principal that requires Lender's consent, Lender may review the amounts on deposit, if any, in the Reserve/Escrow Accounts, the amount of the Monthly Replacement Reserve Deposit and the likely repairs and replacements required by the Mortgaged Property, and the related contingencies which may arise during the remaining Loan Term. Based upon that review, Lender may require an additional deposit to the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, or an increase in the amount of the Monthly Replacement Reserve Deposit as a condition to Lender's consent to such Transfer.

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 65
© 2019 Fannie Mae

**(4)      Insufficient Funds.**

Lender may, upon thirty (30) days' prior written notice to Borrower, require an additional deposit(s) to the Replacement Reserve Account, the Repairs Escrow Account, or the Restoration Reserve Account, or an increase in the amount of the Monthly Replacement Reserve Deposit, if Lender determines that the amounts on deposit in any of the Reserve/Escrow Accounts are not sufficient to cover the costs for Required Repairs, Required Replacements, or the Restoration or, pursuant to the terms of Section 13.02(a)(9), not sufficient to cover the costs for Borrower Requested Repairs, Additional Lender Repairs, Borrower Requested Replacements, or Additional Lender Replacements. Borrower's agreement to complete the Replacements, the Repairs, or the Restoration as required by this Loan Agreement shall not be affected by the insufficiency of any balance in the Reserve/Escrow Accounts.

**(5)      Disbursements for Replacements, Repairs, and Restoration.**

(A)      With respect to Replacements, disbursement requests may only be made after completion of the applicable Replacements and only to reimburse Borrower for the actual approved costs of the Replacements. Lender shall not disburse from the Replacement Reserve Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Replacement Reserve Account shall not be made more frequently than the Maximum Replacement Reserve Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Replacement Reserve Account shall not be less than the Minimum Replacement Reserve Disbursement Amount.

(B)      With respect to Repairs, disbursement requests may only be made after completion of the applicable Repairs and only to reimburse Borrower for the actual cost of the Repairs, up to the Maximum Repair Cost. Lender shall not disburse any amounts which would cause the funds remaining in the Repairs Escrow Account after any disbursement (other than with respect to the final disbursement) to be less than the Maximum Repair Cost of the then-current estimated cost of completing all remaining Repairs. Lender shall not disburse from the Repairs Escrow Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Repairs Escrow Account shall not be made more frequently than the Maximum Repair Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Repairs Escrow Account shall not be less than the Minimum Repairs Disbursement Amount.

(C)      With respect to Restoration, disbursement requests may only be made after completion of the applicable Restoration and only to reimburse Borrower for the actual approved costs of the Restoration. Each disbursement shall be equal to the amount of the actual approved costs of the Restoration items covered

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 66
© 2019 Fannie Mae

by the disbursement request. In addition, Lender shall not disburse any amounts which would cause the funds remaining in the Restoration Reserve Account after any disbursement (other than with respect to the final disbursement) to be less than the then-current estimated cost of completing all remaining Restoration. Lender shall not disburse from the Restoration Reserve Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from any other Reserve/Escrow Account. Disbursement from the Restoration Reserve Account shall not be made more frequently than the Maximum Restoration Reserve Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Restoration Reserve Account shall not be less than the Minimum Restoration Reserve Disbursement Amount.

**(6)    Disbursement Requests.**

Borrower must submit a disbursement request in writing for each disbursement from a Reserve/Escrow Account, which disbursement request must specify the items of Replacement, Repairs, or Restoration for which reimbursement is requested (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)), and must:

(A)    if applicable, specify the quantity and price of the items or materials purchased, grouped by type or category;

(B)    if applicable, specify the cost of all contracted labor or other services, including architectural services, involved in the Replacement, Repair, or Restoration for which such request for disbursement is made;

(C)    if applicable, include copies of invoices for all items or materials purchased and all contracted labor or services provided;

(D)    include evidence of payment of such Replacement, Repair, or Restoration satisfactory to Lender (unless Lender has agreed to issue joint checks in connection with a particular Repair, Replacement, or Restoration item as provided in this Loan Agreement);

(E)    if applicable, contain a certification by Borrower that the Repair, Replacement, or Restoration has been completed lien free and in a good and workmanlike manner, in accordance with any plans and specifications previously approved by Lender (if applicable) and in compliance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority having jurisdiction over the Mortgaged Property, and otherwise in accordance with the provisions of this Loan Agreement; and

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 67
© 2019 Fannie Mae

(F)     if applicable, include evidence that any certificates of occupancy required by applicable laws or any Governmental Authority have been issued.

**(7)     Conditions to Disbursement.**

In addition to each disbursement request and information required in connection with such disbursement request, Lender may require any or all of the following at the expense of Borrower as a condition to disbursement of Reserve/Escrow Account Funds (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)):

(A)     an inspection by Lender of the Mortgaged Property and the applicable Replacement, Repair, or Restoration item;

(B)     an inspection or certificate of completion by an appropriate independent qualified professional (such as an architect, engineer or property inspector, depending on the nature of the Repair, Replacement, or Restoration) selected by Lender;

(C)     either:

(i)     a search of title to the Mortgaged Property effective to the date of disbursement; or

(ii)     a "date-down" endorsement to Lender's Title Policy (or a new Lender's Title Policy if a "date-down" is not available) extending the effective date of such policy to the date of disbursement, and showing no Liens other than (1) Permitted Encumbrances, (2) liens which Borrower is diligently contesting in good faith that have been bonded off to the satisfaction of Lender, or (3) mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(D)     an acknowledgement of payment, waiver of claims, and release of lien for work performed and materials supplied from each contractor, subcontractor or materialman in accordance with the requirements of applicable law and covering all work performed and materials supplied (including equipment and fixtures) for the Mortgaged Property by that contractor, subcontractor, or materialman through the date covered by the disbursement request (or, in the event that payment to such contractor, subcontractor, or materialman is to be made by a joint check, the release of lien shall be effective through the date covered by the previous disbursement).

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 68
© 2019 Fannie Mae

**(8)     Joint Checks for Periodic Disbursements.**

Lender may, upon Borrower's written request, issue joint checks, payable to Borrower and the applicable supplier, materialman, mechanic, contractor, subcontractor, or other similar party, if:

  **(A)** the cost of the Replacement, Repair, or Restoration item exceeds the Replacement Threshold, the Repair Threshold, or the Restoration Threshold, as applicable, and the contractor performing such Replacement, Repair, or Restoration requires periodic payments pursuant to the terms of the applicable written contract;

  **(B)** the contract for such Replacement, Repair, or Restoration item requires payment upon completion of the applicable portion of the work;

  **(C)** Borrower makes the disbursement request after completion of the applicable portion of the work required to be completed under such contract;

  **(D)** the materials for which the request for disbursement has been made are on site at the Mortgaged Property and are properly secured or installed;

  **(E)** Lender determines that the remaining funds in the Reserve/Escrow Account are sufficient to pay the cost of the Replacement, Repair, or Restoration item, as applicable, and the then-current estimated cost of completing all remaining Required Replacements, Restoration, or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender;

  **(F)** each supplier, materialman, mechanic, contractor, subcontractor, or other similar party receiving payments shall have provided, if requested in writing by Lender, a waiver of liens with respect to amounts which have been previously paid to them; and

  **(G)** all other conditions for disbursement have been satisfied.

**(9)     Replacements and Repairs Other than Required Replacements or Required Repairs.**

  **(A)     Borrower Requested Replacements and Borrower Requested Repairs.**

Borrower may submit a disbursement request from the Replacement Reserve Account or the Repairs Escrow Account to reimburse Borrower for any Borrower Requested Replacement or Borrower Requested Repair. The disbursement request must be in writing and include an explanation for such

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 69
© 2019 Fannie Mae

request.  Lender shall make disbursements for Borrower Requested Replacements or Borrower Requested Repairs if:

> (i)     they are of the type intended to be covered by the Replacement Reserve Account or the Repairs Escrow Account, as applicable;

> (ii)     the costs are commercially reasonable;

> (iii)     the amount of funds in the Replacement Reserve Account or Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements or Additional Lender Repairs that have been previously approved by Lender; and

> (iv)     all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit in connection with any such Borrower Requested Replacements, or an additional deposit to the Repairs Escrow Account for any such Borrower Requested Repairs.

**(B)    Additional Lender Replacements and Additional Lender Repairs.**

Lender may require, as set forth in Section 6.02(b), Section 6.03(c), or otherwise from time to time, upon written notice to Borrower, that Borrower make Additional Lender Replacements or Additional Lender Repairs.  Lender shall make disbursements from the Replacement Reserve Account for Additional Lender Replacements or from the Repairs Escrow Account for Additional Lender Repairs, as applicable, if:

> (i)     the costs are commercially reasonable;

> (ii)     the amount of funds in the Replacement Reserve Account or the Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 13

**Form 6001.NR**
06-19

**Page 70**
**© 2019 Fannie Mae**

(iii) all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit for any such Additional Lender Replacements or an additional deposit to the Repairs Escrow Account for any such Additional Lender Repair.

**(10) Excess Costs.**

In the event any Replacement, Repair, or Restoration item exceeds the approved cost set forth on either the Required Replacement Schedule for Replacements, the Maximum Repair Cost for Repairs, or the initial cost approved by Lender for Restoration, as applicable, Borrower may submit a disbursement request to reimburse Borrower for such excess cost. The disbursement request must be in writing and include an explanation for such request. Lender shall make disbursements from the applicable Reserve/Escrow Account, if:

(A) the excess cost is commercially reasonable;

(B) the amount of funds in the applicable Reserve/Escrow Account is sufficient to pay such excess costs and the then-current estimated cost of completing all remaining Required Replacements, Restoration, or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

(C) all conditions for disbursement from the applicable Reserve/Escrow Account or the Repairs Escrow Account have been satisfied.

**(11) Final Disbursements.**

Upon completion and satisfaction of all conditions for disbursements for any Repairs and Restoration, and further provided no Event of Default has occurred and is continuing, Lender shall disburse to Borrower any amounts then remaining in the Repairs Escrow Account or the Restoration Reserve Account, as applicable. Upon payment in full of the Indebtedness and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower any and all amounts then remaining in the Reserve/Escrow Accounts (if not previously released).

**(b) Approvals of Contracts; Assignment of Claims.**

Lender retains the right to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors, or other parties providing labor or materials in

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 71
© 2019 Fannie Mae

connection with the Replacements, Repairs, or Restoration. Notwithstanding Borrower's assignment (in the Security Instrument) of its rights and claims against all Persons supplying labor or materials in connection with the Replacements, Repairs, or Restoration, Lender will not pursue any such right or claim unless an Event of Default has occurred and is continuing or as otherwise provided in Section 14.03(c).

(c)     **Delays and Workmanship.**

If any work for any Replacement, Repair, or Restoration item has not timely commenced, has not been timely performed in a workmanlike manner, or has not been timely completed in a workmanlike manner, Lender may, without notice to Borrower:

(1)     withhold disbursements from the applicable Reserve/Escrow Account;

(2)     proceed under existing contracts or contract with third parties to make or complete such Replacements, Repairs, or Restoration items;

(3)     apply the funds in the applicable Reserve/Escrow Account toward the labor and materials necessary to make or complete such Replacements, Repairs, or Restoration items, as applicable; or

(4)     exercise any and all other remedies available to Lender under this Loan Agreement or any other Loan Document, including any remedies otherwise available upon an Event of Default pursuant to the terms of Section 14.02.

To facilitate Lender's completion and performance of such Replacements, Repairs, or Restoration items, Lender shall have the right to enter onto the Mortgaged Property and perform any and all work and labor necessary to make or complete the Replacements, Repairs, or Restoration and employ watchmen to protect the Mortgaged Property from damage. All funds so expended by Lender shall be deemed to have been advanced to Borrower, and included as part of the Indebtedness and secured by the Security Instrument and this Loan Agreement.

(d)     **Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

(e)     **No Lender Obligation.**

Nothing in this Loan Agreement shall:

(1)     make Lender responsible for making or completing the Replacements, Repairs, or Restoration;

(2)     require Lender to expend funds, whether from any Reserve/Escrow Account, or otherwise, to make or complete any Replacement, Repair, or Restoration item;

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 13

Form 6001.NR
06-19

**Page 72**
**© 2019 Fannie Mae**

(3)     obligate Lender to proceed with the Replacements, Repairs, or Restoration; or

(4)     obligate Lender to demand from Borrower additional sums to make or complete any Replacement, Repair, or Restoration item.

**(f)     No Lender Warranty.**

Lender's approval of any plans for any Replacement, Repair, or Restoration, release of funds from any Reserve/Escrow Account, inspection of the Mortgaged Property by Lender or its agents, representatives, or designees, or other acknowledgment of completion of any Replacement, Repair, or Restoration in a manner satisfactory to Lender shall not be deemed an acknowledgment or warranty by Lender to any Person that the Replacement, Repair, or Restoration has been completed in accordance with applicable building, zoning, or other codes, ordinances, statutes, laws, regulations, or requirements of any Governmental Authority, such responsibility being at all times exclusively that of Borrower.

# ARTICLE 14 - DEFAULTS/REMEDIES

**Section 14.01     Events of Default.**

The occurrence of any one or more of the following in this Section 14.01 shall constitute an Event of Default under this Loan Agreement.

**(a)     Automatic Events of Default.**

Any of the following shall constitute an automatic Event of Default:

(1)     any failure by Borrower to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document;

(2)     any failure by Borrower to maintain the insurance coverage required by any Loan Document;

(3)     any failure by Borrower to comply with the provisions of Section 4.02(d) relating to its single asset status;

(4)     if any warranty, representation, certification, or statement of Borrower or Guarantor in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)     fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, Guarantor, or Key Principal or any of their officers, directors, trustees, partners, members, or managers in connection with:

(A)     the application for, or creation of, the Indebtedness;

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 13

Form 6001.NR
06-19

Page 73
© 2019 Fannie Mae

(B)     any financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)     any request for Lender's consent to any proposed action, including a request for disbursement of Reserve/Escrow Account Funds or Collateral Account Funds;

(6)     the occurrence of any Transfer not permitted by the Loan Documents;

(7)     the occurrence of a Bankruptcy Event;

(8)     the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

(9)     if Borrower, Guarantor, or Key Principal is a trust, or if Control of Borrower, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, the termination or revocation of such trust, except as set forth in Section 11.03(d);

(10)     any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repair Schedule or otherwise required by Lender in writing for such Repair); or

(11)     any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable.

**(b)     Events of Default Subject to a Specified Cure Period.**

Any of the following shall constitute an Event of Default subject to the cure period set forth in the Loan Documents:

(1)     if Key Principal or Guarantor is a natural person, the death of such individual, unless all requirements of Section 11.03(e) are met;

(2)     the occurrence of a Guarantor Bankruptcy Event, unless requirements of Section 11.03(f) are met;

(3)     any failure by Borrower, Key Principal, or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c); or

(4)     any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 74
© 2019 Fannie Mae

period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document.

### (c) Events of Default Subject to Extended Cure Period.

The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:

(1) any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(a) or Section 14.01(b) above) as and when required.

### Section 14.02 Remedies.

### (a) Acceleration; Foreclosure.

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given). Lender may exercise this option to accelerate regardless of any prior forbearance. In addition, Lender shall have all rights and remedies afforded to Lender hereunder and under the other Loan Documents, including, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to Lender at law or in equity (subject to Borrower's statutory rights of reinstatement, if any). Any proceeds of a Foreclosure Event may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement. Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

### (b) Loss of Right to Disbursements from Collateral Accounts.

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral Accounts. During the continuance of any such Event of Default, Lender may use the

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 75
© 2019 Fannie Mae

Reserve/Escrow Account Funds and any Collateral Account Funds (or any portion thereof) for any purpose, including:

(1)     repayment of the Indebtedness, including principal prepayments and the Prepayment Premium applicable to such full or partial prepayment, as applicable (however, such application of funds shall not cure or be deemed to cure any Event of Default);

(2)     reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;

(3)     completion of the Replacement, Repair, or Restoration for any other replacement or repair to the Mortgaged Property; and

(4)     payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the Reserve/Escrow Account Funds or Collateral Account Funds on account of any Event of Default by Borrower or to repayment of the Indebtedness or in any specific order of priority.

**(c)     Remedies Cumulative.**

Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

**Section 14.03     Additional Lender Rights; Forbearance.**

**(a)     No Effect Upon Obligations.**

Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, Guarantor, Key Principal, or other third party obligor, to take any of the following actions:

(1)     the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

(2)     the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 76
© 2019 Fannie Mae

(3)     the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4)     any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(5)     any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(6)     any amounts under this Loan Agreement or any other Loan Document may be released;

(7)     any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(8)     the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower; or

(9)     any other terms of the Loan Documents may be modified.

**(b)     No Waiver of Rights or Remedies.**

Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender. Lender's receipt of any insurance proceeds or amounts in connection with a Condemnation Action shall not operate to cure or waive any Event of Default.

**(c)     Appointment of Lender as Attorney-In-Fact.**

Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1)     use any Reserve/Escrow Account Funds for the purpose of making or completing the Replacements, Repairs, or Restoration;

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 77
© 2019 Fannie Mae

(2)    make such additions, changes, and corrections to the Replacements, Repairs, or Restoration as shall be necessary or desirable to complete the Replacements, Repairs, or Restoration;

(3)    employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4)    pay, settle, or compromise all bills and claims for materials and work performed in connection with the Replacements, Repairs, or Restoration, or as may be necessary or desirable for the completion of the Replacements, Repairs, or Restoration, or for clearance of title;

(5)    adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;

(6)    appear in and prosecute any action arising from any insurance policies;

(7)    collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

(8)    commence, appear in, and prosecute, in Lender's or Borrower's name, any Condemnation Action;

(9)    settle or compromise any claim in connection with any Condemnation Action;

(10)    execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(11)    prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

(12)    take such actions as are permitted in this Loan Agreement and any other Loan Documents;

(13)    execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

(14)    carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 78
© 2019 Fannie Mae

Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable and shall not be affected by the disability or incompetence of Borrower. Borrower specifically acknowledges and agrees that this power of attorney granted to Lender may be assigned by Lender to Lender's successors or assigns as holder of the Note (and the other Loan Documents). The foregoing powers conferred on Lender under this Section 14.03(c) shall not impose any duty upon Lender to exercise any such powers and shall not require Lender to incur any expense or take any action. Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Loan Agreement and any other Loan Documents.

Notwithstanding the foregoing provisions, Lender shall not exercise its rights as set forth in this Section 14.03(c) unless: (A) an Event of Default has occurred and is continuing, or (B) Lender determines, in its discretion, that exigent circumstances exist or that such exercise is necessary or prudent in order to protect and preserve the Mortgaged Property, or Lender's lien priority and security interest in the Mortgaged Property.

**(d)     Borrower Waivers.**

If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

> (1)     bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

> (2)     compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

> (3)     release one or more of the persons constituting Borrower, from liability; or

> (4)     otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

**Section 14.04     Waiver of Marshaling.**

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law. Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 79
© 2019 Fannie Mae

be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

Lender shall account for any moneys received by Lender in respect of any foreclosure on or disposition of collateral hereunder and under the other Loan Documents provided that Lender shall not have any duty as to any collateral, and Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers. NONE OF LENDER OR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR REPRESENTATIVES SHALL BE RESPONSIBLE TO BORROWER (a) FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED PURSUANT TO A FINAL, NON-APPEALABLE COURT ORDER BY A COURT OF COMPETENT JURISDICTION, OR (b) FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

# ARTICLE 15 - MISCELLANEOUS

**Section 15.01      Governing Law; Consent to Jurisdiction and Venue.**

**(a)      Governing Law.**

This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

**(b)      Venue.**

Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

**Section 15.02      Notice.**

**(a)      Process of Serving Notice.**

Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

(1)      in writing and shall be:

(A)      delivered, in person;

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)**
Article 14

Form 6001.NR
06-19

Page 80
© 2019 Fannie Mae

(B)      mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(C)      sent by overnight courier; or

(D)      sent by electronic mail with originals to follow by overnight courier;

(2)      addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address, as applicable; and

(3)      deemed given on the earlier to occur of:

(A)      the date when the notice is received by the addressee; or

(B)      if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

**(b)      Change of Address.**

Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other parties identified on the Summary of Loan Terms in accordance with this Section 15.02.

**(c)      Default Method of Notice.**

Any required notice under this Loan Agreement or any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 15.02.

**(d)      Receipt of Notices.**

Neither Borrower nor Lender shall refuse or reject delivery of any notice given in accordance with this Loan Agreement. Each party is required to acknowledge, in writing, the receipt of any notice upon request by the other party.

**Section 15.03      Successors and Assigns Bound; Sale of Mortgage Loan.**

**(a)      Binding Agreement.**

This Loan Agreement shall bind, and the rights granted by this Loan Agreement shall inure to, the successors and assigns of Lender and the permitted successors and assigns of Borrower. However, a Transfer not permitted by this Loan Agreement shall be an Event of Default and shall be void ab initio.

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
Article 15

Form 6001.NR
06-19

Page 81
© 2019 Fannie Mae

**(b)** **Sale of Mortgage Loan; Change of Servicer.**

Nothing in this Loan Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Mortgage Loan or any interest in the Mortgage Loan. The Mortgage Loan or a partial interest in the Mortgage Loan (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior written notice to Borrower. A sale may result in a change of the Loan Servicer.

## Section 15.04    Counterparts.

This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

## Section 15.05    Joint and Several (or Solidary) Liability.

If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law).

## Section 15.06    Relationship of Parties; No Third Party Beneficiary.

**(a)** **Solely Creditor and Debtor.**

The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement shall create any other relationship between Lender and Borrower. Nothing contained in this Loan Agreement shall constitute Lender as a joint venturer, partner, or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations, or contracts of Borrower.

**(b)** **No Third Party Beneficiaries.**

No creditor of any party to this Loan Agreement and no other Person shall be a third party beneficiary of this Loan Agreement or any other Loan Document or any account created or contemplated under this Loan Agreement or any other Loan Document. Nothing contained in this Loan Agreement shall be deemed or construed to create an obligation on the part of Lender to any third party and no third party shall have a right to enforce against Lender any right that Borrower may have under this Loan Agreement. Without limiting the foregoing:

(1)    any Servicing Arrangement between Lender and any Loan Servicer shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness;

(2)    Borrower shall not be a third party beneficiary of any Servicing Arrangement; and

(3)    no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

## Section 15.07    Severability; Entire Agreement; Amendments.

The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty. All of the Loan Documents contain the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement and the other Loan Documents. This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

## Section 15.08    Construction.

(a)      The captions and headings of the sections of this Loan Agreement and the Loan Documents are for convenience only and shall be disregarded in construing this Loan Agreement and the Loan Documents.

(b)      Any reference in this Loan Agreement to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit or Schedule attached to this Loan Agreement or to a Section or Article of this Loan Agreement.

(c)      Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(d)      Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.

(e)      As used in this Loan Agreement, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

(f)      Whenever Borrower's knowledge is implicated in this Loan Agreement or the phrase "to Borrower's knowledge" or a similar phrase is used in this Loan Agreement, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(g)      Unless otherwise provided in this Loan Agreement, if Lender's approval, designation, determination, selection, estimate, action, or decision is required, permitted, or contemplated hereunder, such approval, designation, determination, selection, estimate, action, or decision shall be made in Lender's sole and absolute discretion.

(h)      All references in this Loan Agreement to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(i)      "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

(j)     If the Mortgage Loan proceeds are disbursed on a date that is later than the Effective Date, as described in Section 2.02(a)(1), the representations and warranties in the Loan Documents with respect to the ownership and operation of the Mortgaged Property shall be deemed to be made as of the disbursement date.

## Section 15.09     Mortgage Loan Servicing.

All actions regarding the servicing of the Mortgage Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives written notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such written notice from Lender shall govern. The Loan Servicer may change from time to time (whether related or unrelated to a sale of the Mortgage Loan). If there is a change of the Loan Servicer, Borrower will be given written notice of the change.

## Section 15.10     Disclosure of Information.

Lender may furnish information regarding Borrower, Key Principal, or Guarantor, or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase, or securitization of the Mortgage Loan, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

## Section 15.11     Waiver; Conflict.

No specific waiver of any of the terms of this Loan Agreement shall be considered as a general waiver. If any provision of this Loan Agreement is in conflict with any provision of any other Loan Document, the provision contained in this Loan Agreement shall control.

## Section 15.12     No Reliance.

Borrower acknowledges, represents, and warrants that:

(a)     it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

(b)     it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c)     it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

(d)     it has had the opportunity to consult counsel; and

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 15

Form 6001.NR
06-19

Page 84
© 2019 Fannie Mae

(e)　　it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

**Section 15.13　　Subrogation.**

If, and to the extent that, the proceeds of the Mortgage Loan are used to pay, satisfy, or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Mortgaged Property, such Mortgage Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall be subrogated automatically, and without further action on its part, to the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.

**Section 15.14　　Counting of Days.**

Except where otherwise specifically provided, any reference in this Loan Agreement to a period of "days" means calendar days, not Business Days. If the date on which Borrower is required to perform an obligation under this Loan Agreement is not a Business Day, Borrower shall be required to perform such obligation by the Business Day immediately preceding such date; provided, however, in respect of any Payment Date, or if the Maturity Date is other than a Business Day, Borrower shall be obligated to make such payment by the Business Day immediately following such date.

**Section 15.15　　Revival and Reinstatement of Indebtedness.**

If the payment of all or any part of the Indebtedness by Borrower, Guarantor, or any other Person, or the transfer to Lender of any collateral or other property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection therewith, and the Indebtedness shall be automatically revived, reinstated, and restored by such amount and shall exist as though such Voidable Transfer had never been made.

**Section 15.16　　Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Loan Agreement and the other Loan Documents, time is of the essence.

### Section 15.17 Final Agreement.

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

### Section 15.18 WAIVER OF TRIAL BY JURY.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY, AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**[Remainder of Page Intentionally Blank]**

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
Article 15

**Form 6001.NR**
**06-19**

**Page 86**
**© 2019 Fannie Mae**

IN WITNESS WHEREOF, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives. Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

**APEX BRITTANY MO LP**, a
Delaware limited partnership

By:    **APEX OPPORTUNITY LIMITED LLC**, a
New Jersey limited liability company,
its General Partner

By: _____ (SEAL)
Name:    Oron Zarum
Title:     Managing Member

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Signature Page**

Form 6001.NR
06-19

Page S-1
© 2019 Fannie Mae

**LENDER:**

**HUNT MORTGAGE CAPITAL, LLC,** a
Delaware limited liability company

By: _____ (SEAL)

Name:

Title:

Vanessa Howes
Vice President

{01529869;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Signature Page**

**Form 6001.NR**
04-18

**Page S-2**
© 2018 Fannie Mae

## <u>SCHEDULES & EXHIBITS</u>

**Schedules**

| | | |
|---|---|---|
| **Schedule 1** | **Definitions Schedule (required)** | **Form 6101.FR** |
| **Schedule 2** | **Summary of Loan Terms (required)** | **Form 6102.FR** |
| **Schedule 3** | **Schedule of Interest Rate Type Provisions (required)** | **Form 6103.FR** |
| **Schedule 4** | **Prepayment Premium Schedule (required)** | **Form 6104.01** |
| **Schedule 5** | **Required Replacement Schedule (required)** | |
| **Schedule 6** | **Required Repair Schedule (required)** | |
| **Schedule 7** | **Exceptions to Representations and Warranties Schedule (required)** | |
| **Schedule 8** | **Ownership Interests Schedule** | |

**Exhibits**

| | | |
|---|---|---|
| **Exhibit A** | **Modifications to Multifamily Loan and Security Agreement (Green Mortgage Loan)** | **Form 6241** |

{01554770;1}
**Multifamily Loan and Security Agreement (Non-Recourse)**
**Schedules and Exhibits**

**Form 6001.NR**
**06-19**

**Page 1**
**© 2019 Fannie Mae**

Borrower hereby acknowledges and agrees that the Schedules and Exhibits referenced above are hereby incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement.

_O. 2_____
Borrower Initials

**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Schedules and Exhibits**

**Form 6001.NR**
**06-19**

**Initial Page**
**© 2019 Fannie Mae**

**SCHEDULE 1**

**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Definitions Schedule**
**(Interest Rate Type – Fixed Rate)**

Capitalized terms used in the Loan Agreement have the meanings given to such terms in this Definitions Schedule.

"**Accrued Interest**" means unpaid interest, if any, on the Mortgage Loan that has not been added to the unpaid principal balance of the Mortgage Loan pursuant to Section 2.02(b) (Capitalization of Accrued But Unpaid Interest) of the Loan Agreement.

"**Additional Lender Repairs**" means repairs of the type listed on the Required Repair Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Additional Lender Replacements**" means replacements of the type listed on the Required Replacement Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Amortization Period**" has the meaning set forth in the Summary of Loan Terms.

"**Amortization Type**" has the meaning set forth in the Summary of Loan Terms.

"**Bankruptcy Event**" means any one or more of the following:

(a)     the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower;

(b)     the acknowledgment in writing by Borrower (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

(c)     the making of a general assignment for the benefit of creditors by Borrower;

(d)     the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower; or

(e)     the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or any substantial part of the assets of Borrower;

{01554772;1}
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate)**
**Fannie Mae**

Form 6101.FR
06-19

Page 1
© 2019 Fannie Mae

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of Borrower, Guarantor, Key Principal, or any Borrower Affiliate (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"**Borrower**" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"**Borrower Affiliate**" means, as to Borrower, Guarantor or Key Principal:

(a)     any Person that owns any direct ownership interest in Borrower, Guarantor or Key Principal;

(b)     any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower, Guarantor or Key Principal;

(c)     any Person Controlled by, under common Control with, or which Controls, Borrower, Guarantor or Key Principal;

(d)     any entity in which Borrower, Guarantor or Key Principal directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity; or

(e)     any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower, Guarantor or Key Principal.

"**Borrower Requested Repairs**" means repairs not listed on the Required Repair Schedule requested by Borrower to be reimbursed from the Repairs Escrow Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Borrower Requested Replacements**" means replacements not listed on the Required Replacement Schedule requested by Borrower to be reimbursed from the Replacement Reserve Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Borrower's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Borrower's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

{01554772;1}
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6101.FR
06-19

Page 2
© 2019 Fannie Mae

"**Collateral Account Funds**" means, collectively, the funds on deposit in any or all of the Collateral Accounts, including the Reserve/Escrow Account Funds.

"**Collateral Accounts**" means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement, including the Reserve/Escrow Account.

"**Collateral Agreement**" means any separate agreement between Borrower and Lender and any other party for the establishment of any other fund, reserve or account affecting the Mortgage Loan.

"**Completion Period**" has the meaning set forth in the Summary of Loan Terms.

"**Condemnation Action**" has the meaning set forth in the Security Instrument.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Credit Score**" means a numerical value or a categorization derived from a statistical tool or modeling system used to measure credit risk and predict the likelihood of certain credit behaviors, including default.

"**Debt Service Amounts**" means the Monthly Debt Service Payments and all other amounts payable under the Loan Agreement, the Note, the Security Instrument or any other Loan Document.

"**Default Rate**" means an interest rate equal to the lesser of:

      (a)      the sum of the Interest Rate plus four (4) percentage points; or

      (b)      the maximum interest rate which may be collected from Borrower under applicable law.

"**Definitions Schedule**" means this Schedule 1 (Definitions Schedule) to the Loan Agreement.

"**Division**" means the filing of a certificate of division, adoption of a plan of division, amending of any organizational documents, or any other actions taken, permitted, or consented to in order to divide a Person into two or more Persons pursuant to a plan of division such as contemplated under the Delaware Limited Liability Company Act or any other similar requirement of law in any jurisdiction. The term "**Divide**" shall have a correlative meaning.

"**Economic Sanctions**" means any economic or financial sanction administered or enforced by the United States Government (including, without limitation, those administered by OFAC at

{01554772;1}
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae**

**Form 6101.FR
06-19**

**Page 3
© 2019 Fannie Mae**

http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx), the U.S. Department of Commerce, or the U.S. Department of State.

"**Effective Date**" has the meaning set forth in the Summary of Loan Terms.

"**Employee Benefit Plan**" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"**Enforcement Costs**" has the meaning set forth in the Security Instrument.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the Effective Date made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Inspections**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to Borrower, any entity that, together with Borrower, would be treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"**ERISA Plan**" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower or its ERISA Affiliates.

"**Event of Default**" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"**Exceptions to Representations and Warranties Schedule**" means that certain Schedule 7 (Exceptions to Representations and Warranties Schedule) to the Loan Agreement.

"**First Payment Date**" has the meaning set forth in the Summary of Loan Terms.

"**First Principal and Interest Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Fixed Rate**" has the meaning set forth in the Summary of Loan Terms.

"**Fixtures**" has the meaning set forth in the Security Instrument.

{01554772;1}
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate)**
**Fannie Mae**

**Form 6101.FR**
**06-19**

**Page 4**
**© 2019 Fannie Mae**

**"Force Majeure"** shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

**"Foreclosure Event"** means:

      (a)     foreclosure under the Security Instrument;

      (b)     any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

      (c)     delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

      (d)     in Louisiana, any dation en paiement.

**"Goods"** has the meaning set forth in the Security Instrument.

**"Governmental Authority"** means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

**"Guarantor"** means, individually and collectively, any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document.

**"Guarantor Bankruptcy Event"** means any one or more of the following:

      (a)     the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

      (b)     the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

      (c)     the making of a general assignment for the benefit of creditors by Guarantor;

      (d)     the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

      (e)     the appointment of a receiver, liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable;

{01554772;1}
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate)**
**Fannie Mae**

**Form 6101.FR**
**06-19**

**Page 5**
**© 2019 Fannie Mae**

provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of Borrower, Guarantor, Key Principal, or any Borrower Affiliate (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

**"Guarantor's General Business Address"** has the meaning set forth in the Summary of Loan Terms.

**"Guarantor's Notice Address"** has the meaning set forth in the Summary of Loan Terms.

**"Guaranty"** means, individually and collectively, any Payment Guaranty, Non-Recourse Guaranty or other guaranty executed by Guarantor in connection with the Mortgage Loan.

**"Immediate Family Members"** means a child, stepchild, grandchild, spouse, sibling, or parent, each of whom is not a Prohibited Person.

**"Imposition Deposits"** has the meaning set forth in the Security Instrument.

**"Impositions"** has the meaning set forth in the Security Instrument.

**"Improvements"** has the meaning set forth in the Security Instrument.

**"Indebtedness"** has the meaning set forth in the Security Instrument.

**"Initial Replacement Reserve Deposit"** has the meaning set forth in the Summary of Loan Terms.

**"Insolvency Laws"** means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

**"Insolvent"** means:

(a)     that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

(b)     such Person's inability to pay its debts as they become due.

**"Intended Prepayment Date"** means the date upon which Borrower intends to make a prepayment on the Mortgage Loan, as set forth in the Prepayment Notice.

**"Interest Accrual Method"** has the meaning set forth in the Summary of Loan Terms.

{01554772;1}
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6101.FR
06-19

Page 6
© 2019 Fannie Mae

"**Interest Only Term**" has the meaning set forth in the Summary of Loan Terms.

"**Interest Rate**" means the Fixed Rate.

"**Interest Rate Type**" has the meaning set forth in the Summary of Loan Terms.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Investor**" means any Person to whom Lender intends to (a) sell, transfer, deliver or assign the Mortgage Loan in the secondary mortgage market, or (b) sell an MBS backed by the Mortgage Loan.

"**Key Principal**" means, collectively:

      (a)     the natural person(s) or entity that Controls Borrower that Lender determines is critical to the successful operation and management of Borrower and the Mortgaged Property, as identified as such in the Summary of Loan Terms; or

      (b)     any natural person or entity who becomes a Key Principal after the date of the Loan Agreement and is identified as such in an assumption agreement, or another amendment or supplement to the Loan Agreement.

"**Key Principal's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Key Principal's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Land**" means the land described in <u>Exhibit A</u> to the Security Instrument.

"**Last Interest Only Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Late Charge**" means an amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (5%).

"**Leases**" has the meaning set forth in the Security Instrument.

"**Lender**" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"**Lender's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Payment Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lien**" has the meaning set forth in the Security Instrument.

"**Loan Agreement**" means the Multifamily Loan and Security Agreement dated as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Application**" means the application for the Mortgage Loan submitted by Borrower to Lender.

"**Loan Documents**" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor, Key Principal, any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Servicer**" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Loan Agreement, the Security Instrument and any other Loan Document, and otherwise to service the Mortgage Loan for the benefit of Lender. Unless Borrower receives notice to the contrary, the Loan Servicer shall be the Lender originally named on the Summary of Loan Terms.

"**Loan Term**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Year**" has the meaning set forth in the Summary of Loan Terms.

"**Material Commercial Lease**" means:

    (a)    any Lease that, individually or in the aggregate with other Leases entered into with the same tenant, comprises five percent (5%) or more of the total gross income at the Mortgaged Property on an annualized basis; or

    (b)    regardless of the percentage of the total gross income at the Mortgaged Property that it comprises, any Lease relating to:

        (1)    solar power, thermal power generation, or co-power generation, or for the installation of solar panels or any other electrical power generation equipment, and any related power purchase agreement; or

        (2)    any dwelling unit at the Mortgaged Property leased to Guarantor, Key Principal, or another Borrower Affiliate.

"**Maturity Date**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Inspection Fee**" has the meaning set forth in the Summary of Loan Terms.

{01554772;1}
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6101.FR
06-19

Page 8
© 2019 Fannie Mae

"**Maximum Repair Cost**" shall be the amount(s) set forth in the Required Repair Schedule, if any.

"**Maximum Repair Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Replacement Reserve Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Restoration Reserve Disbursement Interval**" means one time(s) per calendar month.

"**MBS**" means an investment security that represents an undivided beneficial interest in a pool of mortgage loans or participation interests in mortgage loans held in trust pursuant to the terms of a governing trust document.

"**Mezzanine Debt**" means a loan to a direct or indirect owner of Borrower secured by a pledge of such owner's interest in an entity owning a direct or indirect interest in Borrower.

"**Minimum Repairs Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Minimum Replacement Reserve Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Minimum Restoration Reserve Disbursement Amount**" means **$10,000**.

"**Monthly Debt Service Payment**" has the meaning set forth in the Summary of Loan Terms.

"**Monthly Replacement Reserve Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Mortgage Loan**" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"**Mortgaged Property**" has the meaning set forth in the Security Instrument.

"**Multifamily Project**" has the meaning set forth in the Summary of Loan Terms.

"**Multifamily Project Address**" has the meaning set forth in the Summary of Loan Terms.

"**Net Cash Flow**" means, for any specified period, the total of (a) the net rental income for the Mortgaged Property, plus (b) other allowable income for the Mortgaged Property, if any, minus (c) operating expenses for the Mortgaged Property, minus (d) the full amount underwritten for the Replacement Reserve Account (regardless of whether deposits have been or will be waived or

{01554772;1}
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae**

**Form 6101.FR
06-19**

**Page 9
© 2019 Fannie Mae**

reduced), and as adjusted for economic vacancy and other factors by Lender for the specific asset class or loan type.

**"Non-Recourse Guaranty"** means, if applicable, that certain Guaranty of Non-Recourse Obligations of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**"Note"** means that certain Multifamily Note of even date herewith in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**"O&M Plan"** has the meaning set forth in the Environmental Indemnity Agreement.

**"OFAC"** means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

**"Ownership Interests Schedule"** means that certain <u>Schedule 8</u> (Ownership Interests Schedule) to the Loan Agreement.

**"Payment Date"** means the First Payment Date and the first day of each month thereafter until the Mortgage Loan is fully paid.

**"Payment Guaranty"** means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**"Permitted Encumbrance"** has the meaning set forth in the Security Instrument.

**"Permitted Mezzanine Debt"** means Mezzanine Debt incurred by a direct or indirect owner or owners of Borrower where the exercise of any of the rights and remedies by the holder or holders of the Mezzanine Debt would not in any circumstance cause (a) a change in Control in Borrower, Key Principal, or Guarantor, or (b) a Transfer of a direct or indirect Restricted Ownership Interest in Borrower, Key Principal, or Guarantor.

**"Permitted Preferred Equity"** means Preferred Equity that does not (a) require mandatory dividends, distributions, payments or returns (including at maturity or in connection with a redemption), or (b) provide the Preferred Equity owner with rights or remedies on account of a failure to receive any preferred dividends, distributions, payments or returns (or, if such rights are provided, the exercise of such rights do not violate the Loan Documents or are otherwise exercised with the prior written consent of Lender in accordance with Article 11 (Liens, Transfers and Assumptions) of the Loan Agreement and the payment of all applicable fees and expenses as set forth in Section 11.03(g) (Further Conditions to Transfers and Assumption) of the Loan Agreement).

**"Permitted Prepayment Date"** means the last Business Day of a calendar month.

{01554772;1}
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate)**
**Fannie Mae**

Form 6101.FR
06-19

Page 10
© 2019 Fannie Mae

"**Person**" means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

"**Personal Property**" means the Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Personalty**" has the meaning set forth in the Security Instrument.

"**Preferred Equity**" means a direct or indirect equity ownership interest in, economic interests in, or rights with respect to, Borrower that provide an equity owner preferred dividend, distribution, payment, or return treatment relative to other equity owners.

"**Prepayment Lockout Period**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Notice**" means the written notice that Borrower is required to provide to Lender in accordance with Section 2.03 (Lockout/Prepayment) of the Loan Agreement in order to make a prepayment on the Mortgage Loan, which shall include, at a minimum, the Intended Prepayment Date.

"**Prepayment Premium**" means the amount payable by Borrower in connection with a prepayment of the Mortgage Loan, as provided in Section 2.03 (Lockout/Prepayment) of the Loan Agreement and calculated in accordance with the Prepayment Premium Schedule.

"**Prepayment Premium Period End Date**" or "**Yield Maintenance Period End Date**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Period Term**" or "**Yield Maintenance Period Term**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Schedule**" means that certain Schedule 4 (Prepayment Premium Schedule) to the Loan Agreement.

"**Prohibited Person**" means:

(a)     any Person with whom Lender or Fannie Mae is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

{01554772;1}
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate)**
**Fannie Mae**

Form 6101.FR
06-19

Page 11
© 2019 Fannie Mae

(b)     any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "System for Award Management (SAM)" exclusion list, each of which may be amended from time to time, and any successor or replacement thereof; or

(c)     any Person that is determined by Fannie Mae to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Fannie Mae; or

(d)     any Person that has caused any unsatisfactory experience of a material nature with Fannie Mae or Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"**Property Jurisdiction**" has the meaning set forth in the Security Instrument.

"**Property Square Footage**" has the meaning set forth in the Summary of Loan Terms.

"**Publicly-Held Corporation**" means a corporation, the outstanding voting stock of which is registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"**Publicly-Held Trust**" means a real estate investment trust, the outstanding voting shares or beneficial interests of which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

"**Rents**" has the meaning set forth in the Security Instrument.

"**Repair Threshold**" has the meaning set forth in the Summary of Loan Terms.

"**Repairs**" means, individually and collectively, the Required Repairs, Borrower Requested Repairs, and Additional Lender Repairs.

"**Repairs Escrow Account**" means the account established by Lender into which the Repairs Escrow Deposit is deposited to fund the Repairs.

"**Repairs Escrow Account Administrative Fee**" has the meaning set forth in the Summary of Loan Terms.

"**Repairs Escrow Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Replacement Reserve Account**" means the account established by Lender into which the Replacement Reserve Deposits are deposited to fund the Replacements.

"**Replacement Reserve Account Administration Fee**" has the meaning set forth in the Summary of Loan Terms.

{01554772;1}
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6101.FR
06-19

Page 12
© 2019 Fannie Mae

"**Replacement Reserve Account Interest Disbursement Frequency**" has the meaning set forth in the Summary of Loan Terms.

"**Replacement Reserve Deposits**" means the Initial Replacement Reserve Deposit, Monthly Replacement Reserve Deposits and any other deposits to the Replacement Reserve Account required by the Loan Agreement.

"**Replacement Threshold**" has the meaning set forth in the Summary of Loan Terms.

"**Replacements**" means, individually and collectively, the Required Replacements, Borrower Requested Replacements and Additional Lender Replacements.

"**Required Repair Schedule**" means that certain Schedule 6 (Required Repair Schedule) to the Loan Agreement.

"**Required Repairs**" means those items listed on the Required Repair Schedule.

"**Required Replacement Schedule**" means that certain Schedule 5 (Required Replacement Schedule) to the Loan Agreement.

"**Required Replacements**" means those items listed on the Required Replacement Schedule.

"**Reserve/Escrow Account Funds**" means, collectively, the funds on deposit in the Reserve/Escrow Accounts.

"**Reserve/Escrow Accounts**" means, individually and collectively, the Replacement Reserve Account, the Repairs Escrow Account, and the Restoration Reserve Account.

"**Residential Lease**" means a Lease of an individual dwelling unit.

"**Restoration**" means any work and improvements required to be performed to the Mortgaged Property following a casualty or event of loss as set forth in plans and specifications approved by Lender.

"**Restoration Reserve Account**" means, if applicable, the account established by Lender into which insurance proceeds are deposited in order to fund a Restoration following a casualty or event of loss.

"**Restoration Reserve Account Administration Fee**" means **$500, payable with each disbursement.**

"**Restoration Threshold** means **$25,000**.

"**Restricted Ownership Interest**" means, with respect to any entity, the following:

{01554772;1}
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae**

Form 6101.FR
06-19

**Page 13
© 2019 Fannie Mae**

(a)   if such entity is a general partnership or a joint venture, fifty percent (50%) or more of all general partnership or joint venture interests in such entity;

(b)   if such entity is a limited partnership:

(1)   the interest of any general partner; or

(2)   fifty percent (50%) or more of all limited partnership interests in such entity;

(c)   if such entity is a limited liability company or a limited liability partnership:

(1)   the interest of any managing member or the contractual rights of any non-member manager; or

(2)   fifty percent (50%) or more of all membership or other ownership interests in such entity;

(d)   if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, fifty percent (50%) or more of voting stock in such corporation;

(e)   if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, the amount of shares of voting stock sufficient to have the power to elect the majority of directors of such corporation; or

(f)   if such entity is a trust (other than a land trust or a Publicly-Held Trust), the power to Control such trust vested in the trustee of such trust or the ability to remove, appoint or substitute the trustee of such trust (unless the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender).

"**Review Fee**" means the non-refundable fee of $3,000 payable to Lender.

"**Sanctioned Country**" means a country subject to either a targeted or comprehensive country-wide sanctions program administered and enforced by OFAC, which list is updated from time to time.

"**Sanctioned Person**" means (a) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC, available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time; (b) (1) an agency of the government of a Sanctioned Country, (2) an organization controlled by a Sanctioned Country, or (3) a Person resident in a Sanctioned Country, to the extent any Person described in clauses (1), (2) or (3) is the subject of a sanctions program administered by OFAC; and, (c) a Person whose property and interests in property are blocked pursuant to an Executive Order or regulations administered by OFAC consistent with the guidance issued by OFAC.

{01554772;1}
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6101.FR
06-19

Page 14
© 2019 Fannie Mae

**"Schedule of Interest Rate Type Provisions"** means that certain Schedule 3 (Schedule of Interest Rate Type Provisions) to the Loan Agreement.

**"Security Instrument"** means that certain multifamily mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**"Short-Term Rental"** means any Lease or master Lease (including subleases, licenses, and other possessory interests, whether oral or written) of an individual dwelling unit, for which the intended occupancy of the dwelling unit is for a period or periods of less than thirty (30) days, irrespective of the stated term of the Lease, including any Lease:

(a)     for corporate tenant and guest suite purposes; or

(b)     with an agreement or arrangement between either:

(i)     Borrower and a tenant whereby the tenant may enter into a separate agreement or arrangement with a Short-Term Rental Provider to offer Short-Term Rentals at the Mortgaged Property; or

(ii)     Borrower and a Short-Term Rental Provider, pursuant to which tenants may offer Short-Term Rentals at the Mortgaged Property.

**"Short-Term Rental Provider"** means any platform or provider (including any internet or online service platform or provider) that offers Short-Term Rental services and arrangements, including booking and reservation services to guests and customers.

**"Servicing Arrangement"** means any arrangement between Lender and the Loan Servicer for loss sharing or interim advancement of funds.

**"Software"** has the meaning set forth in the Security Instrument.

**"Summary of Loan Terms"** means that certain Schedule 2 (Summary of Loan Terms) to the Loan Agreement.

**"Taxes"** has the meaning set forth in the Security Instrument.

**"Title Policy"** means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

**"Total Parking Spaces"** has the meaning set forth in the Summary of Loan Terms.

**"Total Residential Units"** has the meaning set forth in the Summary of Loan Terms.

{01554772;1}
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate)
Fannie Mae**

Form 6101.FR
06-19

**Page 15
© 2019 Fannie Mae**

"**Transfer**" means:

(a)    a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law), other than Residential Leases, Material Commercial Leases or non-Material Commercial Leases permitted by this Loan Agreement;

(b)    a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

(c)    an issuance or other creation of a direct or indirect ownership interest;

(d)    a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

(e)    a merger, consolidation, dissolution, Division or liquidation of a legal entity.

"**Transfer Fee**" means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender.

"**UCC**" has the meaning set forth in the Security Instrument.

"**UCC Collateral**" has the meaning set forth in the Security Instrument.

"**Voidable Transfer**" means any fraudulent conveyance, preference or other voidable or recoverable payment of money or transfer of property.

"**Yield Maintenance Period End Date**" or "**Prepayment Premium Period End Date**" has the meaning set forth in the Summary of Loan Terms.

"**Yield Maintenance Period Term**" or "**Prepayment Premium Period Term**" has the meaning set forth in the Summary of Loan Terms.


**[Remainder of Page Intentionally Blank]**

## SCHEDULE 2
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Summary of Loan Terms
### (Interest Rate Type - Fixed Rate)

| I. | GENERAL PARTY AND MULTIFAMILY PROJECT INFORMATION |
|---|---|
| Borrower | **APEX BRITTANY MO LP**, a Delaware limited partnership |
| Lender | **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company |
| Key Principal | **ORON ZARUM** |
| Guarantor | **ORON ZARUM** |
| Multifamily Project | Brittany Village Apartments |
| **ADDRESSES** | |
| **Borrower's General Business Address** | 10 Hill Street Newark, New Jersey 07102 |
| **Borrower's Notice Address** | 10 Hill Street Newark, New Jersey 07102 E-mail: aronzarum@gmail.com |
| **Multifamily Project Address** | 1601 N 36th Street Saint Joseph, Missouri 64506 |
| **Multifamily Project County** | Buchanan |
| **Key Principal's General Business Address** | 10 Hill Street Newark, New Jersey 07102 |
| **Key Principal's Notice Address** | 10 Hill Street Newark, New Jersey 07102 E-mail: aronzarum@gmail.com |
| **Guarantor's General Business Address** | 10 Hill Street Newark, New Jersey 07102 |

{01555598;1}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

Page 1
© 2017 Fannie Mae

| | |
|---|---|
| **Guarantor's Notice Address** | 10 Hill Street<br>Newark, New Jersey 07102<br>E-mail: aronzarum@gmail.com |
| **Lender's General Business Address** | 230 Park Avenue, 19th Floor<br>New York, New York 10169 |
| **Lender's Notice Address** | c/o Hunt Real Estate Capital<br>11501 Outlook Street, Suite 300<br>Overland Park, Kansas 66211<br>e-mail: document_control@huntservicing.com |
| **Lender's Payment Address** | Via Regular Mail:<br><br>Hunt Real Estate Capital<br>P.O. Box 714182<br>Cincinnati, Ohio 45271-4182<br><br>Via Overnight Courier:<br><br>Hunt Real Estate Capital<br>Attn: Wholesale Lockbox #714182<br>895 Central Avenue, Suite #600<br>Cincinnati, Ohio 45202<br><br>Wire/ACH Remittance Information:<br><br>Bank Name: KeyBank, National Association<br>ABA Number: 041-001-039<br>Account Name: Hunt Real Estate Capital Payment Clearing<br>Account Number: 359954010922<br>Ref: 4011473<br>Brittany Village Apartments **APEX BRITTANY MO LP**, a Delaware limited partnership<br>E-mail: Loan_Accounting@huntservicing.com |

| II. | MULTIFAMILY PROJECT INFORMATION |
|---|---|
| **Property Square Footage** | 18.1559 acres |
| **Total Parking Spaces** | 503 |

{01555598;1}
Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6102.FR
12-17

Page 2
© 2017 Fannie Mae

| Total Residential Units | 280 |
|---|---|
| Affordable Housing Property | ☐    Yes<br>☒    No |

| III.     MORTGAGE LOAN INFORMATION | |
|---|---|
| Amortization Period | Three hundred sixty (360) months |
| Amortization Type | ☐    Amortizing<br>☐    Full Term Interest Only<br>☒    Partial Interest Only |
| Effective Date | August 16, 2019 |
| First Payment Date | The first day of October, 2019. |
| First Principal and Interest Payment Date | The first day of October, 2020. |
| Fixed Rate | 3.98% |
| Interest Accrual Method | ☐    30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months).<br><br>or<br><br>☒    Actual/360 (computed on the basis of a three hundred sixty (360) day year and the actual number of calendar days during the applicable month, calculated by multiplying the unpaid principal balance of the Mortgage Loan by the Interest Rate, dividing the product by three hundred sixty (360), and multiplying the quotient obtained by the actual number of days elapsed in the applicable month). |
| Interest Only Term | Twelve (12) months |

{01555598;1}
Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
Fannie Mae

Form 6102.FR
12-17

Page 3
© 2017 Fannie Mae

| | |
|---|---|
| **Interest Rate** | The Fixed Rate |
| **Interest Rate Type** | Fixed Rate |
| **Last Interest Only Payment Date** | The first day of September, 2020. |
| **Loan Amount** | **$7,704,000.00** |
| **Loan Term** | One hundred twenty (120) months |
| **Loan Year** | The period beginning on the Effective Date and ending on the last day of August, 2020, and each successive twelve (12) month period thereafter. |
| **Maturity Date** | The first day of September, 2029, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |
| **Monthly Debt Service Payment** | (i) $25,551.60 for the First Payment Date; <br><br> (ii) for each Payment Date thereafter through and including the Last Interest Only Payment Date: <br><br>    (a) $23,848.16 if the prior month was a 28-day month; <br><br>    (b) $24,699.88 if the prior month was a 29-day month; <br><br>    (c) $25,551.60 if the prior month was a 30-day month; and <br><br>    (d) $26,403.32 if the prior month was a 31-day month; and <br><br> (iii) $36,691.30 for the First Principal and Interest Payment Date and each Payment Date thereafter until the Mortgage Loan is fully paid. |

{01555598;1}
**Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
Fannie Mae**

Form 6102.FR
12-17

Page 4
© 2017 Fannie Mae

| Prepayment Lockout Period | The 0 Loan Year of the term of the Mortgage Loan. |
|---|---|

| IV. | YIELD MAINTENANCE/PREPAYMENT PREMIUM INFORMATION |
|---|---|
| **Yield Maintenance Period End Date**<br><br>*or*<br><br>**Prepayment Premium Period End Date** | The last day of February, 2029. |
| **Yield Maintenance Period Term**<br><br>*or*<br><br>**Prepayment Premium Period Term** | One hundred fourteen (114) months |

| V. | RESERVE INFORMATION |
|---|---|
| **Completion Period** | Within six (6) months after the Effective Date or as otherwise shown on the Required Repair Schedule. |
| **Initial Replacement Reserve Deposit** | $164,000.00 |
| **Maximum Inspection Fee** | $1,000.00 |
| **Maximum Repair Disbursement Interval** | One (1) time(s) per calendar month |
| **Maximum Replacement Reserve Disbursement Interval** | One (1) time(s) per calendar quarter |
| **Minimum Repairs Disbursement Amount** | $5,000.00 |
| **Minimum Replacement Reserve Disbursement Amount** | $5,000.00 |

{01555598;1}
**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) Fannie Mae**

Form 6102.FR
12-17

Page 5
© 2017 Fannie Mae

| | |
|---|---|
| **Monthly Replacement Reserve Deposit** | $8,003.00 |
| **Repair Threshold** | $25,000.00 |
| **Repairs Escrow Account Administrative Fee** | $0.00, payable one time |
| **Repairs Escrow Deposit** | $235,038.00 (Immediate Repairs)<br>$86,319.00 (Green Repairs) |
| **Replacement Reserve Account Administration Fee** | $0.00 |
| **Replacement Reserve Account Interest Disbursement Frequency** | Not Applicable |
| **Replacement Threshold** | $25,000.00 |

{01555598;1}
**Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
Fannie Mae**

**Form 6102.FR
12-17**

**Page 6
© 2017 Fannie Mae**

# SCHEDULE 3
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Schedule of Interest Rate Type Provisions
### (Fixed Rate)

**1.     Defined Terms.**

Capitalized terms not otherwise defined in this Schedule have the meanings given to such terms in the Definitions Schedule to the Loan Agreement.

**2.     Interest Accrual.**

Except as otherwise provided in the Loan Agreement, interest shall accrue at the Interest Rate until fully paid.

{01359313;1}
**Schedule 3 to Multifamily Loan and
Security Agreement - Interest Rate Type
Provisions (Fixed Rate)
Fannie Mae**

**Form 6103.FR
01-11**

**Page 1
© 2011 Fannie Mae**

**SCHEDULE 4**
**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Prepayment Premium Schedule**
**(Standard Yield Maintenance – Fixed Rate)**

**1.      Defined Terms.**

All capitalized terms used but not defined in this Prepayment Premium Schedule shall have the meanings assigned to them in the Loan Agreement.

**2.      Prepayment Premium.**

Any Prepayment Premium payable under Section 2.03 (Lockout/Prepayment) of the Loan Agreement shall be computed as follows:

(a)      If the prepayment is made at any time after the Effective Date and before the Yield Maintenance Period End Date, the Prepayment Premium shall be the greater of:

(1)      one percent (1%) of the amount of principal being prepaid; or

(2)      the product obtained by multiplying:

(A)      the amount of principal being prepaid,

*by*

(B)      the difference obtained by subtracting from the Fixed Rate on the Mortgage Loan, the Yield Rate (as defined below) on the twenty-fifth (25th) Business Day preceding (i) the Intended Prepayment Date, or (ii) the date Lender accelerates the Mortgage Loan or otherwise accepts a prepayment pursuant to Section 2.03(d) (Application of Collateral) of the Loan Agreement,

*by*

(C)      the present value factor calculated using the following formula:

$$\frac{1 - (1 + r)^{-n/12}}{r}$$

[r =      Yield Rate

n =      the number of months remaining between (i) either of the following: (x) in the case of a voluntary prepayment, the

{01359318;1}
**Schedule 4 to Multifamily Loan and**
**Security Agreement (Prepayment Premium**
**Schedule – Standard Yield Maintenance –**
**Fixed Rate)**
**Fannie Mae**

**Form 6104.01**
**08-13**

**Page 1**
**© 2013 Fannie Mae**

last day of the month in which the prepayment is made, or (y) in any other case, the date on which Lender accelerates the unpaid principal balance of the Mortgage Loan and (ii) the Yield Maintenance Period End Date.

For purposes of this clause (2), the "**Yield Rate**" means the yield calculated by interpolating the yields for the immediately shorter and longer term U.S. "Treasury constant maturities" (as reported in the Federal Reserve Statistical Release H.15 Selected Interest Rates (the "**Fed Release**") under the heading "U.S. government securities") closest to the remaining term of the Yield Maintenance Period Term, as follows (rounded to three (3) decimal places):

$$\left( \frac{(a-b)}{(x-y)} \times (z-y) \right) + b$$

$a =$ the yield for the longer U.S. Treasury constant maturity

$b =$ the yield for the shorter U.S. Treasury constant maturity

$x =$ the term of the longer U.S. Treasury constant maturity

$y =$ the term of the shorter U.S. Treasury constant maturity

$z =$ "n" (as defined in the present value factor calculation above) divided by twelve (12).

Notwithstanding any provision to the contrary, if "$z$" equals a term reported under the U.S. "Treasury constant maturities" subheading in the Fed Release, the yield for such term shall be used, and interpolation shall not be necessary. If publication of the Fed Release is discontinued by the Federal Reserve Board, Lender shall determine the Yield Rate from another source selected by Lender. Any determination of the Yield Rate by Lender will be binding absent manifest error.]

(b)     If the prepayment is made on or after the Yield Maintenance Period End Date but before the last calendar day of the fourth (4th) month prior to the month in which the Maturity

{01359318;1}
**Schedule 4 to Multifamily Loan and Security Agreement (Prepayment Premium Schedule – Standard Yield Maintenance – Fixed Rate)**
**Fannie Mae**

Form 6104.01
08-13

Page 2
© 2013 Fannie Mae

Date occurs, the Prepayment Premium shall be one percent (1%) of the amount of principal being prepaid.

(c)     Notwithstanding the provisions of Section 2.03 (Lockout/Prepayment) of the Loan Agreement, no Prepayment Premium shall be payable with respect to any prepayment made on or after the last calendar day of the fourth (4th) month prior to the month in which the Maturity Date occurs.

{01359318;1}
**Schedule 4 to Multifamily Loan and Security Agreement (Prepayment Premium Schedule – Standard Yield Maintenance – Fixed Rate)**
**Fannie Mae**

**Form 6104.01**
**08-13**

**Page 3**
**© 2013 Fannie Mae**

# SCHEDULE 5 TO
# MULTIFAMILY LOAN AND SECURITY AGREEMENT

## Required Replacement Schedule

## PLEASE SEE ATTACHED

{01554770;1}
**Multifamily Loan and Security Agreement**
**(Non-Recourse)**
**Schedule 5**

**Form 6001.NR**
**06-19**

**Page 1**
**© 2019 Fannie Mae**

# PHYSICAL NEEDS ANALYSIS

| | | | |
|---|---|---|---|
| **Deal Name:** Brittany Village Apartments | **Age:** 1968 | **Year first CofO Issued:** 1968 | **Consultant Firm:** Nova Consulting Group, Inc. |
| **Location:** Saint Joseph, MO | **# of Buildings:** 28 | **Building Type:** Garden | **Inspection Date:** 05/15/19 |
| **# of Units:** 280 | **Stories:** 2 & 3 | **Phase Completion Dates (Earliest First):** 1968 | |
| | | **Parking Spaces:** 500 | |
| | | **Property Acreage:** 18.13 | |

| Item | Component Units at Property | # Replaced Over Loan Term | % Replaced Over Loan Term | Unit Cost | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site** | | | | | | | | | | | | | | | | | | |
| Asphalt Seatcoat and Restriping | 343,000 | 343,000 | 100% | $0.12 | $41,160 | | | | | $20,580 | | | | | $20,580 | | | $41,160 |
| **Architectural** | | | | | | | | | | | | | | | | | | |
| Paint/Caulk – Cladding | 280 | 280 | 100% | $300.00 | $84,000 | | | | | | | | $42,000 | $42,000 | | | | $84,000 |
| Roof Replacement – Asphalt Shingles | 65000 | 56,873 | 87% | $1.50 | $85,309 | $12,187 | $12,187 | $12,187 | $12,187 | $12,187 | $12,187 | $12,187 | $12,187 | | | | | $85,309 |
| **Interiors** | | | | | | | | | | | | | | | | | | |
| Domestic Water Heater Tank Type | | | | | | | | | | | | | | | | | | |
| Gas-Fired (80 gal) | 280 | 34 | 12% | $1,800.00 | $60,750 | $0 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $6,750 | $74,250 |
| Furnace | 280 | 101 | 36% | $750.00 | $75,375 | $0 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $8,375 | $92,125 |
| Condenser, Remote – Component | 280 | 126 | 45% | $500.00 | $63,000 | $0 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $7,000 | $77,000 |
| **Interiors** | | | | | | | | | | | | | | | | | | |
| Common Area Carpet | 22400 | 16,800 | 75% | $3.00 | $50,400 | $0 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $5,600 | $61,600 |
| Carpet Flooring Replacement | 373 | 280 | 75% | $400.00 | $111,897 | $0 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $12,433 | $136,763 |
| Vinyl Flooring Replacement | 280 | 168 | 60% | $900.00 | $151,200 | $0 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $16,800 | $184,800 |
| Refrigerators | 280 | 140 | 50% | $400.00 | $56,097 | $0 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $6,233 | $68,563 |
| Range | 280 | 126 | 45% | $350.00 | $44,100 | $0 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $4,900 | $53,900 |
| **Uninflated Cost** | | | | | **$823,288** | $0 | $80,278 | $80,278 | $80,278 | $100,858 | $80,278 | $80,278 | $122,278 | $110,091 | $88,671 | $88,091 | $88,091 | $959,470 |
| Inflation Factor | 3.00% | | | | | 100.00% | 103.00% | 106.09% | 109.27% | 112.55% | 115.93% | 119.41% | 122.99% | 126.68% | 130.48% | 134.39% | 138.42% | |
| **Inflated Cost** | | | | | **$1,148,317** | $0 | $82,686 | $85,167 | $87,722 | $113,517 | $93,064 | $95,855 | $150,387 | $139,460 | $115,696 | $91,509 | $94,254 | $1,148,317 |

| | PUPA | Monthly |
|---|---|---|
| Years 1-2: | $343 | $8,013 |
| Years 3-4: | $343 | $8,013 |
| Years 5-6: | $343 | $8,013 |
| Years 7-8: | $343 | $8,013 |
| Years 9-10: | $343 | $8,013 |

Ongoing Annual Reserves Waived (INA for Pre Review Loans)?: **No**    *Note* : Full Funding of Replacement Reserves required on loans <

Initial Deposit to Replacement Reserve Waived?: **Yes**    *Note* : Immediate Repairs exceed 4% of UW Value for Refinances or exceed 6% of UW Value for Acquisitions

: Full Funding of Replacement Reserves required on loans <

| Replacement Reserve Calculation | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Engineer's Recommended Replacements per Year | $0 | $82,686 | $85,167 | $87,722 | $113,517 | $93,064 | $95,856 | $150,387 | $139,460 | $115,696 | $91,509 | $94,254 | $1,149,317 |
| Less Annual Deposit to Replacement Reserve | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $1,153,824 |
| Net Amount not covered by Annual Deposit | $96,152 | $13,466 | $10,985 | $8,430 | ($17,365) | $3,088 | $296 | ($54,235) | ($43,308) | ($19,544) | $4,643 | $1,898 | $4,507 |
| **Replacement Reserve Running Balance Schedule** | | | | | | | | | | | | | |
| Running Balance of Replacement Reserve (enter initial deposit in Year 1) | $0 | $96,152 | $109,858 | $121,118 | $129,851 | $112,811 | $116,180 | $116,767 | $62,824 | $19,673 | $179 | $4,823 | |
| Annual Deposit to Replacement Reserve | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $96,152 | $1,153,824 |
| Interest Accrual @   0.25% | $240 | $275 | $303 | $325 | $292 | $290 | $292 | $157 | $49 | $0 | $12 | $179 | $2,226 |
| Less Planned Expenditures | $0 | ($82,686) | ($85,167) | ($87,722) | ($113,517) | ($93,064) | ($95,856) | ($150,387) | ($139,460) | ($115,696) | ($91,509) | ($94,254) | ($1,149,317) |
| Ending Balance | $96,152 | $109,858 | $121,118 | $129,851 | $112,811 | $116,180 | $116,767 | $62,824 | $19,673 | $179 | $4,823 | $6,733 | $6,733 |

# SCHEDULE 6 TO
# MULTIFAMILY LOAN AND SECURITY AGREEMENT

## Required Repair Schedule

**Immediate Repairs - Critical Items (6 months) & Deferred Maintenance (12 months)**

| Item | Location | Description | Completion Time (mos.) | $ Cost | Holdback Percentage | Holdback Amount |
|---|---|---|---|---|---|---|
| 1 | Retaining Wall Concrete | Portions of the retaining wall along eastern perimeter appears to be failing. A qualified professional Engineer must be retained to observe the conditions, make recommendations, and, if required, determine estimated costs to resolve the observed problem | 6 | $7,500 | 125% | $9,375 |
| 2 | Erosion/Landscaping | Remediate areas of erosion through the use of improved irrigation, plantings, grading, hardscape or other restorative techniques | 12 | $2,000 | 125% | $2,500 |
| 3 | Asphalt Pavement Repairs/Replacements | Repair damaged asphalt pavement | 12 | $51,000 | 125% | $63,750 |
| 4 | Asphalt Sealcoat and Restriping | Seal coat and strip worn asphalt pavement and faded striping | 12 | $20,580 | 125% | $25,725 |
| 5 | Concrete Pavement Repairs/Replacements | Repair sections of damaged concrete sidewalk and steps | 12 | $17,500 | 125% | $21,875 |
| 6 | Paint/Caulk Cladding | Clean, paint, and caulk weathered and faded stucco finish | 12 | $84,000 | 125% | $105,000 |
| 7 | Down Units | Set appliances and clean fire damaged down units 1, 2, 3, and 4 in Building 1605 and make rentable. | 12 | $0 | 125% | $0 |
| 8 | ADA Accessible Parking Space | Provide required ADA accessible parking space striping with loading area | 12 | $1,950 | 125% | $2,438 |
| 9 | ADA Accessible Curb Cuts | Provide curb cuts at ADA accessible parking spaces | 12 | $3,500 | 125% | $4,375 |
| | | Total Cost of Non-Life Safety Immediate Repairs | | $188,030 | | $235,038 |

Holdback Waived? _____ No

**Green Improvements**

| EWEM | EWEM Type | Description | Quantity | Projected Water Savings (%) | Projected Energy Savings (%) | Total Cost ($) | Completion Requirement (Date) |
|---|---|---|---|---|---|---|---|
| 1 | Thermostats | Install ENERGY STAR certified smart thermostats with built in learning capabilities (Nest or similar) in 100% of apartments and the leasing office to control heating and cooling. | 281 | 0.00% | 6.70% | $53,390 | 8/1/2020 |
| 2 | Water Heaters | Insulate all exposed domestic hot water lines and exposed cold water lines up to 3 feet for each system with R6 foam insulation. | 57 | 0.00% | 4.00% | $13,289 | 8/1/2020 |
| 3 | Bathroom Faucet | Install low flow, 1.0 GPM EPA WaterSense-certified aerators in 100% of apartment bathroom faucet fixtures | 304 | 2.10% | 0.50% | $3,040 | 8/1/2020 |
| 4 | Kitchen Faucet | Install low flow, 1.0 GPM EPA WaterSense-certified aerators in 93% of apartment kitchen faucet fixtures. | 260 | 4.60% | 1.20% | $2,600 | 8/1/2020 |
| 5 | Showerheads | Install low flow, 1.25 GPM EPA WaterSense-certified showerheads in 100% of apartment bathrooms. | 280 | 10.80% | 2.70% | $14,000 | 8/1/2020 |
| | | Total % and Cost of Green Improvements | | 17.50% | 15.10% | $86,319 | |

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)
Schedule 6**

Form 6001.NR
06-19

Page 1
© 2019 Fannie Mae

# MODIFICATIONS TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

## ADDENDUM TO SCHEDULE 6 – REQUIRED REPAIR SCHEDULE
### (Green Rewards Repairs)

| Address of Mortgaged Property: | 1601 N 36th Street, Saint Joseph, Missouri 64506 |
|---|---|
| Collateral Reference Number: | 9999092794 |

| Green Rewards Repairs | Estimated Cost | Maximum Green Rewards Repair Cost | Completion Date |
|---|---|---|---|
| The items marked "Yes" in the "Selected for Implementation" column on the List of Green Rewards Repairs that appears on the following page. | The "Installed Cost" for each item marked "Yes" on the List of Green Rewards Repairs that appears on the following page. | Estimated Cost x 100% | |

{01555592;1}
Modifications to Multifamily Loan and Security
Agreement – Schedule 6 Addendum – Required
Repair Schedule (Green Rewards Repairs)
Fannie Mae

Form 6241
06-19

Page 1
© 2019 Fannie Mae

# List of Green Rewards Repairs

**Green Improvements**

| EWEM | EWEM Type | Decription | Quantity | Projected Water Savings (%) | Projected Energy Savings (%) | Total Cost ($) | Completion Requirement (Date) |
|---|---|---|---|---|---|---|---|
| 1 | Thermostats | Install ENERGY STAR certified smart thermostats with built in learning capabilities (Nest or similar) in 100% of apartments and the leasing office to control heating and cooling. | 291 | 0.00% | 6.70% | $53,390 | 8/1/2020 |
| 2 | Water Heaters | Insulate all exposed domestic hot water lines and exposed cold water lines up to 3 feet for each system with R6 foam insulation. | 57 | 0.00% | 4.00% | $13,289 | 8/1/2020 |
| 3 | Bathroom Faucet | Install low flow, 1.0 GPM EPA WaterSense-certified aerators in 100% of apartment bathroom faucet fixtures. | 304 | 2.10% | 0.50% | $3,040 | 8/1/2020 |
| 4 | Kitchen Faucet | Install low flow, 1.0 GPM EPA WaterSense-certified aerators in 93% of apartment kitchen faucet fixtures. | 260 | 4.60% | 1.20% | $2,600 | 8/1/2020 |
| 5 | Showerheads | Install low flow, 1.25 GPM EPA WaterSense-certified showerheads in 100% of apartment bathrooms. | 280 | 10.80% | 2.70% | $14,000 | 8/1/2020 |
| | | **Total % and Cost of Green Improvements** | | **17.50%** | **15.10%** | **$86,319** | |

{01555592;1}
**Modifications to Multifamily Loan and Security Agreement – Schedule 6 Addendum – Required Repair Schedule (Green Rewards Repairs) Fannie Mae**

Form 6241
06-19

Page 2
© 2019 Fannie Mae

# SCHEDULE 7 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Exceptions to Representations and Warranties Schedule

**NONE**

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)
Schedule 7**

**Form 6001.NR
06-19**

**Page 1
© 2019 Fannie Mae**

# SCHEDULE 8 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Ownership Interests Schedule



[Remainder of Page Intentionally Blank]

{01554770;1}
**Multifamily Loan and Security Agreement
(Non-Recourse)
Schedule 8**

**Form 6001.NR
06-19**

**Page 1
© 2019 Fannie Mae**

**MODIFICATIONS TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**
**(Green Mortgage Loan)**

The foregoing Loan Agreement is hereby modified as follows:

1.      Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

2.      The Definitions Schedule is hereby amended by adding the following new definitions in the appropriate alphabetical order:

"**EPA**" means the United States Environmental Protection Agency.

"**Green Measurement and Verification Consultant**" means the Person designated by Lender from time to time as its consultant to confirm Green Rewards Repairs and facilitate Borrower's required reporting of energy and water consumption.

"**Green Rewards Deposit**" means **$86,319.00**, which amount shall be used to fund the Green Rewards Repairs.  The Green Rewards Deposit shall be included as part of the Repairs Escrow Account.

"**Green Rewards Repairs**" means those items listed and identified as Green Rewards Repairs on the Required Repair Schedule, and which shall be deemed Required Repairs.

"**Portfolio Manager**" means the tool located on the EPA's ENERGY STAR® Portfolio Manager® website (https://portfoliomanager.energystar.gov/pm/login.html) (or any successor or replacement application), which is used to measure and track energy and water consumption for commercial and multifamily buildings.

3.      The Required Repair Schedule is hereby amended by attaching Addendum to Schedule 6 – Required Repair Schedule (Green Rewards Repairs) thereto.

4.      The following Article is hereby added to the Loan Agreement as Article 16 (Green Mortgage Loan):

# ARTICLE 16 – GREEN MORTGAGE LOAN

### Section 16.01  Covenants.

(a)      On the Effective Date, Borrower shall pay to Lender the Green Rewards Deposit for deposit into the Repairs Escrow Account.

(b)      Borrower shall (1) use the Green Measurement and Verification Consultant (or if directed by Lender, a third-party energy consultant to be retained at

{01555592;1}
**Modifications to Multifamily Loan and Security**
**Agreement (Green Mortgage Loan)**
**Fannie Mae**

Form 6241
06-19

**Page 1**
**© 2019 Fannie Mae**

Borrower's expense) to track and report the energy and water consumption and cost for all energy and water sources, metered and unmetered (e.g., unmetered sources including invoiced delivery of fuel oil or wood pellets, or use of well water), that provide energy and water service to the Mortgaged Property using Portfolio Manager; (2) share Borrower's Portfolio Manager account with Lender; (3) if tenants pay bills directly to a utility, a representative sample of tenant bills (as determined by Lender and the Green Measurement and Verification Consultant) must be collected and reported to Lender and the Green Measurement and Verification Consultant; (4) perform any other ongoing monitoring necessary for tracking and reporting the energy and water consumption performance and energy and water costs of the Mortgaged Property in Portfolio Manager; (5) provide Lender and the Green Measurement and Verification Consultant with whole property data for the Mortgaged Property, separated by Borrower and tenant usage; and (6) cooperate fully with the Green Measurement and Verification Consultant to accurately track and report the energy and water consumption performance and energy and water costs of the Mortgaged Property, including the delivery of any documentation or consents needed for the Lender and Green Measurement and Verification Consultant to obtain or verify any requested data.

(c)     Borrower shall include with the delivery of items required under Section 8.02(b)(2), the Fannie Mae Energy Performance Metrics report, as generated by Portfolio Manager, or such other report as directed by Lender or the Green Measurement and Verification Consultant, for the Mortgaged Property for such calendar year. All fields applicable to the Mortgaged Property must be filled out, regardless of whether such field is listed in Portfolio Manager as "optional," and which must result in a report that includes all of the following information for the Mortgaged Property:

(1)     the ENERGY STAR score, if available;

(2)     the Source Energy Use Intensity (EUI);

(3)     for all energy types used at the Mortgaged Property, the annual cost of each energy type;

(4)     the EPA Water Score, if available;

(5)     the Water Use Intensity (WUI);

(6)     the annual cost of water;

(7)     the month and year ending period for items (1) through (6) above;

(8)     any additional energy and water data reasonably requested by Lender; and

(9)     the Portfolio Manager Property Identification Number.

(d)     Borrower shall (1) commence the Green Rewards Repairs promptly following the Effective Date (subject to Force Majeure, if applicable), in accordance with the timelines set forth on the Required Repair Schedule, or if no timelines are provided, as soon as practical following the Effective Date, (2) complete the Green Rewards Repairs within the Completion Period, and (3) maintain the Green Rewards Repairs at the Mortgaged Property thereafter throughout the term of the Mortgage Loan.

(e)     Without limiting any similar rights granted to Lender in this Loan Agreement, Borrower shall (1) permit Lender, the Green Measurement and Verification Consultant, and any of Lender's other experts, consultants, engineers, agents, representatives, and designees to enter upon and inspect the Mortgaged Property, including the Green Rewards Repairs, and any other fixtures, products, or appliances used at the Mortgaged Property; and (2) provide, or cause to be provided, such further documentation or information as may be reasonably requested by Lender, the Green Measurement and Verification Consultant, or any of Lender's other experts, consultants, agents, representatives, and designees to monitor Borrower's compliance with, and obtain any Borrower or tenant data required to be reported pursuant to, this Article 16.

(f)     If the Mortgaged Property has been awarded a Green Building Certification recognized by Lender, Borrower agrees to execute and deliver to Lender a release addressed to the organization granting such Green Building Certification, and authorizing such green building organization to release to Lender the final certification scorecard or equivalent documentation for the granting of such Green Building Certification.

**[Remainder of Page Intentionally Blank]**

{01555592;1}
**Modifications to Multifamily Loan and Security Agreement (Green Mortgage Loan) Fannie Mae**

Form 6241
06-19

Page 3
© 2019 Fannie Mae

# EXHIBIT C

*(Space above reserved for Recorder of Deeds certification)*

# COVER SHEET
# (MISSOURI)

*Title of Document:* Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing

*Date of Document:* August 16, 2019

*Grantor:* **APEX BRITTANY MO LP**, a Delaware limited partnership

*Grantor's Mailing Address:* 10 Hill Street, Newark, New Jersey 07102

*Grantee:* **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company

*Grantee's Mailing Address:* c/o Hunt Real Estate Capital
11501 Outlook Street, Suite 300
Overland Park, Kansas 66211

*Legal Description:* See Exhibit A

*Reference Book and Page(s):* N/A

**This cover page is attached solely for the purpose of complying with the requirements stated in Sections 59.310.2; 59.313.2 Revised Missouri Statutes.**

{01555234;1}
**Fannie Mae Multifamily Security Instrument**
**Missouri**

Form 6025.MO
01-16

© 2016 Fannie Mae

# MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT AND
## FIXTURE FILING

This MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") dated as of August 16, 2019, is executed by **APEX BRITTANY MO LP**, a limited partnership organized and existing under the laws of Delaware, as grantor ("**Borrower**"), to Martin Leigh Attorneys PC as trustee ("**Trustee**"), for the benefit of **HUNT MORTGAGE CAPITAL, LLC**, a limited liability company organized and existing under the laws of Delaware, as beneficiary ("**Lender**").

Borrower, in consideration of (i) the loan in the original principal amount of **$7,704,000.00** (the "**Mortgage Loan**") evidenced by that certain Multifamily Note dated as of the date of this Security Instrument, executed by Borrower and made payable to the order of Lender (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), (ii) that certain Multifamily Loan and Security Agreement dated as of the date of this Security Instrument, executed by and between Borrower and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and (iii) the trust created by this Security Instrument, and to secure to Lender the repayment of the Indebtedness (as defined in this Security Instrument), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined in the Loan Agreement), excluding the Environmental Indemnity Agreement (as defined in this Security Instrument), irrevocably and unconditionally mortgages, grants, warrants, conveys, bargains, sells, and assigns to Trustee, in trust, for benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in **Buchanan** County, State of Missouri, and described in Exhibit A attached to this Security Instrument and incorporated by reference (the "**Land**"), to have and to hold such Mortgaged Property unto Trustee and Trustee's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Borrower, and by their acceptance hereof, each of Trustee and Lender covenants and agrees as follows:

{01555234;1}
**Fannie Mae Multifamily Security Instrument**
**Missouri**

Form 6025.MO
01-16

Page 1
© 2016 Fannie Mae

# 1.    Defined Terms.

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement. All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

**"Condemnation Action"** means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

**"Enforcement Costs"** means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Loan Agreement or in connection with efforts to collect any amount due under the Loan Documents, or to enforce the provisions of the Loan Agreement or any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

**"Environmental Indemnity Agreement"** means that certain Environmental Indemnity Agreement dated as of the date of this Security Instrument, executed by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

**"Environmental Laws"** has the meaning set forth in the Environmental Indemnity Agreement.

**"Event of Default"** has the meaning set forth in the Loan Agreement.

**"Fixtures"** means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

**"Goods"** means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain

rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Imposition Deposits**" means deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Impositions when due.

"**Impositions**" means

> (a)     any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

> (b)     the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement;

> (c)     Taxes; and

> (d)     amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document (other than the Environmental Indemnity Agreement and Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"**Land**" means the real property described in <u>Exhibit A</u>.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or

occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

   (a)   the Land;

   (b)   the Improvements;

   (c)   the Personalty;

   (d)   current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

   (e)   insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

   (f)   awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

   (g)   contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

   (h)   Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)     earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)     Imposition Deposits;

(k)     refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)     tenant security deposits;

(m)     names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)     Collateral Accounts and all Collateral Account Funds;

(o)     products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)     all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

"**Permitted Encumbrance**" means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

"**Personalty**" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Prepayment Premium**" has the meaning set forth in the Loan Agreement.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"**Software**" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Document.

"**Title Policy**" has the meaning set forth in the Loan Agreement.

"**UCC**" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

"**UCC Collateral**" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.      **Security Agreement; Fixture Filing.**

(a)      To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any

way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)     Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Mortgaged Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)     All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

**3.     Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and Rents shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

{01555234;1}

(b)     Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

(c)     If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the

Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)     Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and control of the Mortgaged Property, possession of the Mortgaged Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)     The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

(1)     obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

(2)     obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

(3)     responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property

is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

(g)     Lender shall be liable to account only to Borrower and only for Rents actually received by Lender.  Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order.  If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid.  Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

## 4.     Protection of Lender's Security.

If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property or the Mortgage Loan, including:

(a)     paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

(b)     entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)     obtaining (or force-placing) the insurance required by the Loan Documents; and

(d)     paying any amounts required under any of the Loan Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid. The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

5.    **Default; Acceleration; Remedies.**

(a)    If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Mortgage Loan; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1)or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law. Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)    Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing. In the event Lender invokes the power of sale:

(1)    Lender shall send to Borrower and any other Persons required to receive such notice, written notice of Lender's election to cause the Mortgaged Property to be sold. Borrower hereby authorizes and empowers Trustee to take possession of the Mortgaged Property, or any part thereof, and hereby grants to Trustee a power of sale and authorizes and empowers Trustee to sell (or, in the case of the default of any purchaser, to resell) the Mortgaged Property or any part thereof, in compliance with applicable law, including compliance with any and all notice and timing requirements for such sale;

(2)    Trustee shall have the authority to determine the terms of the sale, subject to applicable law. In connection with any such sale, the whole of the Mortgaged Property may be sold in one (1) parcel as an entirety or in separate lots or parcels at the same or different times. Lender shall have the right to become the purchaser at any such sale. Trustee shall be entitled to receive fees and expenses from such sale not to exceed the amount permitted by applicable law;

(3)    within a reasonable time after the sale, Trustee shall deliver to the purchaser of the Mortgaged Property a deed or such other appropriate conveyance document conveying the Mortgaged Property so sold without any express or implied covenant or

warranty.  The recitals in such deed or document shall be prima facie evidence of the truth of the statements made in those recitals; and

(4)     the outstanding principal amount of the Mortgage Loan and the other Indebtedness, if not previously due, shall be and become immediately due and payable without demand or notice of any kind.  If the Mortgaged Property is sold for an amount less than the amount outstanding under the Indebtedness, the deficiency shall be determined by the purchase price at the sale or sales.  Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment.

(c)     Borrower acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

(d)     The Trustee hereby lets the Mortgaged Property to Borrower until a sale is held under the foregoing provisions therefor, or until an Event of Default has occurred and is continuing, upon the following terms and conditions:  Borrower, and every and all persons claiming or possessing such premises, and any part thereof, by, through or under Borrower, shall pay rent therefor during said term, payable upon demand, and shall and will surrender peaceable possession of the Mortgaged Property, and any and every part thereof, sold under the provisions of this Security Instrument, to the purchaser thereof under such sale, without notice or demand therefor, and shall and will at once, without notice, surrender up possession of the Mortgaged Property and every part thereof in the event Lender shall take charge and enter as hereinbefore provided.

(e)     In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Indebtedness: (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents.  All expenditures and expenses of the nature mentioned in this Section 5, and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents,

{01555234;1}

or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

(f)     Any action taken by Trustee or Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction. Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law. If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), Trustee or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

## 6.     Waiver of Statute of Limitations and Marshaling.

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

## 7.     Waiver of Redemption; Rights of Tenants.

(a)     Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

(1)     Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights

of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)     Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)     if Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)     Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender. The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

**8.     Notice.**

(a)     All notices under this Security Instrument shall be:

(1)     in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)     addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)     deemed given on the earlier to occur of:

(A)     the date when the notice is received by the addressee; or

(B)     if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)     Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)     Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

9.     **Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

10.     **Release.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

11.     **Further Assurances for Trustee.**

Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Trustee may require from time to time in order to better assure, grant, and convey to Trustee the rights intended to be granted, now or in the future, to Trustee under this Security Instrument.

12.     **Successor Trustee.**

Lender, at Lender's option, with or without cause, may from time to time remove Trustee and appoint a successor trustee by an instrument recorded in the city or county in which this Security Instrument is recorded.  Without conveyance of the Mortgaged Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee in this Security Instrument and by applicable law.

For purposes of this Security Instrument the term "Trustee" means the person identified as Trustee in the first paragraph of this Security Instrument and any successor trustee appointed by Lender pursuant to this Section 12 or otherwise appointed as permitted by law.

13.     **Missouri State Specific Provisions.**

(a)     **Oral Agreements are Unenforceable.**

**The following notice is given to comply with Sections 432.045 and 432.047 of the Revised Statutes of Missouri:  Oral or unexecuted agreements or commitments to loan**

money, extend credit or to forbear from enforcing repayment of a debt, including promises to extend or renew such debt, are not enforceable, regardless of the legal theory upon which it is based that is in any way related to the credit agreement. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

As used in this Section 13(a), "this writing" is deemed to include this Security Instrument and all other Loan Documents.

(b)     **Collateral Insurance Protection.**

The following notice is provided pursuant to Section 427.120 of the Revised Statutes of Missouri. As used herein, the terms "you" and "your" shall refer to Borrower; and the terms "we" and "us" shall refer to the Trustee and Lender. Unless you provide evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Indebtedness. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

(c)     **Loan Proceeds.**

The proceeds of the loan secured by this Security Instrument will be used for the purposes specified in Section 408.035 of the Revised Statutes of Missouri and the obligations secured hereby constitute both a business loan and a real estate loan which comes within the purview of Section 408.035 of the Revised Statutes of Missouri.

(d)     **Future Advances.**

This Security Instrument is governed by the provisions of Section 443.055 of the Revised Statutes of Missouri with respect to future advances and future obligations, up to the maximum aggregate original principal amount of two hundred percent (200%) of the original principal amount of the Note excluding any interest and any amounts advanced by Lender for the protection of the lien and security interest herein granted.

In the event any person legally entitled thereto shall at any time deliver or cause to be delivered to Lender a notice pursuant to subsections 6 or 8 of Section 443.055 of the Revised Statutes of Missouri electing to terminate the operation of this Security Instrument as security for

future advances or future obligations made or incurred after the date of such notice, then upon receipt of such notice Lender shall have no further obligation under the Loan Agreement, this Security Instrument or otherwise to advance monies to or for the account of Borrower, notwithstanding anything in the Loan Agreement or this Security Instrument to the contrary. Moreover, any request by Borrower for an advance under the Loan Agreement shall constitute a certification that no such notice of termination has been given.

(e)     **Lease of Mortgaged Property by Trustee.**

Until this Security Instrument is satisfied and released or until an Event of Default occurs and is continuing, Trustee hereby lets the Mortgaged Property to Borrower upon the following terms and provisions, to-wit: The Borrower, its successors and assigns, shall pay rent therefor during said terms at the rate of one cent ($0.01) per month, payable monthly upon demand, and shall and will peaceably surrender possession of the Mortgaged Property, and every part thereof, to Trustee immediately upon an Event of Default, and without notice or demand therefor, and thereupon Trustee or Lender shall be entitled to the rents, revenues, income and profits derived therefrom as provided herein and shall have the right to sell the Mortgaged Property or any part thereof as herein provided.

**14.     Governing Law; Consent to Jurisdiction and Venue.**

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction. Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**15.     Miscellaneous Provisions.**

(a)     This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender. This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Agreement. If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several. The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

(b)     The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Document, all of which shall remain in full force and effect. This Security Instrument contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

(c)     The following rules of construction shall apply to this Security Instrument:

(1)     The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)     Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)     Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)     Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

(5)     As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)     Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)     Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)     All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

**16. Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Documents, time is of the essence.

**17. WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**ATTACHED EXHIBITS.** The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

|X|   Exhibit A   Description of the Land (required)

|_|   Exhibit B   Modifications to Security Instrument

**[Remainder of Page Intentionally Blank]**

**IN WITNESS WHEREOF,** Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

**APEX BRITTANY MO LP,** a
Delaware limited partnership

By:    **APEX OPPORTUNITY LIMITED LLC,** a
New Jersey limited liability company,
its General Partner

By: _____ (SEAL)
Name:    Oron Zarum
Title:    Managing Member

STATE OF   *New Jersey* )
                 )SS.:
COUNTY OF  *Ocean* )

On this *14* day of *August*, in the year 2019, before me *Joseph Lowi*, a Notary Public in and for said State, personally appeared **ORON ZARUM, MANAGING MEMBER** of **APEX OPPORTUNITY LIMITED LLC,** a New Jersey limited liability company, **GENERAL PARTNER** of **APEX BRITTANY MO LP,** a Delaware limited partnership, known to me to be the person who executed the foregoing on behalf of said limited liability company, on behalf of said limited partnership, and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public

             **JOSEPH M LOWI**
             NOTARY PUBLIC
            STATE OF NEW JERSEY
My commission expires: _____ID # 50021480
      MY COMMISSION EXPIRES AUG. 17, 2020

Name: _____
{01555234;1}

The name, chief executive office and organizational identification number of Borrower (as Debtor under any applicable Uniform Commercial Code) are:

Debtor Name/Record Owner: **APEX BRITTANY MO LP**, a Delaware limited partnership

Debtor Chief Executive Office Address:

10 Hill Street
Newark, New Jersey 07102

Debtor Organizational ID Number: N/A

The name and chief executive office of Lender (as Secured Party) are:

Secured Party Name: **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company

Secured Party Chief Executive Office Address:

c/o Hunt Real Estate Capital
11501 Outlook Street, Suite 300
Overland Park, Kansas 66211

**TRUSTEE NOTICE ADDRESS:**
1044 Main Street, Suite 900
Kansas City, Missouri 64105

# EXHIBIT A

# [DESCRIPTION OF THE LAND]

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N, RANGE 35 W., ST. JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING.

THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT; THENCE 873.36 FEET S TO A POINT; THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2:

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING.

{01555234;1}
**Fannie Mae Multifamily Security Instrument**
**Missouri**

Form 6025.MO
01-16

Page A-1
© 2016 Fannie Mae

# EXHIBIT D

# GUARANTY OF NON-RECOURSE OBLIGATIONS

This GUARANTY OF NON-RECOURSE OBLIGATIONS (this "**Guaranty**"), dated as of August 16, 2019, is executed by the undersigned ("**Guarantor**"), to and for the benefit of **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company ("**Lender**").

## RECITALS:

A.     Pursuant to that certain Multifamily Loan and Security Agreement dated as of the date hereof, by and between **APEX BRITTANY MO LP**, a Delaware limited partnership ("**Borrower**") and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the original principal amount of **SEVEN MILLION SEVEN HUNDRED FOUR THOUSAND AND 00/100 DOLLARS ($7,704,000.00)** (the "**Mortgage Loan**"), as evidenced by that certain Multifamily Note dated as of the date hereof, executed by Borrower and made payable to the order of Lender in the amount of the Mortgage Loan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**").

B.     The Note will be secured by, among other things, a Security Instrument (as defined in the Loan Agreement) encumbering the real property described in the Security Instrument (the "**Property**").

C.     Guarantor has an economic interest in Borrower or will otherwise obtain a material financial benefit from the Mortgage Loan.

D.     As a condition to making the Mortgage Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

NOW, THEREFORE, in order to induce Lender to make the Mortgage Loan to Borrower, and in consideration thereof, Guarantor agrees as follows:

## AGREEMENTS:

1.     **Recitals.**

The recitals set forth above are incorporated herein by reference as if fully set forth in the body of this Guaranty.

2.     **Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement.

### 3. Guaranteed Obligations.

Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Lender the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of:

(a) all amounts, obligations and liabilities owed to Lender under Article 3 (Personal Liability) of the Loan Agreement (including the payment and performance of all indemnity obligations of Borrower described in Section 3.03 (Personal Liability for Indemnity Obligations) of the Loan Agreement and including all of Borrower's obligations under the Environmental Indemnity Agreement); and

(b) all costs and expenses, including reasonable fees and out-of-pocket expenses of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

### 4. Survival of Guaranteed Obligations.

The obligations of Guarantor under this Guaranty shall survive any Foreclosure Event, and any recorded release or reconveyance of the Security Instrument or any release of any other security for any of the Indebtedness.

### 5. Guaranty of Payment; Community Property.

Guarantor's obligations under this Guaranty constitute a present and unconditional guaranty of payment and not merely a guaranty of collection. If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse is a community property jurisdiction, Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and Guarantor's interest in any community property.

### 6. Obligations Unsecured; Cross-Default.

The obligations of Guarantor under this Guaranty shall not be secured by the Security Instrument or the Loan Agreement. However, a default under this Guaranty shall be an Event of Default under the Loan Agreement, and a default under this Guaranty shall entitle Lender to be able to exercise all of its rights and remedies under the Loan Agreement and the other Loan Documents.

### 7. Continuing Guaranty.

The obligations of Guarantor under this Guaranty shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any provision of this Guaranty, the Note, the Loan Agreement, the Security Instrument or any other Loan Document. Guarantor agrees that performance of the obligations hereunder shall be a primary obligation, shall not be subject to any counterclaim, set-off, recoupment, abatement, deferment or defense based upon any claim that Guarantor may have against Lender, Borrower, any other guarantor of the obligations hereunder or any other Person, and shall remain in full force and effect without regard to, and shall not be

released, discharged or affected in any way by any circumstance or condition (whether or not Guarantor shall have any knowledge thereof), including:

(a)     any furnishing, exchange, substitution or release of any collateral securing repayment of the Mortgage Loan, or any failure to perfect any lien in such collateral;

(b)     any failure, omission or delay on the part of Borrower, Guarantor, any other guarantor of the obligations hereunder or Lender to conform or comply with any term of any of the Loan Documents or failure of Lender to give notice of any Event of Default;

(c)     any action or inaction by Lender under or in respect of any of the Loan Documents, any failure, lack of diligence, omission or delay on the part of Lender to perfect, enforce, assert or exercise any lien, security interest, right, power or remedy conferred upon it in any of the Loan Documents, or any other action or inaction on the part of Lender;

(d)     any Bankruptcy Event, or any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar events or proceedings with respect to Guarantor or any other guarantor of the obligations hereunder, or any of their respective property or creditors or any action taken by any trustee or receiver or by any court in such proceeding;

(e)     any merger or consolidation of Borrower into or with any entity or any sale, lease or Transfer of any asset of Borrower, Guarantor or any other guarantor of the obligations hereunder to any other Person;

(f)     any change in the ownership of Borrower or any change in the relationship between Borrower, Guarantor or any other guarantor of the obligations hereunder, or any termination of such relationship;

(g)     any release or discharge by operation of law of Borrower, Guarantor or any other guarantor of the obligations hereunder, or any obligation or agreement contained in any of the Loan Documents; or

(h)     any other occurrence, circumstance, happening or event, whether similar or dissimilar to the foregoing, and whether seen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which otherwise might limit recourse against Borrower or Guarantor to the fullest extent permitted by law.

## 8.     Guarantor Waivers.

Guarantor hereby waives:

(a)     the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty (and agrees that Guarantor's obligations shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or a guarantor);

(b)     the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors;

(c)     diligence in collecting the Indebtedness, presentment, demand for payment, protest and all notices with respect to the Loan Documents and this Guaranty which may be required by statute, rule of law or otherwise to preserve Lender's rights against Guarantor under this Guaranty, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest and notice of the incurring by Borrower of any obligation or indebtedness; and

(d)     all rights to require Lender to:

(1)     proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness;

(2)     proceed against or pursue any remedy it may now or hereafter have against Borrower or any guarantor, or, if Borrower or any guarantor is a partnership, any general partner of Borrower or general partner of any guarantor; or

(3)     demand or require collateral security from Borrower, any other guarantor or any other Person as provided by applicable law or otherwise.

## 9.     No Effect Upon Obligations.

At any time or from time to time and any number of times, without notice to Guarantor and without releasing, discharging or affecting the liability of Guarantor:

(a)     the time for payment of the principal of or interest on the Indebtedness may be extended or the Indebtedness may be renewed in whole or in part;

(b)     the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(c)     the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(d)     the maturity of the Indebtedness may be accelerated as provided in the Loan Documents;

(e)     any or all payments due under the Loan Agreement or any other Loan Document may be reduced;

(f)     any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(g)    any amounts under the Loan Agreement or any other Loan Document may be released;

(h)    any security for the Indebtedness may be modified, exchanged, released, surrendered or otherwise dealt with or additional security may be pledged or mortgaged for the Indebtedness;

(i)    the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower;

(j)    any payments made by Borrower to Lender may be applied to the Indebtedness in such priority as Lender may determine in its discretion; and

(k)    any other terms of the Loan Documents may be modified as required by Lender.

**10.    Joint and Several (or Solidary) Liability.**

If more than one Person executes this Guaranty as Guarantor, such Persons shall be liable for the obligations hereunder on a joint and several (solidary instead for purposes of Louisiana law) basis. Lender, in its discretion, may:

(a)    to the extent permitted by applicable law, bring suit against Guarantor, or any one or more of the Persons constituting Guarantor, and any other guarantor, jointly and severally (solidarily instead for purposes of Louisiana law), or against any one or more of them;

(b)    compromise or settle with any one or more of the Persons constituting Guarantor, or any other guarantor, for such consideration as Lender may deem proper;

(c)    discharge or release one or more of the Persons constituting Guarantor, or any other guarantor, from liability or agree not to sue such Person; and

(d)    otherwise deal with Guarantor and any guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty.

Nothing contained in this Section 10 shall in any way affect or impair the rights or obligations of Guarantor with respect to any other guarantor.

**11.    Subordination of Affiliated Debt.**

Any indebtedness of Borrower held by Guarantor now or in the future is and shall be subordinated to the Indebtedness and any such indebtedness of Borrower shall be collected, enforced and received by Guarantor, as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

## 12. Subrogation.

Guarantor shall have no right of, and hereby waives any claim for, subrogation or reimbursement against Borrower or any general partner of Borrower by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute, until the Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment made by Borrower to Lender with respect to the Indebtedness could be deemed a preference under the Insolvency Laws.

## 13. Voidable Transfer.

If any payment by Borrower is held to constitute a preference under any Insolvency Laws or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance. If any payment by any Guarantor should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the obligations guaranteed hereunder shall automatically be revived, reinstated and restored by the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses and legal fees incurred by Lender in connection therewith, and shall exist as though such Voidable Transfer had never been made, and any other guarantor, if any, shall remain liable for such obligations in full.

## 14. Credit Report/Credit Score.

Guarantor acknowledges and agrees that Lender is authorized, no more frequently than once in any twelve (12) month period, to obtain a credit report (if applicable) on Guarantor, the cost of which shall be paid for by Guarantor. Guarantor acknowledges and agrees that Lender is authorized to obtain a Credit Score (if applicable) for Guarantor at any time at Lender's expense.

## 15. Financial Reporting.

Guarantor shall deliver to Lender such Guarantor financial statements as required by Section 8.02 (Books and Records; Financial Reporting – Covenants) of the Loan Agreement.

## 16. Further Assurances.

Guarantor acknowledges that Lender (including its successors and assigns) may sell or transfer the Mortgage Loan, or any interest in the Mortgage Loan.

(a) Guarantor shall, subject to Section 16(b) below:

(1) do anything necessary to comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's and Guarantor's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

(A) Lender to sell the Mortgage Loan to such Investor;

(B) Lender to obtain a refund of any commitment fee from any such Investor; or

(C) any such Investor to further sell or securitize the Mortgage Loan;

(2) confirm that Guarantor is not in default under this Guaranty or in observing any of the covenants or agreements contained in this Guaranty (or, if Guarantor is in default, describing such default in reasonable detail); and

(3) execute and deliver to Lender or any Investor such other documentation, including any amendments, corrections, deletions or additions to this Guaranty as is reasonably required by Lender or such Investor.

(b) Nothing in this Section 16 shall require Guarantor to do any further act that has the effect of:

(1) changing the essential economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower and Lender;

(2) imposing on Borrower or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

(3) materially changing the rights and obligations of Borrower or Guarantor under the commitment letter.

## 17. Successors and Assigns.

Lender may assign its rights under this Guaranty in whole or in part and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned. Guarantor may not assign its rights, duties or obligations under this Guaranty, in whole or in part, without Lender's prior written consent and any such assignment shall be deemed void ab initio. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties.

## 18. Final Agreement.

Guarantor acknowledges receipt of a copy of each of the Loan Documents and this Guaranty. THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Guaranty. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in that agreement.

## 19. Governing Law.

This Guaranty shall be governed by and construed in accordance with the substantive law of the Property Jurisdiction without regard to the application of choice of law principles that would result in the application of the laws of another jurisdiction.

## 20. Property Jurisdiction.

Guarantor agrees that any controversy arising under or in relation to this Guaranty shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Guaranty or any other Loan Document with respect to the subject matter hereof. Guarantor irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 21. Time is of the Essence.

Guarantor agrees that, with respect to each and every obligation and covenant contained in this Guaranty, time is of the essence.

## 22. No Reliance.

Guarantor acknowledges, represents and warrants that:

(a) it understands the nature and structure of the transactions contemplated by this Guaranty and the other Loan Documents;

(b) it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c) it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property or of the assets of Guarantor;

(d)     it has had the opportunity to consult counsel; and

(e)     it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Guaranty or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into or otherwise in connection with this Guaranty, any other Loan Document or any of the matters contemplated hereby or thereby.

23.     **Notices.**

Guarantor agrees to notify Lender of any change in Guarantor's address within ten (10) Business Days after such change of address occurs.  All notices under this Guaranty shall be:

(a)     in writing and shall be

(1)     delivered, in person;

(2)     mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(3)     sent by overnight courier; or

(4)     sent by electronic mail with originals to follow by overnight courier;

(b)     addressed to the intended recipient at the notice addresses provided under the signature block at the end of this Guaranty; and

(c)     deemed given on the earlier to occur of:

(1)     the date when the notice is received by the addressee; or

(2)     if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

24.     **Construction.**

(a)     Any reference in this Guaranty to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Guaranty or to a Section or Article of this Guaranty.

(b)     Any reference in this Guaranty to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(c)     Use of the singular in this Guaranty includes the plural and use of the plural includes the singular.

(d)     As used in this Guaranty, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(e)     Whenever Guarantor's knowledge is implicated in this Guaranty or the phrase "to Guarantor's knowledge" or a similar phrase is used in this Guaranty, Guarantor's knowledge or such phrase(s) shall be interpreted to mean to the best of Guarantor's knowledge after reasonable and diligent inquiry and investigation.

(f)     Unless otherwise provided in this Guaranty, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(g)     All references in this Guaranty to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(h)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

## 25.    WAIVER OF JURY TRIAL.

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF GUARANTOR AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR ANY LOAN DOCUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY GUARANTOR AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

## 26.    Schedules.

The schedules, if any, attached to this Guaranty are incorporated fully into this Guaranty by this reference and each constitutes a substantive part of this Guaranty.

**ATTACHED SCHEDULE.** The following Schedule is attached to this Guaranty:

☐          Schedule 1          Modifications to Guaranty

**[Remainder of Page Intentionally Blank]**

**IN WITNESS WHEREOF**, Guarantor has signed and delivered this Guaranty under seal (where applicable) or has caused this Guaranty to be signed and delivered under seal (where applicable) by its duly authorized representative. Where applicable law so provides, Guarantor intends that this Guaranty shall be deemed to be signed and delivered as a sealed instrument.

**GUARANTOR:**

ORON ZARUM

Address for Notices to Guarantor:
10 Hill Street
Newark, New Jersey 07102
Email address: Aronzarum@gmail.com

# EXHIBIT E

*Recorded in Buchanan County, Missouri*
**Recording Date/Time:** 08/27/2019 at **11:10:58 AM**
**Book:** **3740**    **Page:** **679**
Instr #:    **2019007118**
Pages:    **3**
Fee:    **$30.00 S**

*Electronically Recorded*
BETTER RESEARCH LLC NATIONAL



**RECORD AND RETURN TO:**

Cassin & Cassin LLP
711 Third Avenue, 20th Floor
New York, New York 10017    County:    Buchanan
Attention: Recording Department

## ASSIGNMENT OF SECURITY INSTRUMENT

*This Assignment of Security Instrument* is made and entered into as of the 16th day of August, 2019, by and between **HUNT MORTGAGE CAPITAL, LLC,** a Delaware limited liability company, with its place of business at c/o Hunt Real Estate Capital, 11501 Outlook Street, Suite 300, Overland Park, Kansas 66211 ("Assignor") and **FANNIE MAE,** c/o **HUNT MORTGAGE CAPITAL, LLC,** a Delaware limited liability company, c/o Hunt Real Estate Capital, 11501 Outlook Street, Suite 300, Overland Park, Kansas 66211 ("Assignee").

## W I T N E S S E T H:

That for good and valuable consideration, Assignor does hereby assign, sell, convey, set over and deliver to Assignee all of Assignor's right, title, and interest in and to a certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing in the original principal amount of **$7,704,000.00** made by **APEX BRITTANY MO LP,** a Delaware limited partnership to **Martin Leigh Attorneys PC,** as trustee for the benefit of Assignor (as the "Lender" therein) dated as of August 16, 2019, and recorded immediately prior hereto in the office of the County Clerk, County of Buchanan, State of Missouri and together with all of Assignor's right, title, and interest in and to the real property known as Brittany Village Apartments located at 1601 N 36th Street, Saint Joseph, Missouri, as more particularly described in **EXHIBIT "A"** hereto.

**[THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY]**

{01554765;1}

**WITNESS**, this Assignment has been duly executed as of the day and year first above written.

ASSIGNOR:

**HUNT MORTGAGE CAPITAL, LLC**, a
Delaware limited liability company

By: _____ (SEAL)
Name:
Title:

**Vanessa Howes**
**Vice President**

STATE OF New York )
New York )
)SS.:
COUNTY OF _____ )

On this _18_ day of _June_ in the year 2019 before me, a Notary Public, in and for said state, personally appeared _Vanessa Howes, Vice President_ of **HUNT MORTGAGE CAPITAL, LLC**, a Delaware limited liability company, known to me to be the person who executed the within instrument in behalf of said limited liability company and acknowledged to me that he/she/they executed the same for the purposes therein stated.

_____
Notary Public

**Regina E. Girardi**

Print Name: _____ REGINA E GIRARDI

My commission expires:                Notary Public, State of New York
                                      No. 01GI6134076
_____              Qualified in Nassau County
                                  Commission Expires September 26, 2021

# EXHIBIT "A"

## LEGAL DESCRIPTION

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N, RANGE 35 W., ST. JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING.

THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT; THENCE 873.36 FEET S TO A POINT; THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2:

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING.

# EXHIBIT F

***Recorded in Buchanan County, Missouri***

**Recording Date/Time: 04/26/2023** at **09:01:07 AM**

**Book: 3786** **Page: 406**

Instr #: **2023002909**

Pages: **4**
Fee: **$33.00 S**

*Electronically Recorded*
STINSON LEONARD STREET, LLP



Rebecca Dunlap
Recorder of Deeds

(Space above reserved for Recorder of Deeds certification)

## MISSOURI RECORDING COVER SHEET

| | |
|---|---|
| Document Title: | Appointment of Successor Trustee |
| Document Date: | April 20, 2023 |
| Grantor(s) Name and Address: | Fannie Mae<br>1100 15th St. NW<br>Washington, DC 20005 |
| Trustee Grantee(s) Name and Address: | SMF Registered Services, Inc.,<br>a Missouri Corporation<br>1201 Walnut Street, Suite 2900<br>Kansas City, Missouri 64106 |
| Beneficiary Grantee(s) Name and Address: | |
| Legal Description: | See Exhibit A |
| Affected Recorded Documents: | *Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing filed August 27, 2019 in Book 3740 at Page 678.* |

*(If there is not sufficient space on this page for the information required, state the page reference where it is contained within the document.)*

CORE/0772514.0048/156389788.1

Fannie Mae Confidential

## APPOINTMENT OF SUCCESSOR TRUSTEE

WHEREAS, Fannie Mae (the "Holder") is the current lawful holder of a Multifamily Note dated August 16, 2019 in the original principal amount of $7,704,000.00 (the "Note") executed by APEX Brittany MO LP, a Delaware limited liability company in favor of Lument Real Estate Capital, LLC, a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC), as original lender, secured by that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 16, 2019, executed by APEX Brittany MO LP, a Delaware limited liability company, as Grantor and Borrower, to Martin Leigh Attorneys PC, Trustee, recorded August 27, 2019 in Book 3740 at Page 678, in the Office of the Recorder of Deeds for Buchanan County, Missouri, as assigned to Holder by virtue of an Assignment of Security Instrument, recorded August 27, 2019 in Book 3740 at Page 679 in the Office of the Recorder of Deeds for Buchanan County, Missouri (the "Deed of Trust"), which Deed of Trust affects the following described land in Buchanan County, Missouri, to-wit:

See Exhibit A attached hereto (the "Real Property").

WHEREAS, the Deed of Trust provides that the Holder, at Holder's option, may from time to time appoint a successor Trustee to any Trustee appointed under the Deed of Trust by an instrument executed and acknowledged by Holder and recorded in the Office of the Recorder of Deeds for Buchanan County, Missouri. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Grantor, the book and page where the Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Holder or its successor in interest. The successor trustee, without conveyance of the Real Property, shall succeed to all the title, power and duties conferred upon the Trustee by the Deed of Trust and by applicable law.

NOW, THEREFORE, in consideration of the premises, and acting pursuant to the terms of the Deed of Trust, the Holder hereby removes Martin Leigh Attorneys PC, the Trustee under the Deed of Trust, and nominates and appoints SMF Registered Services, Inc., 1201 Walnut Street, Suite 2900, Kansas City, Missouri 64106, a corporation located in Jackson County, Missouri, to serve as successor trustee under the Deed of Trust in the place and stead of Martin Leigh Attorneys PC. SMF Registered Services, Inc. shall succeed to the Trustee's title to said property and the trust created pursuant to the Deed of Trust for the uses and purposes expressed in the Deed of Trust.

IN WITNESS WHEREOF, Fannie Mae has caused these presents to be signed by its ___Assistant Vice President___ this 20th day of April, 2023.

FANNIE MAE

By: _____

Name: Roy E. Miller

Title: Assistant Vice President

STATE OF TEXAS )
                )  SS.
COUNTY OF COLLIN )

    On this __20__ day of April, 2023, before me appeared __Roy E. Miller__, to me personally known, who being by me duly sworn, did say that he or she is the _____ AVP _____ of Fannie Mae, and that said instrument was signed on behalf of said corporation by authority of its Board of Directors, and said _____ AVP _____ acknowledged said instrument to be the free act and deed of said corporation.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at my office in Dallas, Dallas County, Texas the day and year last above written.



Notary Public – State of Texas
Commissioned in Collin County
Printed Name: _Linda S Henderson_

LINDA S. HENDERSON
My Notary ID # 1511536
Expires April 19, 2024

My commission expires: __4-19-2024__

Return recorded copy to:

Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Attention: Nicholas J. Zluticky

# EXHIBIT A

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N., RANGE 35 W., ST JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING. THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI, THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2, THENCE 541.00 FEET N 89° 39' 30" E TO A POINT: THENCE 873.36 FEET S TO A POINT, THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING

TRACT 2:

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THENCE 541.00 FEET N. 89° 47' E. TO A POINT, THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING.

---

Fannie Mae Confidential

# EXHIBIT G



January 12, 2023

Via EMAIL: aronzarum@gmail.com

Via Overnight Courier

Apex Brittany MO LP ("Borrower")
10 Hill Street Ste 1E
Newark, NJ 07102
Attention: Oron Zarum

Re: **NOTICE OF DEMAND (the "Notice")**
Property Name: Brittany Village Apartments
Property Address: 1601 N 36th Street Saint Joseph, MO 64506
Loan Number: 010204891 / 1717480404 (the "Loan")

Multifamily Note (the "Note") dated as of August 16, 2019 in the original principal
amount of $7,704,000.00  made by Borrower, payable to the order of Lument Real Estate
Capital, LLC a Delaware limited liability company (SUCCESSOR BY MERGER TO
HUNT MORTGAGE CAPITAL, LLC) ("Original Lender"), which Note is secured by,
*inter alia*, certain real property more particularly described in the Multifamily
Mortgage/Deed of Trust/Deed to Secure Debt, Assignment of Rents and Security
Agreement of even date therewith (the "Security Instrument") and Multifamily Loan and
Security Agreement of even date therewith (the "Loan Agreement"), which Note, Security
Instrument and Loan Agreement, together with other loan documents (such Note, Security
Instrument and Loan Agreement and other loan documents hereafter referred to as the
"Loan Documents") were assigned from Original Lender to Fannie Mae ("Fannie Mae")
and all of which covering certain real and personal property located at the address set forth
above and more particularly described in the Security Instrument (the "Mortgaged
Property" or the "Property"). Original Lender is now the servicer of the Loan and may be
referred to herein as "Servicer."

Dear Borrower,

Notice is hereby given that Borrower has failed to maintain the Mortgaged Property in accordance
with the terms of the Loan Documents, including, but not limited to, Article 6 of the Loan
Agreement, which failure to maintain may constitute an Event of Default under the Loan
Documents.

---

ORIX Real Estate Capital Holdings, LLC, d/b/a Lument, is a subsidiary of ORIX Corporation USA.
Securities, Investment Banking and Advisory Services provided through OREC Securities, LLC, d/b/a Lument Securities, Member FINRA/SIPC.
Investment advisory services are provided by OREC Investment Management, LLC, d/b/a Lument Investment Management. OREC Investment
Management is registered as an investment adviser with the U.S. Securities and Exchange Commission.



On December 31, 2022, a Property Condition Assessment ("PCA") was conducted on the Mortgaged Property, whereby certain deficiencies were noted and identified. Enclosed herewith is a copy of the PCA and a schedule of needed repairs and replacements is attached hereto as Exhibit A.

The PCA contains specific information related to the current deficiencies in physical condition of the Mortgaged Property and should be reviewed by Borrower for more detail on the required repairs. All repairs and replacements identified on Exhibit A and in the PCA shall constitute Additional Lender Repairs and Additional Lender Replacements, as defined in the Loan Documents. Please note, however, this may not be an exhaustive list and is subject to change pursuant to additional inspections that may be performed or required by Fannie Mae or Servicer.

Demand is hereby made for Borrower to correct its failure to maintain the Mortgaged Property and immediately implement corrective action to undertake repairs and replacements of the deficiencies noted in the PCA and on Exhibit A, as well as any other repair or replacement needed at the Mortgaged Property, to the satisfaction of Fannie Mae in its sole discretion. Borrower must also perform the Additional Lender Repairs and Additional Lender Replacements within the dates listed on Exhibit A. Furthermore, Borrower must provide Fannie Mae or Servicer access at such time and date requested by either for inspection of the Mortgaged Property to determine the status of the required Additional Lender Repairs and Additional Lender Replacements to confirm that such repairs and replacements have been completed to Fannie Mae's satisfaction, in its sole discretion.

Pursuant to Section 13.02(a)(4) of the Loan Agreement, Fannie Mae has determined the funds in the Replacement Reserve Account, or the Repairs Escrow Account are insufficient to cover the costs of the Additional Lender Repairs and Additional Lender Replacements. Demand is further made for Borrower to deposit with Servicer, on behalf of Fannie Mae, within thirty (30) days of the date of this letter an amount equal to **$1,313,330.00**, which deposit will be held by Servicer as additional security for the Loan. Failure to deposit the required amount shall constitute Borrower's failure to pay an amount due on the Loan and will be an Event of Default under the Loan Documents.

Additionally, Fannie Mae and Servicer have determined the amount of funds in the Replacement Reserve Account and Repairs Escrow Account are insufficient to cover the on-going Required Repairs and Required Replacements identified in the PCA, even after completion of the Additional Lender Repairs and Additional Lender Replacements identified on Exhibit A. To ensure the necessary funds are available, Fannie Mae hereby notifies Borrower the Monthly Replacement Reserve Deposit is being increased by **$11,877.00** per month so that the total Monthly Replacement Reserve Deposit by Borrower shall be equal to **$19,880.00** per month. This increased deposit amount will commence with the payment due on **March 1, 2023**.



Each of the above constitute separate obligations of Borrower under the Loan Documents and Borrower's failure to perform any of the above obligations may constitute a separate Event of Default under the Loan Documents.

The Servicer's or Fannie Mae's acceptance of any payment on the Loan should not be considered a waiver of any default or a novation, modification, or renewal of the Loan.  Notwithstanding the acceptance of any payments or any other amounts at any time by the Servicer, Fannie Mae does not waive any default which may exist under the Loan Documents. Furthermore, acceptance of any payment shall not act as a waiver of, or prevent Fannie Mae from exercising any right, remedy, or power available to Fannie Mae, including, without limitation, all rights, remedies, and powers granted under the Loan Documents and at law or in equity, all of which are expressly reserved.

Sincerely,

Demarcus Lawrence

cc: Brad Cavanaugh, Fannie Mae

Enclosures (PCA copy)

**Exhibit A**

**Required Repair Schedule**


| Description of Repair | Amount | Completion Time Frame (Mos.) |
|---|---|---|
| Repair walkway step guardrails | $2,000.00 | 1 |
| Repair/refurbish sidewalks (asphalt, concrete or brick) | $250.00 | 1 |
| Replace broken windows | $3,500.00 | 1 |
| Tot Lot / Uncompressed Ground Cover | $5,000.00 | 1 |
| Install carbon monoxide (CO) detectors | $980.00 | 1 |
| Contract structural engineer to assess building integrity and subsequent repairs to the damaged framing | $125,000.00 | 6 |
| Trim landscaping away from buildings | $5,000.00 | 12 |
| Repair sinkhole and regrade areas of landscaping | $10,000.00 | 12 |
| Dumpster enclosure – Stockade fencing – wood | $5,000.00 | 12 |
| Wood fascia and trim – Replace | $280,000.00 | 12 |
| Composite (asphalt/fiberglass) Shingles – 3 tab | $360,000.00 | 12 |
| Common Area Flooring / Hallways and Common Areas | $90,000.00 | 12 |
| Restore / Renovate down units | $525,000.00 | 12 |
| Reconfigure parking to include ADA van-designated parking at Leasing Office | $250.00 | 12 |
| Install required signage at ADA parking spaces where lacking | $750.00 | 12 |
| Install required pavement markings at ADA parking spaces where lacking | $300.00 | 12 |
| Reconfigure parking to include required side access aisle at ADA parking spaces where lacking | $300.00 | 12 |
| *Reserves Credit:* | <$100,000.00> | |
| *Total cost of Required Repairs* | **$1,313,330.00** | |

# EXHIBIT H



**Nicholas Zluticky**
**PARTNER**
DIRECT: 816.691.3278
OFFICE: 816.842.8600

nicholas.zluticky@stinson.com

February 13, 2023

*Via Federal Express Next Business Day Delivery,*
*U.S.P.S. Certified Mail – Return Receipt Requested, U.S.P.S. First Class Mail and Email*

Apex Brittany MO LP ("Borrower")
10 Hill Street
Newark, NJ 07102
aronzarum@gmail.com

Oron Zarum
10 Hill Street
Newark, NJ 07102
aronzarum@gmail.com

Re:     **NOTICE OF ACCELERATION OF INDEBTEDNESS AND DEMAND FOR PAYMENT**
         **(the "Notice")**

         <u>Mortgaged Property</u>: 1601 N 36th St., Saint Joseph, MO 64506
         <u>Mortgage Loan Number</u>: Fannie Mae Loan # 1717480404 (the "Loan")

Multifamily Note (the "Note") dated as of August 16, 2019 in the original principal amount of $7,704,000.00 made by Borrower, payable to the order of Lument Real Estate Capital, LLC, a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC) ("Original Lender"), which Note is secured by, *inter alia*, certain real property more particularly described in the Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date therewith (the "Security Instrument") and Multifamily Loan and Security Agreement of even date therewith (the "Loan Agreement"), which Note, Security Instrument and Loan Agreement, together with other loan documents (such Note, Security Instrument and Loan Agreement and other loan documents hereafter referred to as the "Loan Documents") were assigned from Original Lender to Fannie Mae ("Fannie Mae") and all of which covering certain real and personal property located at the address set forth above and more particularly described in the Security Instrument (the "Mortgaged Property"), which Mortgaged Property is commonly known as Brittany Village Apartments. Original Lender is now the servicer of the Loan and may be referred to herein as "Servicer."

Dear Sir or Madam:

The undersigned represents Fannie Mae with respect to the Loan Documents and the Mortgaged Property described above. On January 12, 2023, Servicer sent Borrower a Notice of Demand (the "Demand Notice"), notifying Borrower of its failure to maintain the Mortgaged Property pursuant to Section 6 of the Loan Agreement and demanding that Borrower perform, within the dates listed in the Demand Notice, the Additional Lender Repairs and Additional Lender Replacements noted in the Property Condition Assessment ("PCA") performed on December 31, 2022 by Armada Analytics, Inc. and attached to the Demand Notice, and that Borrower, within thirty (30) days, deposit with Servicer, on behalf of Fannie Mae, the amount of $1,313,330.00 (the "Demanded Deposit") to cover the costs of the Additional Lender Repairs and Additional Lender Replacements. Notice is hereby given that Borrower has failed to perform, within thirty (30) days, the Additional Lender Repairs and Additional Lender Replacements in the PCA and has failed to make the Demanded Deposit as required by the Loan Documents and the Demand Notice. Each such failure constitutes an "Event of Default" as defined in the Loan Documents, as applicable.

 

This letter consitutes a formal notice that, pursuant to the terms of the Loan Documents, Fannie Mae has accelerated the outstanding principal indebtedness evidenced by the Note as a result of the occurrence and present continuation of such Event of Default. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae. In order to determine the exact payoff figure currently owing to Fannie Mae pursuant to the Note, you may have your counsel contact me at the direct dial telephone number set forth above.

You are further notified that, by reason of such default and acceleration of said indebtedness, Fannie Mae may immediately institute foreclosure proceedings under the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity (including, without limitation, the appointment of a receiver over the Mortgaged Property, applications of escrow deposits, reserves, or other funds held by Servicer toward payment of Borrower's obligations under the Loan Documents in the manner set forth therein).

You are further notified that this letter is also being sent to Oron Zarum, individually, in order to notify him of the Event of Default described herein, as guarantor of certain obligations of the Borrower under the Loan Documents. Under the Guaranty of Non-Recourse Obligations executed by Oron Zarum on August 16, 2019 in favor of Original Lender (the "Guaranty"), demand is hereby made of Oron Zarum for full payment of all amounts due under the Guaranty.

Please be advised that the demand made hereby is being given pursuant to the terms and provisions of the Loan Documents. By making this demand, Fannie Mae does not waive any of the rights and remedies available to Fannie Mae under the Loan Documents or otherwise. No failure to exercise such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Further, reference by Fannie Mae or Servicer to any event of default or default shall in no way constitute, or be construed to be, a waiver of any other event of default or default which may now exist or hereafter arise under the Loan Documents.

The Servicer's or Fannie Mae's acceptance of any payment under the Loan Documents will not be considered a waiver of any default or a novation, modification, or renewal of the Note. Notwithstanding the acceptance of any payments or any other amounts at any time by the Servicer, Fannie Mae does not waive any default which may exist under the Loan Documents. Furthermore, acceptance of any payment shall not act as a waiver of, or prevent Fannie Mae from exercising any right, remedy, or power available to Fannie Mae, including, without limitation, all rights, remedies, and powers granted under the Loan Documents and at law or in equity, all of which are expressly reserved.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE, AS HOLDER OF THE SECURITY INSTRUMENT, IS NOW ENTITLTED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED AFTER THE OCCURRENCE OF THE EVENT OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE MORTGAGED PROPERTY WITH EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

Sincerely,

**Stinson LLP**

Nicholas Zlutickky
NZ:

# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

FANNIE MAE,                                )
                                           )
          Plaintiff,                       )
                                           )
      v.                               )    Case No. 5:23-cv-06050-SRB
                                           )
APEX BRITTANY MO LP, a                     )
Delaware limited partnership,              )
                                           )
          Defendant.                       )

## **ORDER**

On March 24, 2023 (the "Petition Date"), Plaintiff Fannie Mae ("Fannie Mae") filed an

Emergency Motion for Appointment of Receiver against defendant APEX Brittany MO LP (the

"Borrower"), with Supporting Suggestions (the "Motion"), pursuant to Mo. Rev. Stat. § 515.510.

After reviewing the Motion, Verified Petition, supporting exhibits, provisions of the Missouri

Commercial Receivership Act (the "Act"), and for good cause shown, the Court finds that it has

jurisdiction over the parties, the subject matter, and the Receivership Property (as defined

herein); the legal prerequisites for the appointment of a receiver have been met; and that equity

will be served by the appointment of a receiver. The Court further finds that Trigild, Inc. is

qualified to serve as a receiver and has signed the necessary Oath. The Receiver's bond is

approved and determined to be five hundred thousand dollars and zero cents ($500,000). This

Order is effective immediately upon entry.

Therefore, it is hereby ORDERED that Trigild, Inc. be, and hereby is, appointed to be the

general receiver ("Receiver") of Borrower, pursuant to Mo. Rev. Stat. § 515.510 and Mo. Sup.

Ct. R. 68.02, to serve with bond. Said Receiver shall take such action as in the best interests of

Fannie Mae and other creditors and parties in interest with respect to the Receivership Property

(defined below). In addition, and with respect to taking over the affairs of Borrower with respect to the Receivership Property:

**A. Definitions, Receivership Property, and Bond.**

1. <u>Definitions</u>. Capitalized terms used in this Order and not otherwise defined herein shall have the meanings given to them in the Motion. Additionally, for purposes of this Order:

   a. The term "<u>Claim</u>" means a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

   b. The term "<u>Creditor</u>" means a person that has a claim against the Borrower that arose at the time of or before the Petition Date.

   c. The term "<u>Income</u>" means, collectively, all cash, cash on hand, checks, drafts, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts, bank or other deposits, and all other cash collateral (all whether now existing or later arising) to the extent related to the Real Property or business operations of the Borrower; current and past-due earnings, revenues, rents, issues and profits, accounts, and accounts receivable (all whether unpaid, accrued, due, or to become due) related to the Real Property or business operations of the Borrower; all claims to rent, issues, profits, income, cash collateral, and all other gross income derived with respect to the Real Property or business operations of the Borrower regardless of whether earned before or after entry of this Order.

   d. The term "<u>Notice and a Hearing</u>" means such notice as is appropriate and an opportunity for hearing if one is requested. Absent request for hearing by an appropriate person or Party in Interest, the term notice and a hearing does not indicate a requirement for an actual hearing unless the Court so orders.

   e. The term "<u>Party</u>" means a person who is a party to this action, becomes a party to this action, or shall be joined or shall be allowed to intervene in the action pursuant to the rules of the Missouri Supreme Court including, without limitation, any person needed for just adjudication of the action.

f. The term "Party in Interest" means the Borrower, any Party, the Receiver, any person with an ownership interest in or lien against Receivership Property or property sought to become Receivership Property, any person that, with respect to particular matters presented in the receivership, has an interest that will be affected, and any Creditor of the Borrower.

g. The term "Real Property" means the real property identified on **Exhibit A** to this Order.

h. The term "Receivership" means the estate created pursuant to the Act and this Order, including all Receivership Property and the interests, rights, powers, and duties of the Receiver and all Parties in Interest relating to Receivership Property.

i. The term "Receivership Action" means the current action commenced by filing the Verified Petition.

j. The term "Receivership Property" means and includes any right, title, and interest of Borrower, whether legal or equitable, tangible or intangible, in real and personal property, wherever located, regardless of the manner by which such rights were or are acquired including, without limitation:

    i. All assets, facilities, and offices of the borrower together with all records, correspondence, and books of account;

    ii. The Real Property;

    iii. All tangible and intangible property used or usable in connection with the operations of the borrower including, without limitation, equipment, furniture, insurance premium refunds, insurance proceeds, condemnation awards, utility deposits and deposits of every other kind related thereto, causes of action, drawings, plans, specifications, escrow agreements, and all cash on hand, bank accounts, credit card receipts, bank deposits, security deposits and other cash collateral;

    iv. All Income;

    v. Any refund or reimbursement of taxes, whether for taxes paid by the Receiver or the Borrower, and whether pertaining to any tax period before or after the entry of this Order, and the right to institute or continue any contest, protest, or appeal of any ad valorem tax or assessment, real estate tax, personal property tax, or other tax or assessment pertaining to the Receivership Property;

    vi. All fixtures, trade fixtures, and tenant improvements of every kind or nature located in or upon or attached to, or used or intended to be used in connection with the operation of the Borrower and any buildings,

structures or improvements (to the full extent of the Borrower's interest in such);

 vii. All permits, licenses, other contracts, and other intangible property pertaining to the borrower;

 viii. All intellectual property of the borrower including, without limitation, all patents, trade names and trademarks owned or used by the borrower and any trade secrets;

 ix. All books, records, accounts, and documents that in any way related to the borrower, the Real Property or Income;

 x. All other property, estate, right, title and interest as described in loan documents by and among the Borrower and Fannie Mae; and

 xi. For the avoidance of doubt, and without limiting any of the foregoing, Receivership Property includes any right, title, and interest of the borrower, whether legal or equitable, tangible, or intangible, in personal property located in Buchanan County, Missouri.

k. Rules of Construction. In this Order:

 i. "Includes" and "including" are not limiting;

 ii. "may not" is prohibitive, and not permissive;

 iii. "or" is not exclusive; and

 iv. The singular includes the plural.

2. Surety Bond. Promptly after entry of this Order, the Receiver shall execute a bond with one or more sureties approved by the Court in the amount of five hundred thousand dollars and zero cents ($500,000) conditioned on the Receiver faithfully discharging his duties in accordance with this Court's orders and state law.  This bond runs in favor of all persons having an interest in this Receivership Action or Receivership Property and in favor of State agencies.

3. Control of Receivership Property. Effective as of the Petition Date, the Receiver is hereby authorized to immediately enter upon, receive, recover, and take complete, entire, and exclusive possession and control of the Receivership Property until further Order of the court.

4. <u>Turnover of Receivership Property</u>.  Upon demand by the Receiver, any person, including the Borrower, shall turn over Receivership Property that is within the possession or control of that person unless otherwise provided for in this Order or ordered by the Court for good cause shown.  The Receiver by motion may seek to compel turnover of Receivership Property pursuant to this Order against any person over which the Court first establishes jurisdiction, unless there exists a *bona fide* dispute with respect to the existence or nature of the Receiver's possessory interest in the Receivership Property, in which case turnover shall be sought by means of a legal action.  In the absence of a *bona fide* dispute with respect to the Receiver's right to possession of the Receivership Property, the failure to relinquish possession and control to the Receiver shall be punishable as contempt of the Court.  Should the Court, after Notice and Hearing, order the turnover of property to the Receiver (the "Turnover Order"), the party against which such order is made shall have the right to deliver a bond executed by such party, as principal together with one or more sufficient sureties, providing that the principal and each such surety shall each be bound to the Receiver in double the amount of the value of the property to be turned over, should the property not be turned over to the Receiver when such order becomes final.  Absent such bond, the property ordered to be turned over to the Receiver shall be turned over to the Receiver within ten (10) days after entry of the Turnover Order.

**B. General Powers and Duties**

5. <u>Receiver's Powers</u>.  The Receiver shall have the usual powers vested, conferred, enjoyed, and exercised by receivers according to the practice of this Court, the Act, and other statutes of this State including, without limitation, the following:

      a.  To operate the business of the Borrower and manage the Receivership Property;

      b.  To incur or pay expenses incidental to the Receiver's preservation and use of Receivership Property, and otherwise in the performance of the Receiver's

duties, including the power to pay obligations incurred prior to the Receiver's appointment if and to the extent that payment is determined by the Receiver to be prudent in order to preserve the value of the Receivership Property and the funds used for this purpose are not subject to any lien or right of setoff in favor of a creditor who has not consented to the payment and whose interest is not otherwise adequately protected;

c.  To pay installments of principal and interest due on existing encumbrances on the Real Property, fixtures, machinery and equipment constituting part of the fixed assets of the Receivership Property;

d.  To do all the things which the Borrower may do in the exercise of ordinary business judgment or in the ordinary course of the operation and use of the Receivership Property including, without limitation, the purchase and sale of goods or services in the ordinary course of such business and the incurring and payment of expenses of the business or property in the ordinary course;

e.  The Receiver shall be vested with, and is authorized and empowered to exercise, all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file a voluntary petition under Title 11 of the United States Code;

f.  To assert any rights, claims, or choses in action of the Borrower, if and to the extent that the rights, claims or choses in action are themselves property within the scope of the appointment or relate to any Receivership Property, to maintain in the Receiver's name or in the name of the borrower any action to enforce any right, claim, or chose in action, and to intervene in actions in which the Borrower is a party for the purpose of exercising the powers under this subsection;

g.   To borrow and incur secured debt in the ordinary course of preserving and liquidating Receivership Property, with liens attaching to sale proceeds of Receivership Property on a super-priority basis, without further order of this Court, provided (i) such secured debt may only be advanced by Fannie Mae, in Fannie Mae's sole discretion, and such amounts incurred may, among other things, consist of over advances by Fannie Mae under the Loan Documents; and (ii) to the extent such secured debt is incurred, the Receiver shall provide an account on a monthly basis of amounts incurred;

h.  To intervene in any action in which a Claim is asserted against the Borrower and that impacts the Receivership Property, for the purpose of prosecuting or defending the claim and requesting the transfer of venue of the action to this Court.  The Court, however, shall not transfer actions in which a State agency is a party and as to which a statute expressly vests jurisdiction or venue elsewhere;

i. To assert rights, claims or choses in action of the Receiver arising out of transactions in which the Receiver is a participant;

j. To seek and obtain advice or instruction from the Court with respect to any course of action with respect to which the Receiver is uncertain in the exercise of the Receiver's powers or the discharge of the Receiver's duties;

k. To obtain appraisals and environmental reports with respect to Receivership Property;

l. To compel by subpoena any person to submit to an examination under oath, in the manner of a deposition in accordance with Rule 57.03 of the Missouri Rules of Civil Procedure, with respect to Receivership Property or any other matter that may affect the administration of the Receiverships;

m. To use, sell, or lease Receivership Property other than in the ordinary course of business pursuant to provisions of this Order or subsequent orders of this Court and to execute in the Borrower's stead such documents, conveyances, and borrower consents as may be required in connection therewith;

n. To assume, reject, or assign executory contracts and unexpired leases pursuant to the provisions of this Order or subsequent orders of this Court;

o. Subject to the prior written agreement and consent of Fannie Mae, establish and adopt bidding and auction sale procedures for the sale or Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court; and

p. Subject to the prior written agreement and consent of Fannie Mae, designate and pay critical vendors, without further order of this Court.

6. <u>Limitation of Receiver's Powers</u>.  The Receiver shall not:

a. Enter any transactions that are not in the ordinary course of the Borrower's business or otherwise authorized in this Order without Court approval and the prior written agreement and consent of Fannie Mae; and

b. Pay any Claims that arose prior to the Petition Date without Court approval and the prior written agreement and consent of Fannie Mae.

7. <u>Receiver's Duties</u>.  The Receiver shall have the following duties;

a. The duty to notify all Federal and State taxing and applicable regulatory agencies of the Receiver's appointment in accordance with any applicable laws imposing this duty, including but not limited to 26 U.S.C. § 6036;

b. The duty to comply with State law;

7

c. The duty to record as soon as practicable within the land records in any county in which such real property may be situated a notice of *lis pendens* as provided in section Mo. Rev. Stat. 527.260, together with a certified copy of this Order, together with a legal description of the Real Property;

d. The Receiver shall retain custody of all such records and documents pending the final determination of this proceeding, or until further order of the Court;

e. The Receiver shall immediately enter into discussions with Fannie Mae concerning the use of cash collateral and/or funding for this Receivership Action and other actions taken in this case, pursuant to a budget as set forth herein; and

f. Other duties as may be required specifically by statute, court rule, this Order, the Act, or by the Court.

## C. Borrower's Duties and Prohibitions

8. <u>Borrower's Duties</u>.  The Borrower shall:

a. Within fourteen (14) days of the appointment of the Receiver, make available for inspection by the Receiver during normal business hours all information and data required to be filed with the Court pursuant to the Act and this Order, in the form and manner the same are maintained in the ordinary course of the Borrower's business;

b. Assist and cooperate fully with the Receiver in the administration of the Receivership and the discharge of the Receiver's duties and comply with all orders of this Court;

c. Supply to the Receiver information necessary to enable the Receiver to complete any schedules or reports that the Receiver may be required to file with the Court, including, but not limited to, borrower's organizational documents and all licenses or certifications issued to borrower by any local, state or federal authority, and otherwise assist the Receiver in the completion of such schedules;

d. Deliver into the Receiver's possession all Receivership Property in the borrower's possession, custody, or control including, without limitation, all accounts, books, papers, records, and other documents, monies, property, books of account, keys, assets, records, documents, rent rolls, bank accounts, access codes, passwords, security deposits, petty cash fund, current aged account receivable/delinquency report, notices of any local, state and federal health, building, or any violations, a list of all litigation by or against the Borrower, list of utilities and utility accounts, equipment, furniture, vehicles and supplies, all existing service contracts, pending bids for contractor work, all insurance policies for the Receivership Property, surveys, site plans, specifications, floor plans, drawings, measurements and the like, all

documents, books and records, computer files and computer equipment, software, management files and passwords needed to access all software and computer files including, but not limited to, email accounts maintained at the on-site management office(s) (and all off-site financial records) including all records relating to the income, operation, and management of the Receivership Property, all such other records pertaining to the management of the Receivership Property as may be reasonably required by the Receiver and other personal property in its possession, custody, or control pertaining to the Receivership Property; and

e. Submit to examination by the Receiver, Fannie Mae, or by any other person upon order the Court, under oath, concerning the acts, conduct, property, liabilities, and financial condition of the Borrower or any matter relating to the Receiver's administration of the Receivership.

The Borrower's officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are subject to the requirements of this section of the Order.

9. <u>No Authority to Act</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from exercising any and all the powers of Borrower, its officers, directors, shareholders, and general partners or persons who exercise similar powers and perform similar duties, including without limitation the authority and power to file a voluntary petition under Title 11 of the United States Code. For the avoidance of doubt, no person or entity other than the Receiver shall have the authority and power to file a voluntary petition for the Borrower under Title 11 of the United States Code;

10. <u>Prohibitions</u>. Borrower and its agents, servants, employees, representatives, attorneys, officers, directors, managers, members, partners, or other individuals exercising or having the power to exercise control over the affairs of the Borrower are hereby enjoined from:

9

a. Collecting or attempting to collect Income and are hereby further directed to deliver to the Receiver all Income that has or may come into its possession; and

b. Interfering in any manner whatsoever with the Receiver in the performance of his responsibilities and duties under this Order.

**D. Budget and Reporting.**

11.    _Budget_.  Upon request of Fannie Mae or further order of the Court, the Receiver shall prepare a budget with respect to the payment of the various administrative expenses of the Receivership (the "Budget").  The Receiver shall provide the Court and Fannie Mae a proposed Budget within fourteen (14) days from the date of request or entry of such further order, upon which Fannie Mae's prior written agreement and consent shall be required.  Budgets thereafter shall be prepared pursuant to further request of either Fannie Mae or order of the Court and are subject to Fannie Mae's prior written agreement and consent.  The Receiver shall operate within the terms of the Budget with revenues from the Receivership Property as may be, but shall not be required, supplemented by additional funds provided by Fannie Mae in its sole and absolute discretion.

12.    _Reports and Schedules_.  Upon further order of the Court, the Receiver shall file such additional schedules, reports of assets, liabilities, or inventories that are necessary and proper.  Whenever a list or schedule required pursuant to this Order is not prepared and filed by the Borrower, the Receiver shall prepare and file such list or schedule within a time fixed by the Court.  The Court may approve reimbursement of the reasonable cost in complying with such order as an administrative expense.

**E. Utilities.**

13.    A public utility, as defined in Mo. Rev. Stat. § 386.020, providing service to the Receivership Property, many not alter, refuse, or discontinue service to the Receivership

Property without first giving the Receiver fifteen (15) days' notice, or such other notice as may be required by the rules of the public service commission for a customer of that class, of any default or intention to alter, refuse, or discontinue service to the Receivership Property. Nothing in this Order prohibits the Court, upon motion by the Receiver, to prohibit the alteration or cessation of utility service if the Receiver can furnish adequate assurance of payment in the form of deposit or other security for service to be provided after entry of this Order.

**F. Claims, Defenses, and Judicial Immunity.**

14.     <u>Assertion of Claims.</u> The Receiver shall use reasonable efforts to collect the legally enforceable accounts receivable, rents, causes of action, and other obligations owing to the Borrower (the "Obligations"), shall bring, or intervene in, an action or actions, if necessary, to collect the Obligations, and shall use reasonable efforts to settle and compromise any of the Obligations whenever the Receiver shall deem it advisable to do so, on such terms and conditions as appear to the Receiver to be justifiable, all of which shall be subject to the prior written agreement and consent of Fannie Mae. All such actions shall be brought in this Court, unless otherwise so directed or required by law. The Receiver shall not be entitled to settle and/or compromise any causes of action or other claims the Borrower has or may have against Fannie Mae or the Receiver without Court approval and notice to the borrower. All such actions shall be brought in this Court, unless otherwise so directed.

15.     <u>Judicial Immunity.</u> The Receiver, his agents, assistants, Professionals (as defined below, representatives, and each of their respective staffs shall enjoy judicial immunity for acts and omissions arising out of and performed in connection with the Receiver's official duties on behalf of the Court and with the scope of the Receiver's appointment except for claims due to their gross negligence, gross or willful misconduct, malicious acts, or the failure to comply with

this Court's orders. The Receiver, his agents, assistants, Professionals (as defined below, representatives, and each of their respective staffs shall have no personal liability in connection with any liabilities, obligations., liens, or amounts owed to any of the Borrower's Creditors or to the Borrower because of their duties as Receiver or representative of the Receiver.

G. **Compensation and Employment of Management Personnel and Professionals.**

16. <u>Receiver's Compensation</u>. The Receiver's compensation shall be set by the Court upon agreement by Fannie Mae and the Receiver, subject to Notice and a Hearing. In addition to the hourly rate, the Receiver shall be entitled to the reimbursement of reasonable out-of-pocket expenses, subject to Fannie Mae's prior written agreement and consent. The Receiver's compensation shall be subject to the Court's review and approval. The Receiver shall file with the Court and serve on the parties periodic requests for payment of such reasonable compensation.

17. <u>Management Personnel</u>. By this Order, the Receiver is authorized and empowered, without further leave of the Court, to employ any assistants, agents, managers, or other persons and entities, including but not limited to employees, officers, directors, and owners of Borrower, deemed necessary and proper to assist the Receiver in diligently executing the duties imposed by this Order including, but not limited to, managing, insuring, maintaining, preserving, and protecting the Receivership Property that is in the possession or under the care and control of the Receiver (collectively, the "Management Personnel"), upon such terms and conditions as the Receiver deems just and beneficial to the performance of his duties; provided, however, that any management agreement and the compensation to be paid thereunder shall as also be subject to the prior agreement and consent of Fannie Mae. The Receiver shall pay the Management Personnel such compensation for their services as the Receiver deems to be proper,

subject to Fannie Mae's prior written agreement and consent. Any such payments, however, which are not in the ordinary course of the Receiver's business, shall also be subject to Court approval.

18. <u>Professionals</u>. The Receiver is authorized and empowered to employ accountants, attorneys, investment bankers, brokers, and similar professionals (collectively, the "Professionals") as the Receiver may from time to time deem appropriate and on such terms as the Receiver deems appropriate, subject to Fannie Mae's prior written agreement and consent. The Receiver's and Professionals' compensation shall be subject to the Court's review and approval. The Professionals shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation.

19. <u>Source of Compensation</u>. The Receiver, Management Personnel, and Professionals shall maintain detailed time records reflecting the compensation to be paid. The fees and expenses for the Receiver, Management Personnel, and Professionals shall be paid from secured debt borrowed from Fannie Mae. Notwithstanding anything to the contrary contained herein, the fees and expenses paid pursuant to this Order shall be outlined in the Receiver's monthly operating report to the Court.

**H. Abandonment, Sale, Executory Contracts/Unexpired Leases and Surcharge**

20. <u>Abandonment of Receivership Property</u>. The Receiver or any party to the Receivership Action, upon order to the Court following Notice and hearing and upon the terms and conditions the Court considers just and proper, may abandon any Receivership Property that is burdensome to the Receiver. However, the Receiver may not abandon Receivership Property that is a hazard or potential hazard to the public in contravention of a State statute or rule that is

reasonably designed to protect the public health or safety from identified hazards. Property that is abandoned no longer constitutes Receivership Property.

21. <u>Bidding and Sale Auction Procedures</u>. Subject to Fannie Mae's prior written agreement and consent, the Receiver is authorized and empowered to establish and adopt bidding and auction sale procedures for the sale of the Receivership Property, as the Receiver deems advisable or necessary, without further order of this Court.

22. <u>Sale of Receivership Property</u>. The Receiver may market and sell all or any portion of the Receivership Property upon the prior written agreement and consent of Fannie Mae; provided however, that any such sale or contract(s) for sale shall be subject to Court approval and notice to those parties with an interest in such property. Subject to the aforementioned conditions, the Receiver shall have the authority with respect to the sale of Receivership Property to do and perform all and every act desirable, proper, or necessary with respect to the Receivership Property including, without limitation, the authority to execute and deliver deeds of conveyance and all other documents necessary or desirable to transfer the Receivership Property, all on behalf of and in the name of the Borrower.

23. <u>Executory Contracts and Unexpired Leases</u>. The Receiver may assume, reject, or assign any executory contract or unexpired lease of the Borrower upon further order of this Court following Notice and a Hearing, which shall include notice to any party to the executory contract or unexpired lease to be assumed, rejected, or assigned. The Court may condition assumption, rejection, or assignment of any executory contract or unexpired lease on the terms and conditions the Court believes are just and proper under the particular circumstances of the action and to the extent allowed by applicable law. The Receiver's performance of an executory contract or unexpired lease prior to this Court's authorization of its assumption or rejection shall not

constitute an assumption of the executory contract or unexpired lease, or an agreement by the Receiver to assume it, nor otherwise preclude the Receiver thereafter from seeking this Court's authority to reject it. The Receiver may not assign an executory contract or unexpired lease without assuming it, absent the consent of the other parties to the contract or lease.

24.     Surcharge. Any secured creditor that is duly perfected under applicable law shall receive the proceeds from the disposition of Receivership Property that secures its Claim. However, the Receiver may recover from Receivership Property secured by a lien or the proceeds thereof the reasonable necessary expenses of preserving, protecting, or disposing of the Receivership Property to the extent of any benefit to a duly perfected secured creditor. Duly perfected secured Claims shall be paid from the proceeds in accordance with their respective priorities under otherwise applicable law.

**I. Binding Nature of Orders and Notice**

25.     Binding Nature. Creditors and Parties in Interest who are given notice as provided in this Order and Creditors or persons otherwise appearing and participating in the Receivership shall be bound by the actions of the Receiver and the orders of this Court relating to the Receivership, whether or not the person is a Party.

26.     General Notice of Receivership Action. Within fourteen (14) days after entry of this Order, the Receiver shall give notice of the appointment to all Parties in Interest, including the Secretary of State for the State of Missouri, and State and Federal taxing authorities. Such notice shall be made by first class mail and proof of service thereof shall be filed by the Court. the content of such notice shall include: (a) the caption reflecting this action; (b) the date this action was filed; (c) the date the Receiver was appointed; (d) the name, address, and contact information of the Receiver; (e) the general description of the Receivership Property; (f)

Borrower's name and address, and, if known, the name and address of the Borrower's attorney; (g) the Court's address at which pleadings, motions, or other papers may be filed; and (h) a copy of this Order.

27. <u>Stay Pursuant to the Act</u>. The automatic stay provided by the Act shall be in full force and effect from the Petition Date. In addition, good causes exists to extend the automatic stay in the Act an additional sixty (60) days, for a stay of a total of one hundred twenty (120) days from the Petition Date (the "Stay Period"). For good cause shown, the Stay Period may be extended pursuant to the Act. Notwithstanding the foregoing, the automatic stay by the Act shall not apply to any foreclosure on the Receivership Property by or at the direction of Fannie Mae and, to the extent that the automatic stay applies, the Court hereby grants Fannie Mae relief from the automatic stay for the limited purpose of conducting a foreclosure on the Receivership Property.

28. <u>Borrower Cooperation</u>. Borrower shall cooperate with all reasonable requests for information from the Receiver for purposes of assisting the Receiver in providing notice required by this Order. The failure of the borrower to cooperate with any reasonable request for information may be punished as a contempt of court.

29. <u>Notice Procedures</u>.

    a. Creditors and Parties in Interest have a right to Notice and a Hearing as provided in this Order whether or not the person is a Party to the Receivership Action.

    b. Any Party in Interest may appear in the Receivership in the manner prescribed by court rule and shall file with the Court a written notice ("Request for Notice") including the name and mailing address of the Party in Interest, and the name and address of the Party in Interest's attorney, if any, with the clerk, and by serving a copy of the notice upon the Receiver and the Receiver's attorney of record, if any. The Receiver shall maintain a master mailing list of all parties and of all Parties in Interest that file and serve a notice of appearance in accordance with this subsection and such Parties in Interest's

attorneys, if any. The Receiver shall make a copy of the current master mailing list available to any Party in Interest upon written request.

c. Separately, the Receiver shall maintain a service list (the "Service List") consisting solely of those parties that file a Request for Notice, Fannie Mae, Debtor, and the twenty largest unsecured Creditors known to the Receiver. Unless otherwise provided herein, all motions, notices, and orders shall only be served on the Service List, plus any additional Parties directly affected by the pleading.

d. Any request for relief against a State agency shall be mailed to or otherwise served on the agency and on the office of the attorney general.

e. The Receiver shall give not less than seven (7) days' written notice of any examination, authorized herein or by the Act, by the Receiver of the Borrower to all persons required to be identified on the master mailing list.

f. Unless modified by the Court for good cause shown, all persons required to be identified on the Service List are entitled to not less than twenty-one (21) days' written notice of the hearing of any motion or other proceeding involving any proposed:

   i. Allowance or disallowance of any Claim or Claims;

   ii. Abandonment, disposition, or distribution of Receivership Property, other than an emergency disposition of property subject to eroding value or a disposition of Receivership Property in the ordinary course of business;

   iii. Compromise or settlement of a controversy that might materially affect the distribution to Creditors from the Receivership;

   iv. Motion for termination of the Receivership or removal or discharge of the Receiver. Notice of the motion shall also be sent to the department of revenue and other applicable regulatory agencies;

   v. Any opposition to any motion to authorize any of the actions under subdivisions (i) to (iv) of this subjection shall be filed and served upon all persons required to be identified on the Service List within fourteen (14) days after the service of such motion.

g. Whenever notice is not specifically required to be given under this Order or otherwise by court rule or applicable law, the Court may consider motions and grant or deny relief without notice or hearing, unless a Party or Party in Interest would be prejudiced or harmed by the relief requested.

## J. Term, Termination, and Final Accounting

30. <u>Termination</u>. This Receivership shall continue until further Order of the Court.

31. <u>Removal of the Receiver</u>. The Receiver can be removed either (a) automatically thirty (30) days after the filing of a written demand for removal signed by Fannie Mae's counsel and filed with the Court; or (b) in the Court's equitable discretion upon a motion for cause. The Receiver may resign upon thirty (30) days' written notice or sooner upon a motion for cause. If the Receiver is removed or resigns, a successor receiver can be appointed by further order of the Court and the prior written agreement and consent of Fannie Mae.

32. <u>Turnover of Receivership Property Upon Termination</u>. Immediately upon termination of the Receivership, the Receiver shall turn over to Fannie Mae or its designees (including any property manager), all of the Receivership Property in which Fannie Mae asserts a security interest or lien unless otherwise ordered by the Court, all such other Receivership Property shall be turned over as further directed by the Court.

33. <u>Discharge of Receiver and Bond; Final Accounting</u>. Neither the termination of the Receivership nor the Receiver's removal or resignation will discharge the Receiver or the Receiver's bond. The Receiver shall submit a final accounting (with copies to counsel for Fannie Mae and upon the Borrower or its attorney of record) for approval by the Court within thirty (30) days after the termination of the Receivership or the Receiver's removal or the Receiver's resignation. Only after the Court approves the Receiver's final accounting may the Receiver be discharged and the Receiver's bond be cancelled.

## K. Modification of this Order.

34. <u>Modification of Order</u>. The Court shall modify this Order as it deems appropriate, including as to the proper amount of the Bond required of the Receiver. The Receiver, during the pendency of this action, shall have the right to apply to this Court for further

18

instructions or directions.  Further, this Order is without prejudice to (a) Fannie Mae, the Receiver, Borrower, or any other Party in Interest, during the pendency of this action, seeking modification of this Order including, without limitation, the shortening or expanding any of the time frames specified herein or the expansion, modification, or limitation of the Receiver's powers, authorities and duties as set forth in this Order or by applicable law; or (b) any party opposing such modification.  To the extent that a party seeks to modify this Order, such party must provide reasonable notice to Fannie Mae, Borrower, and the Receiver.  The party seeking modification shall have the burden of proof with respect to the same.

35.    <u>Missouri Commercial Receivership Act</u>. For purposes of the Act, this Receivership is considered a general receivership but may be modified to a limited receivership upon proper motion to the Court for cause shown and with the prior written agreement and consent of Fannie Mae or the Receiver.  To the extent the Receiver withholds such consent, it will be grounds for the immediate removal of the Receiver and appointment of a successor receiver willing to serve as a general receiver.

# EXHIBIT A
## LEGAL DESCRIPTION OF REAL PROPERTY

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N, RANGE 35 W., ST. JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING.

THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT; THENCE 873.36 FEET S TO A POINT; THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2:

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: April 26, 2023

# EXHIBIT J

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____    Chapter __11__

☐ Check if this an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy                06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **Apex Brittany MO LP** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 84-2153129 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **10 Hill Street, Suite 1E**<br>**Newark, NJ 07102**<br>Number, Street, City, State & ZIP Code | <br>P.O. Box, Number, Street, City, State & ZIP Code |
| **Essex**<br>County | **Location of principal assets, if different from principal place of business**<br>**1601 N. 36th Street Saint Joseph, MO 64506**<br>Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | |

6. **Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

■ Partnership (excluding LLP)

☐ Other. Specify: _____

Debtor    **Apex Brittany MO LP**                                         Case number (*if known*) _____
            Name

**7.  Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

■ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☐ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

____

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**    *Check one:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**    ■ No.

☐ Yes.

If more than 2 cases, attach a separate list.

District _____    When _____    Case number _____
District _____    When _____    Case number _____

Debtor   **Apex Brittany MO LP**                                          Case number (*if known*) _____
         Name

**10.  Are any bankruptcy cases**
       **pending or being filed by a**        ■ No
       **business partner or an**             ☐ Yes.
       **affiliate of the debtor?**

List all cases. If more than 1,
attach a separate list            Debtor _____    Relationship _____

                                  District _____  When _____  Case number, if known _____

**11.  Why is the case filed in**      *Check all that apply:*
       ***this district?***
                                  ■   Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately
                                      preceding the date of this petition or for a longer part of such 180 days than in any other district.

                                  ☐   A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12.  Does the debtor own or**        ■ No
       **have possession of any**       ☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.
       **real property or personal**
       **property that needs**
       **immediate attention?**              **Why does the property need immediate attention?** (*Check all that apply.*)

                                       ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
                                          What is the hazard? _____

                                       ☐ It needs to be physically secured or protected from the weather.

                                       ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example,
                                          livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

                                       ☐ Other _____
                                       **Where is the property?** _____
                                                                Number, Street, City, State & ZIP Code

                                       **Is the property insured?**
                                       ☐ No
                                       ☐ Yes.   Insurance agency _____
                                                Contact name    _____
                                                Phone           _____

▆▆▆▆   **Statistical and administrative information**

**13.  Debtor's estimation of**   .    *Check one:*
       **available funds**
                                  ■ Funds will be available for distribution to unsecured creditors.

                                  ☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14.  Estimated number of**      ■ 1-49               ☐ 1,000-5,000          ☐ 25,001-50,000
       **creditors**              ☐ 50-99              ☐ 5001-10,000          ☐ 50,001-100,000
                                  ☐ 100-199            ☐ 10,001-25,000        ☐ More than100,000
                                  ☐ 200-999

**15.  Estimated Assets**         ■ $0 - $50,000                 ☐ $1,000,001 - $10 million        ☐ $500,000,001 - $1 billion
                                  ☐ $50,001 - $100,000           ☐ $10,000,001 - $50  million      ☐ $1,000,000,001 - $10 billion
                                  ☐ $100,001 - $500,000          ☐ $50,000,001 - $100 million      ☐ $10,000,000,001 - $50 billion
                                  ☐ $500,001 - $1 million        ☐ $100,000,001 - $500 million     ☐ More than $50 billion

**16.  Estimated liabilities**    ☐ $0 - $50,000                 ■ $1,000,001 - $10 million        ☐ $500,000,001 - $1 billion

Official Form 201          **Voluntary Petition for Non-Individuals Filing for Bankruptcy**                 page 3

Debtor    **Apex Brittany MO LP**
Name

☐ $50,001 - $100,000          ☐ $10,000,001 - $50  million     ☐ $1,000,000,001 - $10 billion
☐ $100,001 - $500,000         ☐ $50,000,001 - $100 million     ☐ $10,000,000,001 - $50 billion
☐ $500,001 - $1 million       ☐ $100,000,001 - $500 million    ☐ More than $50 billion

| Debtor | **Apex Brittany MO LP** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

| **Request for Relief, Declaration, and Signatures** |
|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **September 15, 2023**
                  MM / DD / YYYY

**X** **/s/ Oron Zarum**                        Oron Zarum
    Signature of authorized representative of debtor         Printed name

Title    **Managing Member of General Partner**

**18. Signature of attorney**

**X** **/s/ Damien Nicholas Tancredi**         Date  **September 15, 2023**
    Signature of attorney for debtor                    MM / DD / YYYY

**Damien Nicholas Tancredi**
Printed name

**Flaster/Greenberg, P.C.**
Firm name

**1007 North Orange Street**
**Suite 400**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone   **215-587-5675**      Email address   **damien.tancredi@flastergreenberg.com**

**5395 DE**
Bar number and State

**APEX BRITTANY MO, LP**
**(A Delaware Limited Partnership)**

**WRITTEN CONSENT OF GENERAL PARTNER**

The undersigned, being the General Partner of Apex Brittany MO, LP, a Delaware

Limited Partnership (the "Company"), hereby adopts the following resolutions with the same

force and effect as if adopted at a duly held meeting of the partners of the Company held

pursuant to the Company's Partnership Agreement, direct the Secretary of the Company to file

this written consent with the records of the Company and consent to the taking of all prior

actions referred to in such resolutions:

RESOLVED, that, in the judgment of the General Partner, it is
desirable and in the best interests of the Company that the Company
commence a bankruptcy case by filing a voluntary petition under Chapter
11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

FURTHER RESOLVED, that the appropriate officers of the
Company be, and each hereby is, authorized and empowered on behalf of,
and in the name of, the Company to execute and verify or certify a petition
under Chapter 11 of the Bankruptcy Code and to cause the same to be
filed in the United States Bankruptcy Court for the District of Delaware
(the "Bankruptcy Court") at such time as said authorized officer executing
the same shall determine; and

FURTHER RESOLVED, that the appropriate officers of the
Company be, and they hereby are, authorized and empowered on behalf
of, and in the name of, the Company to execute and file all petitions,
schedules, lists, and other papers and to take any and all actions that any of
the authorized officers may deem necessary, proper or desirable in
connection with the Chapter 11 case, with a view to the successful
prosecution of the case; and

FURTHER RESOLVED, that the law firm of Flaster Greenberg,
P.C. be, and it hereby is, employed as bankruptcy counsel for the
Company under a general retainer; and

FURTHER RESOLVED, that all appropriate officers of the
Company are hereby authorized to instruct the Company's bankruptcy

counsel to take all necessary steps in connection with the Company's Chapter 11 case; and

FURTHER RESOLVED, that this Written Consent of the General Partner in lieu of a regularly scheduled meeting shall be filed with the limited liability company records of the Company.

FURTHER RESOLVED, that any and all acts by or on behalf of the Company taken by one or more of the officers of the Company in connection with or furtherance of the foregoing resolutions prior to the adoption of these resolutions be and the same hereby are in all respects ratified, approved and confirmed.

This Written Consent shall be effective as of the 15th day of September, 2023, upon the signing of a copy hereof by the General Partner of the Company.

WITNESS our hands as of the date written above.

APEX OPPORTUNITY LIMITED, LLC
General Partner

By: _____
Oron Zarum
Managing Member

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Apex Brittany MO LP** |
| United States Bankruptcy Court for the: | **DISTRICT OF DELAWARE** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Atlas Pest Management PO Box 1391 Saint Joseph, MO 64503 | | | | | | $4,932.00 |
| Better NOI 2900 Monarch Lakes Blvd., Suite 201 Hollywood, FL 33027 | | | | | | $1,150.00 |
| C&M Appliance 3222 Mitchell Avenue St. Joseph, MO 64507 | | | | | | $4,425.00 |
| City of St. Joseph 1100 Frederick Avenue Saint Joseph, MO 64501 | | | | | | $151,565.00 |
| Fannie Mae Midtown Center 1100 15th St. NW Washington, DC 20005 | | | | $7,388,131.00 | $0.00 | $7,388,131.00 |
| Fischer Adjusters 251 2nd Street Lakewood, NJ 08701 | | | | | | $64,389.02 |
| Glankler Brown 6000 Poplar Avenue Suite 400 Memphis, TN 38119 | | | | | | $17,000.00 |
| Great America Financial Services PO Box 660831 Dallas, TX 75266-0831 | | | | | | $1,131.00 |

| Debtor | **Apex Brittany MO LP** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| HD Supply 7411 Goen Place San Diego, CA 92120 | | | | | | $8,775.82 |
| Missouri American Water 727 Craig Road Saint Louis, MO 63141 | | | | | | $69,129.36 |
| Pro Floors & Construction 515 Middleton Street Saint Joseph, MO 64505 | | | | | | $13,675.41 |
| Reed Sewer Services 801 S. 16th Street Saint Joseph, MO 64501 | | | | | | $15,943.95 |
| Restoration Remediation Services Corp. 1941 Warren Street Kansas City, MO 64116-4435 | | | | | | $18,618.43 |
| Roberts Roofing Co 1601 Buchanan Avenue Saint Joseph, MO 64501 | | | | | | $4,625.00 |
| Roto-Rooter Services Co. 304 S. Belt Hwy Ste B Saint Joseph, MO 64506 | | | | | | $1,843.00 |
| Spire Missouri Inc 700 Market Street Saint Louis, MO 63101 | | | | | | $94,329.19 |
| St. Joseph Plumbing & Heating 714 S. 7th Street Saint Joseph, MO 64501 | | | | | | $7,000.00 |
| The Home Depot Pro 6600 Pritchard Rd. Jacksonville, FL 32219 | | | | | | $11,146.21 |

Debtor  **Apex Brittany MO LP**
Name

Case number *(if known)*

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **VCorp Services 25 Robert Pitt Drive Suite 204 Monsey, NY 10952** | | | | | | **$928.00** |
| **YH Roth CPA PC 501 Chestnut Ridge Rd., Suite 204 Chestnut Ridge, NY 10977** | | | | | | **$13,000.00** |

| Fill in this information to identify your case: | |
|---|---|
| Debtor 1 | **Oron Zarum** |
| | First Name　　　　Middle Name　　　　Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name　　　　Middle Name　　　　Last Name |
| United States Bankruptcy Court for the: | DISTRICT OF DELAWARE |
| Case number (if known) | _____ |

☐ Check if this is an
amended filing

## B 104

# For Individual Chapter 11 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims Against You and Are Not Insiders                                              12/15

If you are an individual filing for bankruptcy under Chapter 11, you must fill out this form. If you are filing under Chapter 7, Chapter 12, or Chapter 13, do not fill out this form. Do not include claims by anyone who is an insider. Insiders include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20 percent or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor.  11 U.S.C. § 101.  Also, do not include claims by secured creditors unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information.

**Part 1:**　List the 20 Unsecured Claims in Order from Largest to Smallest.  Do Not Include Claims by Insiders.

| | | **Unsecured claim** |
|---|---|---|

**1**

**Atlas Pest Management
PO Box 1391
Saint Joseph, MO 64503**

What is the nature of the claim? _____　$4,932.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

_____
_____
Contact

_____
Contact phone

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)
　　Value of security:　　-_____
　　Unsecured claim　　　_____

**2**

**Better NOI
2900 Monarach Lakes Blvd.,
Suite 201
Hollywood, FL 33027**

What is the nature of the claim? _____　$1,150.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

_____
_____
Contact

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)
　　Value of security:　　-_____

Debtor 1    **Apex Brittany MO LP**                                    Case number *(if known)*

Contact phone                                    Unsecured claim

---

**3**

**C&M Appliance**
**3222 Mitchell Avenue**
**St. Joseph, MO 64507**

What is the nature of the claim?                                    $4,425.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?

■ No
☐ Yes. Total claim (secured and unsecured)

Contact                                    Value of security: -

Contact phone                                    Unsecured claim

---

**4**

**City of St. Joseph**
**1100 Frederick Avenue**
**Saint Joseph, MO 64501**

What is the nature of the claim?                                    $151,565.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?

■ No
☐ Yes. Total claim (secured and unsecured)

Contact                                    Value of security: -

Contact phone                                    Unsecured claim

---

**5**

**Fannie Mae**
**Midtown Center**
**1100 15th St. NW**
**Washington, DC 20005**

What is the nature of the claim?                                    $7,388,131.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?

☐ No
■ Yes. Total claim (secured and unsecured)    $7,388,131.00

Contact                                    Value of security: -  $0.00

Contact phone                                    Unsecured claim    $7,388,131.00

---

**6**

**Fischer Adjusters**
**251 2nd Street**
**Lakewood, NJ 08701**

What is the nature of the claim?                                    $64,389.02

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

---

Debtor 1     **Apex Brittany MO LP**                                    Case number *(if known)* _____

_____

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

Contact

    Value of security:                    - _____

Contact phone

    Unsecured claim        _____

---

**7**  **Glankler Brown**
6000 Poplar Avenue
Suite 400
Memphis, TN 38119

**What is the nature of the claim?** _____    **$17,000.00**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

_____

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

Contact

    Value of security:                    - _____

Contact phone

    Unsecured claim        _____

---

**8**  **Great America Financial Services**
PO Box 660831
Dallas, TX 75266-0831

**What is the nature of the claim?** _____    **$1,131.00**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

_____

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

Contact

    Value of security:                    - _____

Contact phone

    Unsecured claim        _____

---

**9**  **HD Supply**
7411 Goen Place
San Diego, CA 92120

**What is the nature of the claim?** _____    **$8,775.82**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

_____

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

Contact

    Value of security:                    - _____

Contact phone

    Unsecured claim        _____

---

**10**  **Missouri American Water**

**What is the nature of the claim?** _____    **$69,129.36**

Debtor 1    **Apex Brittany MO LP**                                    Case number *(if known)*

**727 Craig Road**
**Saint Louis, MO 63141**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No
☐ Yes. Total claim (secured and unsecured)
            Value of security:                    - _____
            Unsecured claim

Contact

Contact phone

---

| 11 | **Pro Floors & Construction** | What is the nature of the claim? | | $13,675.41 |
|----|----|----|----|----|

**515 Middleton Street**
**Saint Joseph, MO 64505**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No
☐ Yes. Total claim (secured and unsecured)
            Value of security:                    - _____
            Unsecured claim

Contact

Contact phone

---

| 12 | **Reed Sewer Services** | What is the nature of the claim? | | $15,943.95 |
|----|----|----|----|----|

**801 S. 16th Street**
**Saint Joseph, MO 64501**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No
☐ Yes. Total claim (secured and unsecured)
            Value of security:                    - _____
            Unsecured claim

Contact

Contact phone

---

| 13 | **Restoration Remediation** | What is the nature of the claim? | | $18,618.43 |
|----|----|----|----|----|

**Services Corp.**
**1941 Warren Street**
**Kansas City, MO 64116-4435**

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No
☐ Yes. Total claim (secured and unsecured)
            Value of security:                    - _____

Contact

Debtor 1    **Apex Brittany MO LP**    Case number *(if known)* _____

Contact phone _____    Unsecured claim    _____

---

**14**    **Roberts Roofing Co**
          **1601 Buchanan Avenue**
          **Saint Joseph, MO 64501**

What is the nature of the claim? _____    $4,625.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)
       Value of security:                    - _____
       Unsecured claim                         _____

Contact _____

Contact phone _____

---

**15**    **Roto-Rooter Services Co.**
          **304 S. Belt Hwy**
          **Ste B**
          **Saint Joseph, MO 64506**

What is the nature of the claim? _____    $1,843.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)
       Value of security:                    - _____
       Unsecured claim                         _____

Contact _____

Contact phone _____

---

**16**    **Spire Missouri Inc**
          **700 Market Street**
          **Saint Louis, MO 63101**

What is the nature of the claim? _____    $94,329.19

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

Does the creditor have a lien on your property?
■ No
☐ Yes. Total claim (secured and unsecured)
       Value of security:                    - _____
       Unsecured claim                         _____

Contact _____

Contact phone _____

---

**17**    **St. Joseph Plumbing & Heating**
          **714 S. 7th Street**
          **Saint Joseph, MO 64501**

What is the nature of the claim? _____    $7,000.00

As of the date you file, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

---

Debtor 1    **Apex Brittany MO LP**                                      Case number *(if known)* _____

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

_____ Contact                          Value of security:        - _____

_____ Contact phone                    Unsecured claim             _____

---

**18**

**The Home Depot Pro**
**6600 Pritchard Rd.**
**Jacksonville, FL 32219**

**What is the nature of the claim?** _____        $11,146.21

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

_____ Contact                          Value of security:        - _____

_____ Contact phone                    Unsecured claim             _____

---

**19**

**VCorp Services**
**25 Robert Pitt Drive**
**Suite 204**
**Monsey, NY 10952**

**What is the nature of the claim?** _____        $928.00

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

_____ Contact                          Value of security:        - _____

_____ Contact phone                    Unsecured claim             _____

---

**20**

**YH Roth CPA PC**
**501 Chestnut Ridge Rd., Suite**
**204**
**Chestnut Ridge, NY 10977**

**What is the nature of the claim?** _____        $13,000.00

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed
■ None of the above apply

**Does the creditor have a lien on your property?**

■ No

☐ Yes. Total claim (secured and unsecured)

_____ Contact                          Value of security:        - _____

_____ Contact phone                    Unsecured claim             _____

---

**Part 2:    Sign Below**

Under penalty of perjury, I declare that the information provided in this form is true and correct.

Debtor 1    **Apex Brittany MO LP**                                          Case number *(if known)*

X    **/s/ Oron Zarum**                                          X
    **Oron Zarum**                                              Signature of Debtor 2
    Signature of Debtor 1


Date    **September 15, 2023**                                  Date

ATLAS PEST MANAGEMENT
PO BOX 1391
SAINT JOSEPH, MO 64503

BETTER NOI
2900 MONARACH LAKES BLVD., SUITE 201
HOLLYWOOD, FL 33027

C&M APPLIANCE
3222 MITCHELL AVENUE
ST. JOSEPH, MO 64507

CITY OF ST. JOSEPH
1100 FREDERICK AVENUE
SAINT JOSEPH, MO 64501

FANNIE MAE
13150 WORLD GATE DRIVE
HERNDON, VA 20170

FANNIE MAE
MIDTOWN CENTER
1100 15TH ST. NW
WASHINGTON, DC 20005

FISCHER ADJUSTERS
251 2ND STREET
LAKEWOOD, NJ 08701

FRANKEL RUBIN KLEIN ET AL
231 S. BEMISTON AVENUE
SUITE 1111
SAINT LOUIS, MO 63105

GLANKLER BROWN
6000 POPLAR AVENUE
SUITE 400
MEMPHIS, TN 38119

GREAT AMERICA FINANCIAL SERVICES
PO BOX 660831
DALLAS, TX 75266-0831

HD SUPPLY
7411 GOEN PLACE
SAN DIEGO, CA 92120

JASON SOPER
1100 FREDERICK AVENUE
ROOM 307
SAINT JOSEPH, MO 64501

JETZ SERVICE COMPANY
C/O GEORGE E. KAPKE, JR.
THE CHAPEL RIDGE LAW BUILDING
3304 N.E. RALPH POWELL ROAD
LEES SUMMIT, MO 64064

LUMENT CAPITAL
PO BOX 846019
DALLAS, TX 75284-6019

MISSOURI AMERICAN WATER
727 CRAIG ROAD
SAINT LOUIS, MO 63141

NICHOLAS ZLUTICKY
STINSON LLP
1201 WALNUT STREET
SUITE 2900
KANSAS CITY, MO 64106

PRO FLOORS & CONSTRUCTION
515 MIDDLETON STREET
SAINT JOSEPH, MO 64505

REED SEWER SERVICES
801 S. 16TH STREET
SAINT JOSEPH, MO 64501

RESTORATION REMEDIATION SERVICES CORP.
1941 WARREN STREET
KANSAS CITY, MO 64116-4435

ROBERTS ROOFING CO
1601 BUCHANAN AVENUE
SAINT JOSEPH, MO 64501

ROTO-ROOTER SERVICES CO.
304 S. BELT HWY
STE B
SAINT JOSEPH, MO 64506

SMF REGISTERED SERVICES
1201 WALNUT STREET
SUITE 2900
KANSAS CITY, MO 64106

SPIRE MISSOURI INC
700 MARKET STREET
SAINT LOUIS, MO 63101

ST. JOSEPH PLUMBING & HEATING
714 S. 7TH STREET
SAINT JOSEPH, MO 64501

THE HOME DEPOT PRO
6600 PRITCHARD RD.
JACKSONVILLE, FL 32219

TRIGILD INC
ATTN: DAVID WALLACE
4131 NORTH CENTRAL EXPRESSWAY
SUITE 775
DALLAS, TX 75204

VCORP SERVICES
25 ROBERT PITT DRIVE
SUITE 204
MONSEY, NY 10952

YH ROTH CPA PC
501 CHESTNUT RIDGE RD., SUITE 204
CHESTNUT RIDGE, NY 10977

# EXHIBIT K

*Recorded in Buchanan County, Missouri*
**Recording Date/Time: 01/23/2024 at 02:54:58 PM**

**Book: 3794     Page: 132**

Instr #:  **2024000484**

Pages:  **22**
Fee:  **$87.00 S**

*Electronically Recorded*
**PREFERRED TITLE OF ST. JOSEPH, L.L.C...**



Rebecca Dunlap
Recorder of Deeds

---

(Space above reserved for Recorder of Deeds certification)

## MISSOURI RECORDING COVER SHEET

Document Title:  Trustee's Deed Under Sale

Document Date:  January 12, 2024

Grantor(s) Name
and Address:  SMF Registered Services, Inc.,
A Missouri Corporation
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106

Trustee Grantee(s)
Name and
Address:  Fannie Mae
5600 Granite Parkway
Plano, Texas 75024

Legal Description:  *See Page 9*

Affected Recorded
Documents:  *Multifamily Deed of Trust, Assignment of Leases and Rents, Security
Agreement and Fixture Filing dated August 16, 2019, recorded August 27,
2019 in Book 3740 at Page 678 in the Buchanan County, Missouri
Recorder of Deeds Office, assigned to Fannie Mae by virtue of Assignment
of Security Instrument recorded August 27, 2019 in Book 3740 at Page 679
in the Office of the Recorder of Deeds for Buchanan County, Missouri.*

*(If there is not sufficient space on this page for the information required, state the page reference where it is
contained within the document.)*

CORE/0772514.0056/186315296.1

(Space above reserved for Recorder of Deeds certification)

## MISSOURI RECORDING COVER SHEET

Document Title:  Trustee's Deed Under Sale

Document Date:  January 12, 2024

Grantor(s) Name
and Address:  SMF Registered Services, Inc.,
A Missouri Corporation
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106

Trustee Grantee(s)
Name and
Address:  Fannie Mae
5600 Granite Parkway
Plano, Texas 75024

Legal Description:  *See Page 8. 9*

Affected Recorded
Documents:  *Multifamily Deed of Trust, Assignment of Leases and Rents, Security
Agreement and Fixture Filing dated August 16, 2019, recorded August 27,
2019 in Book 3740 at Page 678 in the Buchanan County, Missouri
Recorder of Deeds Office, assigned to Fannie Mae by virtue of Assignment
of Security Instrument recorded August 27, 2019 in Book 3740 at Page 679
in the Office of the Recorder of Deeds for Buchanan County, Missouri.*

*(If there is not sufficient space on this page for the information required, state the page reference where it is
contained within the document.)*

CORE/0772514.0056/186315296.1

# TRUSTEE'S DEED UNDER SALE

WHEREAS, APEX Brittany MO LP, a Delaware limited partnership, as Grantor by a Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 16, 2019, recorded August 27, 2019 in Book 3740 at Page 678 in the Office of the Recorder of Deeds for Buchanan County, Missouri, assigned by Lument Real Estate Capital, LLC, a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC), to Fannie Mae by virtue of an Assignment of Security Instrument, recorded August 27, 2019 in Book 3740 at Page 679 in the Office of the Recorder of Deeds for Buchanan County, Missouri, conveyed to Martin Leigh Attorneys PC, as Trustee, the property therein and hereinafter described; in trust, to secure the payment of the indebtedness in said deed described, which Trustee was succeeded by SMF Registered Services, Inc. (the "Successor Trustee"); and

WHEREAS, default was made and still continues in the payment of said indebtedness; by reason whereof the undersigned Successor Trustee did, at the request of the legal owner and holder of all unpaid indebtedness secured by said deed, proceed to execute the powers to him given by said deed, and did on Friday, the 12th day of January, Two Thousand Twenty-Four, having previously given public notice daily for twenty consecutive days prior to the day of the sale, of the date and book and page number of the record of said deed, the grantor, and the time, terms, and place of sale and the description of the property to be sold, and all other particulars required by law, by advertisement inserted in a daily newspaper known as The St. Joseph Daily Courier, a newspaper published in Buchanan County, City of St. Joseph, and State of Missouri, daily for twenty consecutive days, with the last insertion of such advertisement no more than one week prior to the day of sale, a copy of which advertisement, with the affidavit of the publisher of said newspaper proving its publication, is hereto annexed as Exhibit A and made part hereof, at the East front door of the Buchanan County Courthouse, 411 Jules St., St. Joseph, MO 64501, Buchanan County, Missouri, and in the County and State aforesaid, between the hours of 9:00 o'clock in the forenoon and 5:00 o'clock in the afternoon, and more particularly at 2:00 p.m. of said day, expose to sale for cash, to the highest bidder, at public venue and auction, the said property hereinafter described; and at said sale the high bidder was Fannie Mae, with an address of 5600 Granite Parkway, Plano, Texas 75024 (the "High Bidder") being the highest and best bidder for the whole of said property, for the price and sum of Seven Million One Hundred Eighty-Eight Thousand and 00/100 dollars ($7,188,000.00).

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that the undersigned Successor Trustee, in consideration of the premises and the sum of Seven Million One Hundred Eighty-Eight Thousand and 00/100 dollars ($7,188,000.00), bid by said High Bidder, the receipt of the consideration for which is hereby acknowledged and described in the attachment hereto, does hereby SELL AND CONVEY unto Fannie Mae, a corporation organized and existing under the laws of the United States, the property in said Deed of Trust described, situated in the County of Buchanan and State of Missouri, to wit:

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N., RANGE 35 W., ST JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89°

1

49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING. THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT: THENCE 873.36 FEET S TO A POINT THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2;

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING (the "Land").

Together with:

A.      All of Borrower's rights, title and interest as Lessor in and to all leases and all other tenancies, rental arrangements, license agreements, concession agreements, subleases, and guarantees of the performance or obligations of any tenants thereunder affecting the Premises, or any part thereof, now existing or which may be executed at any time in the future during the life of this Deed of Trust, and all amendments, extensions and renewals of same, all of which are hereinafter called the "Leases" and all rents or other income or payments, regardless of type or source of payment (including, but not limited to, security deposits, lease termination payments, purchase option payments, refunds of any type, prepayment of rents, settlements of litigation or settlements of past due rents) which may now or hereafter be or become due or owing under the Leases, collectively, the "Rents", which are pledged and assigned absolutely and directly (and not merely collaterally).  Borrower intends to establish a present and complete transfer of all the Leases and all rights of the lessor thereunder and all the Rents unto Lender, with the right, but without the obligation, to collect all of said Rents, which may become due during the life of this Deed of Trust;

B.      All and singular the tenements, hereditaments, easements, appurtenances, passages, waters, water courses, riparian rights, and other water rights, whether or not adjudicated, whether tributary or nontributary and whether evidenced by deed, water stock, permit or otherwise, sewer rights, rights in trade names and any name

2

under which the Improvements are now or hereafter operated, licenses, permits and contracts, and all other rights of any kind or character in any way now or hereafter appertaining to the Land and Improvements, including but not limited to, homestead and any other claim at law or in equity as well as any after-acquired title, franchise or license and the reversion and reversions and remainder and remainders thereof;

C.    All right, title and interest of Borrower in and to any and all buildings and improvements of every kind and description now or hereafter erected or placed on the said Land and all materials intended for construction, reconstruction, alteration and repairs of such buildings and improvements now or hereafter erected thereon, all of which materials shall be deemed to be included within the Premises immediately upon the delivery thereof to the Premises, and all improvements and fixtures now or hereafter owned by Borrower and attached to or contained in and used in connection with the Premises and appurtenances thereto; and all items of furniture, furnishings, equipment and personal property owned by Borrower used or useful in the operation of the Premises; and all renewals or replacements of all of the aforesaid property owned by Borrower or articles in substitution therefore, whether or not the same are or shall be attached to said buildings or improvements in any manner (collectively, the "Improvements"); all the aforesaid property shall be deemed to form a part and parcel of the Land and for the purpose of this Deed of Trust to be Land and covered by this Deed of Trust.  As to any of the property aforesaid which does not form a part and parcel of the Land or does not constitute a "fixture" (as such term is defined in the Uniform Commercial Code ("UCC")) this Deed of Trust and the other Loan Documents are each hereby deemed to be, as well, a security agreement under the UCC for the purpose of creating a security interest in all such items, including, but not limited to, all property and rights which Borrower may grant to Lender, as secured party, under the terms of this Deed of Trust or any of the other Loan Documents, including any and all proceeds thereof (as used herein, Borrower shall mean "Debtor" under the UCC and Lender shall mean "Secured Party" under the UCC), and this instrument shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included in the Premises.  Borrower hereby grants a security interest in and to any of the Premises governed by the UCC to Lender and appoints Lender as its attorney-in-fact to execute such documents necessary to perfect Lender's security interest and Borrower authorizes Lender at any time until the Indebtedness is paid in full, to prepare and file, at Borrower's expense, any and all UCC financing statements, amendments, assignments, terminations and the like, necessary to create and/or maintain a prior security interest in such property all without Borrower's execution of the same.  Furthermore, upon a default under the Loan Documents, Lender will, in addition to all other remedies provided for in the Loan Documents, have the remedies provided for under the UCC in effect in the state in which the Premises are located;

D.    All right, title and interest of Borrower, now or hereafter acquired, in and to any and all strips and gores of land adjacent to and used in connection with the Premises and all right, title and interest of Borrower, now owned or hereafter

3

acquired, in, to, over and under the ways, streets, sidewalks and alleys adjoining the Premises;

E.     All funds now or hereafter held by Lender under any property reserves agreement (including any proceeds derived from any letter of credit) or escrow security agreement or under any of the terms hereof or of the Loan Documents;

F.     All of Borrower's payment intangibles, letter of credit rights, interest rate cap agreements, tenant in common agreement rights, and any other contract rights of Borrower related in any manner to the ownership, operation, or management of the Premises, as well as any and all supporting obligations, and all proceeds, renewals, replacements and substitutions thereof; and

G.     All funds, accounts and proceeds of any of the foregoing whether or not such funds, accounts or proceeds thereof are held by Lender under the terms of any of the Loan Documents, including, but not limited to bankruptcy claims of Borrower against any tenant at the Premises, and any proceeds thereof; proceeds of any Rents, insurance proceeds from all insurance policies required to be maintained by Borrower under the Loan Documents, and all awards, decrees, proceeds, settlements or claims for damage now or hereafter made to or for the benefit of Borrower by reason of any damage to, destruction of or taking of the Premises or any part thereof, whether the same shall be made by reason of the exercise of the right of eminent domain or by condemnation or otherwise (a "Taking"), all of the foregoing is herein referred to as the "Property".

Said Property being sold and transferred "as is" and "where is" without any express or implied warranties of or representations as to condition, description, title, merchantability, quality, or fitness for use.

The undersigned, SMF Registered Services, Inc., Successor Trustee, warrants and certifies that, as required by R.S.Mo. § 443.320, pertaining to notices of sale under power of sale, a writing in words and figures identical to the notice of sale attached to the published affidavit affixed hereto, was by it placed in an envelope and deposited in the United States mail on December 22, 2023, being not less than twenty (20) days prior to the scheduled date of sale, certified, with postage prepaid, to the following at the addresses shown:

Owner as of 40 days prior to sale date:

Apex Brittany MO LP
10 Hill Street
Newark, NJ 07102
aronzarum@gmail.com

Person requiring notice of sale: None.

Beneficiaries under subordinate deeds of trust: None.

Other persons receiving notice of sale:

| | |
|---|---|
| Oron Zarum | Corporate Creations Network, Inc. |
| 10 Hill Street | 12747 Olive Boulevard, #300 |

4

Neward, NJ 07102

Joshua Kahane (TN #23726)
Aubrey B. Greer (TN #35613)
6000 Poplar Ave., Suite 400
Memphis, TN 38119

City of St. Joseph, Missouri
Attn: Payroll
1100 Fredrick Ave
St. Joseph, MO 64501

Reed Sewer Service
801 S 16th St.
St. Joseph, MO 64501

Spire Missouri, Inc.
700 Market St
St. Louis, MO 63101

Timothy Hugh Bosler Jr.
Julie R Cooper
Donald Wayne Petty
14 South Main
Liberty, MO 64068

George E. Kapke, Jr.
3304 NE Ralph Powell Rd.
Lee's Summit, MO 64064

St. Louis, MO 63141

Mayer S. Klein (MO #32605)
231 South Bemiston Ave., Suite 1111
Clayton, Missouri 63105

Jason Soper
1100 Fredrick Ave, Room 307
St. Joseph, MO 64501

Joel Randall Euler
137 S. Main
PO Box 326
Troy, LS 66087

Heather Plowman
400 Harrington Lane
Gower, MO 64454

Blaine Smith
700 W 47th St., Ste. 410
Kansas City, MO 64112

Trigild, Inc.
4143 North Central Expressway, Suite 775
Dallas, TX 75204

SMF Registered Services, Inc. had no knowledge that any owner had died within six months next preceding the first date of the publication of this foreclosure sale.

SMF Registered Services, Inc. had no knowledge that any owner was entitled to the protection of the Soldiers' and Sailors' Civil Relief Act.

Prior to conducting the foreclosure sale described herein, SMF Registered Services, Inc. received no notice of intention to redeem.

TO HAVE AND TO HOLD the same unto acknowledged and described in the attachment hereto, does hereby SELL AND CONVEY unto Fannie Mae, its successors and assigns forever.

5

IN WITNESS WHEREOF, I, Nicholas Zluticky, the Vice President of the said Successor Trustee, have hereunto set my hand this 12th day of January, 2024.

SMF Registered Services, Inc., Successor Trustee
By: Nicholas Zluticky, Vice President

6

STATE OF MISSOURI )
                          )   SS.
COUNTY OF JACKSON )

On this 12th day of January, 2024, before me _Nicholas Zluticky_ a Notary Public, personally appeared Nicholas Zluticky, Vice President of SMF Registered Services, Inc. to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed on behalf of SMF Registered Service, Inc., Trustee.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at my office in Kansas City, Jackson County, Missouri, the day and year last above written.

JANET C. BRISCOE
Notary Public, Notary Seal
State of Missouri
Platte County
Commission # 13464553
My Commission Expires 07-21-2025

_Janet C. Briscoe_
Notary Public – State of Missouri
Commissioned in _Platte_ County
Printed Name: _Janet C. Briscoe_

My commission expires: _07-21-2025_

7

# LEGAL DESCRIPTION OF PROPERTY

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N., RANGE 35 W., ST JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING. THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT: THENCE 873.36 FEET S TO A POINT THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2;

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING (the "Land").

CORE/0772514.0056/186315296.1

# EXHIBIT A - AFFIDAVIT OF PUBLICATION

### St. Joseph Daily Courier

# Proof of Publication

County of Buchanan

ss

State of Missouri

I, Peter J. Gray, being duly sworn, state that I am the Publisher of the St. Joseph Daily Courier, a daily newspaper of general circulation in said County where published and located; that said newspaper has been admitted to the post office as periodicals matter; that it has been published regularly and consecutively for a period of three years; that it has a list of bona fide subscribers voluntarily engaged to pay a stated subscription price for a definite period of time; that said newspaper has complied with the provisions of Sections 493.050 to 493.090 of the Revised Statutes of MO; and that the affixed notice appeared in the edition(s) stated.

SEE ATTACHED

### Trustee's Sale Notice

### December 22, 2023 through January 12, 2024

Vol # **773**    **249-270**

Peter J. Gray

Sworn to and subscribed before me this

**January 12, 2024**

Ashli Fanning
Notary Public

ASHLI FANNING
Notary Public-Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires 9/13/2026
Commission # 22410866

# NOTICE OF TRUSTEE'S SALE

For default in the payment of debt and performance of obligations secured by that Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 16, 2019, executed by **APEX Brittany MO LP**, a Delaware limited partnership, as Grantor and Borrower, and recorded August 27, 2019 in Book 3740 at Page 678 in the Office of the Recorder of Deeds for Buchanan County, Missouri, assigned by Lument Real Estate Capital, LLC, a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC), to Fannie Mae by virtue of an Assignment of Security Instrument, recorded August 27, 2019 in **Book 3740 at Page 679** in the Office of the Recorder of Deeds for Buchanan County, Missouri, the undersigned successor trustee will on **January 12, 2024**, between the hours of 9:00 a.m. and 5:00 p.m., and more particularly at 2:00 p.m., at the East front door of the Buchanan County Courthouse, 411 Jules St., St. Joseph, MO 64501, Buchanan County, Missouri sell at public venue to the highest bidder for cash:
**TRACT 1:**

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N., RANGE 35 W., ST JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING. THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT: THENCE 873.36 FEET S TO A POINT THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.
**TRACT 2;**

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING (the "Land").

The buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land (the "Improvements");

All of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land (collectively, the "Personalty");

Current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

Insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

Awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlement resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

Contracts, options and other agreement for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions of renewals thereof (the "Leases");

Lease and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits (the "Rents");

Earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

Deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the following (collectively, the "Impositions"): any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property; the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement; all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Documents (the "Taxes"); and amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender, when due (the "Imposition Deposits") ;

Refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

Tenant security deposits;

Names under or by which any of the Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

Collateral Accounts and all Collateral Account Funds;

Products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

All of Borrower's right, title and interest in the oil, gas, mineral, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.
(collectively, the "Mortgaged Property").

to satisfy said debt and costs.

**SMF REGISTERED SERVICES, INC.,**
Successor Trustee
By: Nicholas J. Zluticky, Vice-President
SMF REGISTERED SERVICES, INC.
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
(816) 842-8600
First Publication December 22, 2023
249-270—Daily          DC1241

# TRUSTEE'S AFFIDAVIT

STATE OF MISSOURI     )
                              )    ss.

COUNTY OF JACKSON   )

Comes now, Nicholas J. Zluticky, vice-president of SMF Registered Services, Inc. ("SMF"), of lawful age, being duly sworn upon his oath and states:

That SMF is the Successor Trustee under the Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 16, 2019, recorded August 27, 2019 in Book 3740 at Page 678 in the Office of the Recorder of Deeds for Buchanan County, Missouri, assigned by Lument Real Estate Capital, LLC, a Delaware limited liability company (successor by merger to Hunt Mortgage Capital, LLC), to Fannie Mae by virtue of an Assignment of Security Instrument, recorded August 27, 2019 in Book 3740 at Page 679 in the Office of the Recorder of Deeds for Buchanan County, Missouri (the "Deed of Trust"), said Deed of Trust encumbering certain real property situated in the Buchanan County, State of Missouri, to-wit:

TRACT 1:

A TRACT OF LAND IN THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 57 N., RANGE 35 W., ST JOSEPH, BUCHANAN COUNTY, MISSOURI, DESCRIBED AS FOLLOWS: FROM THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 20 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING N 89° 49' 30" E ALONG THE NORTH LINE OF SAID QUARTER SECTION 541.0 FEET; THENCE SOUTH PARALLEL TO THE WEST LINE OF SAID QUARTER SECTION 873.36 FEET; THENCE S 89° 47' W, 541.0 FEET TO THE WEST LINE OF THIRTY-SIXTH STREET; THENCE NORTH ALONG THE EAST LINE OF THIRTY-SIXTH STREET, 873.77 FEET TO THE POINT OF BEGINNING. THE ABOVE PROPERTY ALSO BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT THAT IS 1766.23 FEET N AND 20.00 FEET, N 89° 47' E OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T. 57N, R 35 W, IN BUCHANAN COUNTY, MISSOURI; THENCE 873.77 FEET N ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT, THIS SAID POINT BEING 20.00 FEET N 89° 49' 30" E OF THE NW CORNER OF THE SE 1/4 OF THE AFORESAID SECTION 2; THENCE 541.00 FEET N 89° 39' 30" E TO A POINT: THENCE 873.36 FEET S TO A POINT THENCE 541.00 FEET, S 89° 47' W TO THE POINT OF BEGINNING.

TRACT 2;

BEGINNING AT A POINT THAT IS 1176.23 FEET NORTH AND 20.00 FEET N 89° 47' E. OF THE SW CORNER OF THE SW 1/4 OF SECTION 2, T.57N., R 35W., IN BUCHANAN COUNTY, MISSOURI; THENCE 590.00 FEET NORTH ON THE EAST RIGHT OF WAY LINE OF 36TH STREET TO A POINT; THENCE 541.00 FEET N. 89° 47' E. TO A POINT; THENCE 590.00 FEET SOUTH TO A POINT; THENCE 541.00 FEET S. 89° 47' W. TO THE POINT OF BEGINNING (the "Land").

Together with:

The buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land (the "Improvements");

All of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land (collectively, the "Personalty");

Current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

Insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

Awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlement resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

Contracts, options and other agreement for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

All present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions of renewals thereof (the "Leases");

Lease and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all rents (whether from residential or non-

2

residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits (the "Rents");

Earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

Deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the following (collectively, the "Impositions"): any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property; the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement; all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Documents (the "Taxes"); and amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender, when due (the "Imposition Deposits") ;

Refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

Tenant security deposits;

Names under or by which any of the Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

Collateral Accounts and all Collateral Account Funds;

Products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

All of Borrower's right, title and interest in the oil, gas, mineral, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

(collectively, the "Property").

CORE/0772514.0056/186315340.1

That SMF was nominated and appointed to serve as Successor Trustee under the Deed of Trust in the place and stead of Martin Leigh Attorneys PC, by an Appointment of Successor Trustee recorded on April 26, 2023, in Book 3786 at Page 406 in the Office of the Recorder of Deeds for Buchanan County, Missouri.

That on December 22, 2023, SMF caused to be deposited in the United States mail a sealed envelope addressed to the following person at the address indicated, which envelope was certified with return receipt requested and postage prepaid:

Apex Brittany MO LP
10 Hill Street
Newark, NJ 07102
aronzarum@gmail.com

That the entity listed above constituted the record owner of the property hereinabove described as of thirty (30) days prior to the date of the trustee's sale hereinafter referred to and Apex Brittany, a Delaware limited partnership, is the grantor in said Deed of Trust, and all persons for whom there were recorded Requests for Notice of Sale as of thirty (30) days prior to the date of the trustee's sale hereinafter referred to in connection with said Deed of Trust, and all persons claiming any interest in any part of the property that is the object of the trustee's sale, and that there existed no mortgage or deed of trust recorded prior to the recordation of the Deed of Trust being foreclosed;

Others receiving notice of the sale include the following:

Oron Zarum
10 Hill Street
Neward, NJ 07102

Corporate Creations Network, Inc.
12747 Olive Boulevard, #300
St. Louis, MO 63141

Joshua Kahane (TN #23726)
Aubrey B. Greer (TN #35613)
6000 Poplar Ave., Suite 400
Memphis, TN 38119

Mayer S. Klein (MO #32605)
231 South Bemiston Ave., Suite 1111
Clayton, Missouri 63105

City of St. Joseph, Missouri
Attn: Payroll
1100 Fredrick Ave
St. Joseph, MO 64501

Jason Soper
1100 Fredrick Ave, Room 307
St. Joseph, MO 64501

Reed Sewer Service
801 S 16th St.
St. Joseph, MO 64501

Joel Randall Euler
137 S. Main
PO Box 326
Troy, LS 66087

CORE/0772514.0056/186315340.1

Spire Missouri, Inc.
700 Market St
St. Louis, MO 63101

Heather Plowman
400 Harrington Lane
Gower, MO 64454

Timothy Hugh Bosler Jr.
Julie R Cooper
Donald Wayne Petty
14 South Main
Liberty, MO 64068

Blaine Smith
700 W 47th St., Ste. 410
Kansas City, MO 64112

George E. Kapke, Jr.
3304 NE Ralph Powell Rd.
Lee's Summit, MO 64064

Trigild, Inc.
4143 North Central Expressway, Suite 775
Dallas, TX 75204

That said envelopes contained a Notice of Trustee's Sale, which Notice contained all of the information required in the published notice of sale referred to in R.S.Mo. § 443.320; that SMF foreclosed the aforesaid Deed of Trust by a sale held on January 12, 2024, in accordance with the terms of the Notice of Sale hereinabove referred to;

That the receipts attached hereto as Schedule 1 are the receipts from the United States Post Office to indicate that said envelopes containing said Notice were delivered by the undersigned to said Post Office, and by virtue of this Affidavit are hereby recorded so as to afford proof of said Notice in accordance with R.S.Mo. § 443.325(3), (4);

That it received no written notice of redemption at said trustee's sale or at any time within ten (10) days prior thereto.

That it had no knowledge that any owner had died within six months next preceding the first date of the publication of this foreclosure sale.

That it had no knowledge that any owner was entitled to the protection of the Soldiers' and Sailors' Civil Relief Act.

_____

SMF Registered Services, Inc.,
Successor Trustee
By: Nicholas J. Zluticky, Vice President

5

STATE OF MISSOURI )
) ss.
COUNTY OF JACKSON )

On this *12ᵀᴴ* day of January 2024, before me *Nicholas J. Zluticky* Notary Public, personally appeared Nicholas J. Zluticky, Vice President of SMF Registered Services, Inc. to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed on behalf of SMF Registered Service, Inc., Successor Trustee.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in Kansas City, Jackson County, Missouri, the day and year last above written.

JANET C. BRISCOE
Notary Public, Notary Seal
State of Missouri
Platte County
Commission # 13464553
My Commission Expires 07-21-2025

*Janet C. Briscoe*
Notary Public – State of Missouri
Commissioned in *Platte* County
Printed Name: *Janet C. Briscoe*

My commission expires: *07-21-2025*

# SCHEDULE 1 - RECEIPTS

| U.S. Postal Service® CERTIFIED MAIL® RECEIPT | U.S. Postal Service® CERTIFIED MAIL® RECEIPT | U.S. Postal Service® CERTIFIED MAIL® RECEIPT |
|---|---|---|
| Domestic Mail Only | Domestic Mail Only | Domestic Mail Only |

**USPS® ARTICLE NUMBER**

9414 7266 9904 2151 6650 34

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Joel Randall Euler
137 S. Main
PO Box 326
Troy, LS 66087

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

**USPS® ARTICLE NUMBER**

9414 7266 9904 2203 2951 72

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Oron Zarum
10 Hill Street
Newark, NJ 07102

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

**USPS® ARTICLE NUMBER**

9414 7266 9904 2203 2952 02

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Apex Brittany MO LP
10 Hill Street
Newark, NJ 07102

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

---

| U.S. Postal Service® CERTIFIED MAIL® RECEIPT | U.S. Postal Service® CERTIFIED MAIL® RECEIPT | U.S. Postal Service® CERTIFIED MAIL® RECEIPT |
|---|---|---|
| Domestic Mail Only | Domestic Mail Only | Domestic Mail Only |

**USPS® ARTICLE NUMBER**

9414 7266 9904 2205 5259 94

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Heather Plowman
400 Harrington Lane
Gower, MO 64454

Reference Information

**USPS® ARTICLE NUMBER**

9414 7266 9904 2203 2951 41

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Jason Soper
1100 Fredrick Ave, Room 307
St. Joseph, MO 64501

Reference Information

**USPS® ARTICLE NUMBER**

9414 7266 9904 2203 2951 65

Certified Mail Fee $

Return Receipt (Hardcopy) $

Return Receipt (Electronic) $

Certified Mail Restricted Delivery $

Postage $

Total Postage and Fees $

Sent to:
Mayer S. Klein (MO #32605)
231 South Bemiston Ave., Suite 1111
Clayton, Missouri 63105

Reference Information



**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6304 10

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ 8.72 |
| Total Postage and Fees | $ |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent to: City of St. Joseph, Missouri
Attn: Payroll
1100 Fredrick Ave
St. Joseph, MO 64501

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6304 58

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ 8.72 |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent to: Corporate Creations Network, Inc.
12747 Olive Boulevard, #300
St. Louis, MO 63141

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6304 96

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ 8.72 |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent to: Blaine Smith
700 W 47th St., Ste. 410
Kansas City, MO 64112

Reference Information

Nicholas Zluticky
(0772514.0056) -

PS Form 3800, Facsimile, July 2015

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6303 73

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ 8.72 |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent to: Spire Missouri, Inc.
700 Market St
St. Louis, MO 63101

Reference Information

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6304 34

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ 8.72 |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent t

**Joshua Kahane (TN #23726)**
**Aubrey B. Greer (TN #35613)**
**6000 Poplar Ave.,Suite 400**
**Memphis, TN 38119**

Reference Information

---

**U.S. Postal Service®**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

USPS® ARTICLE NUMBER
9414 7266 9904 2209 6304 72

| Certified Mail Fee | $ |
| Return Receipt (Hardcopy) | $ |
| Return Receipt (Electronic) | $ |
| Certified Mail Restricted Delivery | $ |
| Postage | $ |
| Total Postage and Fees | $ 8.72 |

WOWU KANSAS CITY MO
DEC 22 2023 Postmark Here

Sent to: Trigild, Inc.
4143 North Central Expressway,
Suite 775
Dallas, TX 75204

Reference Information